No. 24-10561

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GUARDIAN FLIGHT, L.L.C.; MED-TRANS CORPORATION,

*Plaintiffs-Appellants*

v.

HEALTH CARE SERVICE CORPORATION,

*Defendant-Appellee*

On Appeal from the United States District Court
for the Northern District of Texas, Hon. Jane J. Boyle
Case No. 3:23-cv-01861-B

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Adam T. Schramek
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard
Suite 1100
Austin, TX 78701
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Charlotte H. Taylor
  *Counsel of Record*
Alexa R. Baltes
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3872
ctaylor@jonesday.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10561, *Guardian Flight, LLC and Med-Trans Corporation v. Health Care Service Corporation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellant: **Guardian Flight, LLC**, is a wholly-owned subsidiary of Global Medical Response, Inc. through a holding company, Air Medical Group Holdings Company LLC.

2. Plaintiff-Appellant: **Med-Trans Corporation**, is a wholly-owned subsidiary of Global Medical Response, Inc. through a holding company, Air Medical Group Holdings Company LLC.

3. Defendant-Appellee: **Health Care Service Corporation**

The following law firms and counsel have participated in this case, either in the district court or on appeal:

| **Defendant-Appellee** | **Counsel** |
| --- | --- |
| Health Care Service Corporation | Raymond A. Cardozo<br>REED SMITH, L.L.P.<br>101 2nd Street<br>Suite 2000<br>San Francisco, CA 94105 |

Martin J. Bishop
Jason Mayer
REED SMITH, L.L.P.
10 S. Wacker Drive
40th Floor
Chicago, IL 60606-7507

| | |
|---|---|
| **Plaintiffs-Appellants** | **Counsel** |
| Guardian Flight, LLC & Med-Trans Corporation | Charlotte H. Taylor |
| | Alexa R. Baltes |
| | JONES DAY |
| | 51 Louisiana Ave. NW |
| | Washington, DC 20001 |
| | Adam T. Schramek |
| | NORTON ROSE FULBRIGHT US LLP |
| | 98 San Jacinto Boulevard |
| | Suite 1100 |
| | Austin, TX 78701 |
| | Abraham Chang |
| | Dewey Jude Gonsoulin, III |
| | NORTON ROSE FULBRIGHT US LLP |
| | 1550 Lamar St. |
| | Suite 2000 |
| | Houston, TX 77010-3095 |

Dated:  September 27, 2024

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor

*Counsel for Plaintiffs-Appellants*

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants respectfully request oral argument. This appeal involves important questions of first impression respecting the interpretation and application of the federal No Surprises Act, its amendments to the Employee Retirement Income Security Act, and its overall impact on payment relationships between emergency healthcare providers and insurers or health plans. Oral argument will aid the Court's decision-making process as to these issues.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ......................................................5

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF THE CASE................................................................6

    A.    The Providers Give Lifesaving Air Medical Transport. ......................6

    B.    Congress Passed the No Surprises Act to Efficiently and Conclusively Resolve Insurer-Provider Billing Disputes While Protecting Patients. ................................................................7

    C.    Procedural History...........................................................13

        1.    HCSC Refuses to Pay. ............................................13

        2.    The District Court Dismisses the Claims................................14

SUMMARY OF THE ARGUMENT ....................................................17

STANDARD OF REVIEW ..................................................................21

ARGUMENT ........................................................................................22

I.    THE PROVIDERS MAY SUE TO ENFORCE THEIR RIGHT TO PAYMENT FROM HCSC UNDER THE NSA.......................................................22

    A.    Congressional Intent Drives the Analysis. .........................................23

    B.    The NSA Gives Providers a Right to Payment. .................................28

    C.    The Text and Structure of the NSA Evince Congress's Intent for Providers to be Able to Enforce Their Right to Payment in Court. ................................................................30

          1.      Text ........................................................................31

          2.      Structure .................................................................37

     D.     The District Court's Analysis Was Mistaken......................38

II.    THE PROVIDERS HAVE DERIVATIVE STANDING TO ASSERT AN ERISA
CLAIM FOR IMPROPER DENIAL OF BENEFITS....................................44

III.   THE PROVIDERS STATED A QUANTUM-MERUIT CLAIM................................49

IV.   THE PROVIDERS SHOULD HAVE BEEN GIVEN LEAVE TO AMEND. .................51

CONCLUSION ........................................................................53

ADDENDUM OF STATUTORY PROVISIONS

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Acara v. Banks*,
470 F.3d 569 (5th Cir. 2006) ........................................................24, 28

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ...........................................................*passim*

*Arizona v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982) .............................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................................................49

*Booth v. Hume Publ'g, Inc.*,
902 F.2d 925 (11th Cir. 1990) ............................................35

*Brown v. Plata*,
563 U.S. 493 (2011) ..........................................................51

*California v. Sierra Club*,
451 U.S. 287 (1981) ......................................................26, 27

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ...........................................................*passim*

*Cent. Laborers' Pension Fund v. Heinz*,
541 U.S. 739 (2004) ..........................................................45

*Cheminova A/S v. Griffin L.L.C.*,
182 F. Supp. 2d 68 (D.D.C. 2002) .............................22, 35, 36

*Cort v. Ash*,
422 U.S. 66 (1975) ............................................................28

*Cox v. Cmty. Loans of Am. Inc.*,
   625 F. App'x 453 (11th Cir. 2015) ................................................. 27

*Doyle v. Liberty Life Assurance Co. of Bos.*,
   542 F.3d 1352 (11th Cir. 2008) .................................................. 47

*Gonzaga University v. Doe*,
   536 U.S. 273 (2002) .............................................................. 25, 26

*GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*,
   2023 WL 5815821 (D.N.J. Sept. 8, 2023) ....................................... 51

*Green Valley Special Util. Dist. v. City of Schertz*,
   969 F.3d 460 (5th Cir. 2020) ..................................................... 28

*Greene v. Sprint Commc'ns Co.*,
   340 F.3d 1047 (9th Cir. 2003) .................................................... 29

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
   552 U.S. 576 (2008) .............................................................. 42, 43

*HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.*,
   240 F.3d 982 (11th Cir. 2001) .................................................... 47

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
   599 U.S. 166 (2023) .............................................................. 24, 30

*Jack v. Evonik Corp.*,
   79 F.4th 547 (5th Cir. 2023) ..................................................... 51

*Kallen v. Dist. 1199, Nat'l Union of Hosp. & Health Care Emp.,
   RWDSU, AFL-CIO*,
   574 F.2d 723 (2d Cir. 1978) ...................................................... 34

*Koehler v. Aetna Health Inc.*,
   683 F.3d 182 (5th Cir. 2012) ...................................................... 7

*Lander Co. v. MMP Invs., Inc.*,
   107 F.3d 476 (7th Cir. 1997) ..................................................... 34

*Legacy Cmty. Health Servs., Inc. v. Smith*,
 881 F.3d 358 (5th Cir. 2018) .......................................................25, 29

*Local 3–689, Oil, Chem. & Atomic Int'l Union v. Martin Marietta*
 *Energy Sys. Inc.*,
 77 F.3d 131 (6th Cir. 1996) ...................................................................28

*Love v. DeltaAirlines*,
 310 F.3d 1347 (11th Cir. 2002) ............................................................25

*Lundeen v. Mineta*,
 291 F.3d 300 (5th Cir. 2002) ................................................................24

*Maine Cmty. Health Options v. United States*,
 590 U.S. 296 (2020) .................................................................31, 32, 43

*Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*,
 904 F.2d 236 (5th Cir. 1990) ..................................................................7

*MetroplexCore, L.L.C. v. Parsons Transp., Inc.*,
 743 F.3d 964 (5th Cir. 2014) ................................................................49

*Mitchell v. Blue Cross Blue Shield of N. Dakota*,
 953 F.3d 529 (8th Cir. 2020) .....................................................45, 47, 48

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
 781 F.3d 182 (5th Cir. 2015) .........................................................*passim*

*New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
 798 F.3d 125 (2d Cir. 2015) ..................................................................46

*New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
 980 F. Supp. 2d 527 (S.D.N.Y. 2013) ...................................................46

*Pee Dee Health Care, P.A. v. Sanford*,
 509 F.3d 204 (4th Cir. 2007) ...........................................................25, 29

*Photopaint Techs., LLC v. Smartlens Corp.*,
 335 F.3d 152 (2d Cir. 2003) ..................................................................42

*Planned Parenthood S. Atl. v. Kerr*,
    95 F.4th 152 (4th Cir. 2024) ............................................................26

*Qorvis Comm'cns, LLC v. Wilson*,
    549 F.3d 303 (4th Cir. 2008) ............................................................35

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ............................................................21

*Red Cross Line v. Atl. Fruit Co.*,
    264 U.S. 109 (1924)...........................................................................33

*Sambrano v. United Airlines, Inc.*,
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022)................27

*Specialty Healthcare Mgmt., Inc. v. St. Mary Par. Hosp.*,
    220 F.3d 650 (5th Cir. 2000) ............................................................34

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ..........................................................47

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..........................................................45, 46, 48

*Springer v. Cleveland Clinic Emp. Health Plan Total Care*,
    900 F.3d 284 (6th Cir. 2018) ......................................................46, 48

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024)......................................................................50

*Stokes v. Sw. Airlines*,
    887 F.3d 199 (5th Cir. 2018) ............................................................23

*Sverdrup Corp. v. WHC Constructors, Inc.*,
    989 F.2d 148 (4th Cir. 1993) ......................................................33, 42

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    110 F.4th 762 (5th Cir. 2024) .............................................................9

*Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*,
 659 S.W.3d 424 (Tex. 2023) ............................................50

*Thomas v. Union Carbide Agr. Prod. Co.*,
 473 U.S. 568 (1985)...........................................................41

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
 444 U.S. 11 (1979).......................................................35, 43

*Turkiye Halk Bankasi A.S. v. United States*,
 598 U.S. 264 (2023).....................................................37, 40

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus.
 & Serv. Workers Int'l Union, AFL-CIO/CLC v. Cookson Am., Inc.*,
 710 F.3d 470 (2d Cir. 2013) .............................................47

*Wright v. Allstate Ins. Co.*,
 500 F.3d 390 (5th Cir. 2007) ............................................28

*Wyandotte Transportation Co. v. United States*,
 389 U.S. 191 (1967).........................................................26

## STATUTES AND REGULATIONS

5 U.S.C. § 580...................................................................52

9 U.S.C. § 9.......................................................34, 42, 52

20 U.S.C. § 1232g.............................................................26

26 U.S.C. § 9816.................................................................9

26 U.S.C. § 9817.................................................................9

28 U.S.C. § 1291.................................................................5

28 U.S.C. § 1331.................................................................5

28 U.S.C. § 1332.................................................................5

29 U.S.C. § 1132 ........................................................................44

29 U.S.C. § 1185e ...................................................................9, 45

29 U.S.C. § 1185f ....................................................................9, 45

42 U.S.C. § 300gg-111 ..........................................................*passim*

42 U.S.C. § 300gg-112 ..........................................................*passim*

42 U.S.C. § 300gg-131 .........................................................12, 50

42 U.S.C. § 300gg-135 ...............................................................12

42 U.S.C. § 1396a ................................................................25, 26

42 U.S.C. § 2000d .....................................................................26

45 C.F.R. § 149.510 ..................................................................11

## OTHER AUTHORITIES

21 Williston on Contracts, *Arbitration Agreements at Common Law*
(4th ed.) ..............................................................................33

*Black's Law Dictionary* (11th ed. 2019) ...........................32, 42

Brief for Appellees, *Haller v. U.S. Dep't of Health & Hum. Servs.*,
No. 22-3054 (2d Cir. July 26, 2023) ...................................10

Brief of United States as Amicus Curiae, *Reach Air Medical Servs., v.
Kaiser Foundation Health Plan.*,
No. 24-10135 (11th Cir. Aug. 28, 2024) .........................12, 40

Restatement (Third) of Restitution and Unjust Enrichment (Am. L.
Inst. 2011) .........................................................................50

U.S. Centers for Medicare & Medicaid Services, *About Independent
Dispute Resolution* ..............................................................10

## INTRODUCTION

Congress passed the No Surprises Act ("NSA") to address "surprise" medical bills for out-of-network emergency care. When a commercially insured patient receives *in-network* care (meaning care from a provider that has a contract with the patient's insurer), the provider accepts the contracted rate from the insurer; and the patient pays only any deductible, co-pay, or co-insurance applicable under her policy. But when a commercially insured patient receives *out-of-network* care— which frequently happens in emergencies where the patient cannot choose the provider—there is no agreed-upon rate between insurer and provider, and the patient is ultimately responsible for the balance the insurer does not cover. Before the NSA, that sometimes resulted in patients receiving significant, unexpected medical bills. The NSA's solution to this problem is simple in concept: treat the care as if it were in-network. But to reach that end, Congress had to balance the interests of patients, providers, and insurers.

Congress started by spelling out the terms for patients: insurers must put them in the same position they would have occupied with in-network care. That means insurers cover the emergency services regardless of whether the provider is in-network, and patients pay only their same deductibles, co-pays, or co-insurance. *See* 42 U.S.C. §§ 300gg-111(a)(1), 300gg-112(a). Providers, for their part, cannot balance bill patients. But in return Congress gave providers a right to prompt and

1

fair payment from insurers via a reimbursement scheme that culminates in an independent dispute resolution ("IDR") process and a binding determination as to the rate for the services. Finally, insurers are protected by having a neutral IDR entity decide the rate while taking into consideration, among other factors, the in-network rates the insurer has negotiated with other providers.

The NSA's carefully calibrated system is thus like a three-legged stool—it stays upright when patients, providers, and insurers all play their assigned parts. This appeal concerns what happens when one party—the insurer—pulls out a leg.

The case originated with 33 emergency air-ambulance transports by Plaintiffs-Appellants Guardian Flight, LLC and Med-Trans Corporation ("the Providers") of patients covered by health plans insured and/or administered by divisions of Defendant-Appellee Health Care Service Corporation ("HCSC"). The Providers are not in-network with HCSC, so the transports in question were subject to the NSA. The parties went through the NSA reimbursement process, which begins with the insurer making (or denying) payment on the out-of-network provider's claim. If the provider is not satisfied with the initial payment—as happened here—the parties proceed to negotiations. If negotiations fail—as again happened here—the NSA channels the parties to IDR. The IDR process is efficient: Both parties submit simultaneous, blind offers to the IDR entity tasked with reviewing the dispute. The IDR entity then chooses one bid; its determination is the total rate for the service.

For all 33 transports at issue, the IDR entity determined that HCSC underpaid for the Providers' services and thus that additional payments were due.

At that point, one would assume, HCSC should have paid the Providers. And indeed, the NSA so specifies. Specifically, the NSA states that "a determination of a certified IDR entity" "shall be binding upon the parties involved." *Id.* § 300gg-111(c)(5)(E)(i)(I); *see also id.* § 300gg-112(b)(5)(D). And it further states that payment determined by that award "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* §§ 300gg-111(c)(6), 300gg-112(b)(6). But despite its legal obligation to pay the Providers the additional amounts within 30 days, HCSC failed to do so. And now HCSC claims there is nothing the Providers (or, for that matter, HCSC plan participants) can do about it.

Astonishingly, the district court agreed. As most relevant, the Providers asserted claims under the NSA and the Employee Retirement Income Security Act ("ERISA"). The district court held that (1) the NSA does not provide a private right of action for providers to enforce their right to payment from insurers, and (2) patients (in whose shoes the Providers stand) are not injured by an insurer's failure to pay and therefore lack standing to pursue an ERISA claim. The NSA and common sense plainly demand different answers on both issues.

3

First, the NSA provides a private right of action.  The provisions directing payment within 30 days and expressly stating that IDR determinations are "binding" make clear Congress's intent to grant providers a right to payment and the ability to enforce that right in court.  As courts have long held, it would be pointless to have a system that results in a binding award if the award were not also enforceable in court. That is especially so considering that the NSA does not expressly provide for any alternative enforcement mechanism and that the intertwined goals of the NSA depend on fair and prompt payment from insurers to providers.

Second, beneficiaries of the plans at issue are injured by HCSC's failure to pay the Providers and therefore have standing (assigned to the Providers) to pursue an improper-denial-of-benefits claim under ERISA.  The provision directing insurers to cover out-of-network care as if it were in-network is incorporated into ERISA directly.  That means coverage of out-of-network emergency care is a benefit included in every ERISA plan that covers in-network emergency care, including the plans at issue here.  HCSC's failure to satisfy its coverage obligation is thus a denial of a bargained-for benefit and an injury to plan participants.  That is true, as this Court and many others have held, even without *financial* consequences to plan participants.  Because plan participants would have standing to bring their ERISA claim, the Providers have standing to bring that claim here.

This is not a difficult case. Either Congress intended its detailed and innovative NSA IDR scheme to have legal force or it did not. Either an injury sufficient for constitutional standing that has already been recognized by this Court and others continues to be recognized or not. Both answers are plain. But even were it otherwise, it would still have been within the district court's equitable power to order HCSC to pay the Providers to avoid twisting the NSA into a tool to facilitate unjust enrichment. The district court's decision cannot stand. If it does, the NSA may fall.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1332. On May 30, 2024, the district court ordered that the claims against HCSC be dismissed under Rules 12(b)(1) and 12(b)(6) and entered final judgment. ROA.117–118. The Providers appealed on June 21, 2024. ROA.119. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.** Whether Congress provided a private right of action that allows Providers to enforce their right to payment of IDR awards in court, or whether Congress instead designed an elaborate and targeted dispute-resolution system that has no legal effect.

**II.** Whether plan participants are injured by HCSC's failure to cover out-of-network emergency care as provided in their ERISA plans and therefore have

standing (passed to their Provider-assignees) to pursue an improper-denial-of-benefits claim.

**III.** Whether the Providers stated a claim for quantum meruit or unjust enrichment where HCSC keeps, and continues to profit from, the money necessary to pay for emergency care for the beneficiaries.

**IV.** Whether the district court should have at least allowed the Providers leave to amend their complaint.

## STATEMENT OF THE CASE

### A.    The Providers Give Lifesaving Air Medical Transport.

The Providers provide life-saving emergency air-ambulance services to critically ill and injured patients across the country.  ROA.7 ¶ 7.  Air-ambulance providers ensure that individuals suffering from emergencies like trauma, stroke, heart attack, and burns can quickly access life-saving treatment.  ROA.7 ¶ 7.  Without air ambulances, over 85 million Americans would not be able to reach a Level 1 or 2 trauma center within an hour.  ROA.7 ¶ 7.  Air-ambulance services require significant investment in specialized aircraft, air bases, technology, personnel, and regulatory-compliance systems.  ROA.7 ¶ 7.

**B. Congress Passed the No Surprises Act to Efficiently and Conclusively Resolve Insurer-Provider Billing Disputes While Protecting Patients.**

As a general matter—and outside the context of the NSA—a provider has a right to payment from a patient, and a patient's insurer or health plan then assumes, by contract, the obligation to pay for some of the patient's medical care. *See, e.g.*, *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 246 (5th Cir. 1990) (discussing patient's "obligat[ion] to pay for the medical services received"); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 339 n.7 (1982) (discussing insurer's assumption of payment obligation). Insurers typically establish a "network" of providers with whom they have contracts to pay agreed-upon rates. When patients receive treatment from in-network providers, the provider accepts the contracted rate as payment in full, and the patient is responsible for paying only a limited share—any applicable deductible, copayment, or coinsurance. *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 187 (5th Cir. 2015). By contrast, when patients receive care from out-of-network providers—providers without a contracted rate with the insurer—the insurer can pay whatever amount the plan or policy covers, and the provider is free to bill the patient for the balance. *Id.*; *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 185 (5th Cir. 2012). If a plan or insurer underpays for out-of-network care, the provider may bring any number of state-law

claims to recover what it is due.  And the provider can ultimately balance bill the patient for any unpaid amount.[1]

The NSA transformed this system for most commercial health plans.  Instead of letting insurers opt out of paying and leaving patients with large balances, the NSA creates a direct payment obligation to out-of-network providers.[2]

To accomplish this, the NSA first requires insurers to cover patients' out-of-network emergency services as if they were in-network emergency services.  *See* 42 U.S.C. § 300gg-111(a)(1) ("Coverage Provision"); *id.* § 300gg-112(a) (requiring coverage for air transports).[3]  In a provision titled "coverage of emergency services,"

---

[1] Large employers typically "self-fund" their health plans rather than purchase actual insurance.  But they nevertheless contract with insurers to administer their health plans, including paying claims and resolving payment disputes.  Employer-funded health plans also obtain access to the health insurer's network of providers.  The insurers execute managed care agreements with network providers, meaning the insurer has the direct, contractual payment obligation to network providers for both insured and self-funded plans.

[2] The NSA refers to "group health plans" and "health insurance issuers."  *E.g.*, 42 U.S.C. § 300gg-111(a)(1).  For simplicity, this brief uses the term "insurers" for both except where the distinction is relevant.

[3] The NSA is comprised of two relevant parts, one applicable to emergency room facilities and providers and the other to air-ambulance providers.  The two parts are substantially similar and cross-reference one another.  *See* 42 U.S.C. § 300gg-111; *id.* § 300gg-112.

The relevant provisions of the NSA occur in triplicate in the United States Code, because the Act amended three statutes: the Public Health Service Act, ERISA, and the Internal Revenue Code.  This brief mainly cites to the provisions in the Public Health Service Act, codified at Title 42 of the U.S. Code.  The parallel

the NSA states that "[i]f a group health plan … provides or covers any benefits with respect to … emergency services … the plan … shall cover emergency services … whether the health care provider furnishing such services is a participating provider." *Id.* § 300gg-111(a)(1)(B); *see id.* § 300gg-112(a) (discussing coverage of services by a "nonparticipating provider"). In other words, the NSA includes a coverage mandate that *requires* plans and policies to include coverage for out-of-network emergency care as one of the benefits they provide to beneficiaries.

In furtherance of this mandate, the statute requires insurers to make "an initial payment or notice of denial of payment" to those out-of-network providers "not later than 30 calendar days" after the provider sends a bill. 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I); *id* § 300gg-112(a)(3)(A). But that initial payment is not necessarily the "total plan or coverage payment" that the insurer is required to pay. *Id.* § 300gg-111(a)(1)(C)(iv)(II); *id.* § 300gg-112(a)(3)(B). Because out-of-network providers, by definition, do not have contracts with insurers setting forth agreed-upon rates, the statute provides a detailed process for determining the "out-of-network rate," which ultimately dictates the amount insurers must pay providers. 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II); *id* § 300gg-112(a)(3)(B); *see Texas Med. Ass'n*

---

provisions are codified at 29 U.S.C. §§ 1185e, 1185f (ERISA) and 26 U.S.C. §§ 9816, 9817 (Internal Revenue Code).

*v. United States Dep't of Health & Hum. Servs.*, 110 F.4th 762, 768–69 (5th Cir. 2024) (discussing the statutory process).

If a provider is unsatisfied with the initial payment from an insurer, it may initiate a 30-day open-negotiation period to determine the out-of-network rate. *Id.* §§ 300gg-111(c)(1)(A), 300gg-112(b)(1)(A). And if negotiations fail, either party may "initiate the independent dispute resolution ["IDR"] process"—an abbreviated, arbitration-like system—for a final determination of the "total plan or coverage payment" due. *Id.* §§ 300gg-111(c)(1)(B), 300gg-112(b)(1)(B); *see id.* §§ 300gg-111(a)(1)(C)(iv)(II), 300gg-112(a)(3)(B).[4] The IDR process is mandatory once initiated. *See* Brief for Appellees at 25, *Haller v. U.S. Dep't of Health & Hum. Servs.*, No. 22-3054 (2d Cir. July 26, 2023).

The IDR process "is managed by" the Departments of Treasury, Labor, and Health and Human Services. U.S. Centers for Medicare & Medicaid Services, *About Independent Dispute Resolution*, https://perma.cc/F2H9-SRGN. But the NSA scheme depends on private firms known as "IDR entities" to resolve these out-of-

---

[4] As a technical matter, the IDR process determines the total "out-of-network rate" due to a provider. 42 U.S.C. § 300gg-111(a)(3)(K). The NSA derives from that figure the "total plan or coverage payment" that the insurer must pay the provider by subtracting any "cost-sharing" obligation of the patient. *Id.* § 300gg-111(a)(1)(C)(iv)(II). Accordingly, upon issuance of the IDR determination (sometimes referred to by the parties as an "award"), the insurer owes the "total plan or coverage payment" minus any amount it has already paid. *Id.*; *see id.* § 300gg-111(c)(6).

network payment disputes. These firms apply to the Departments for five-year certifications. *See* 42 U.S.C. § 300gg-111(c)(4)(A)–(B); *id.* § 300gg-112(b)(4)(A); 45 C.F.R. § 149.510(c)(1)(ii), (e)(1)–(2). Among other qualifications, they must have sufficient medical and legal expertise. *See* 42 U.S.C. § 300gg-111(c)(4)(A)(i). The IDR process is done "baseball-style": both parties offer a payment amount, and the IDR entity selects one offer based on specified statutory factors. *Id.* §§ 300gg-111(c)(5)(A)–(C); *id.* § 300gg-112(b)(5)(A)–(C). These factors include the insurer's "qualified payment amount"—essentially the insurer's median in-network rate for the same services—as well as such considerations as the nature and quality of the care provided. *See Id.* §§ 300gg-111(a)(3)(E)(i), 300gg-112(b)(5)(C).

The NSA plainly sets forth the "[e]ffects of [an IDR] determination." *Id.* § 300gg-111(c)(5)(E); *see id.* § 300gg-112(b)(5)(D). It states that a "determination of a certified IDR entity …"

> (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and

> (II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

*Id.* § 300gg-111(c)(5)(E)(i) ("Effects of Determination Provision"). In other words, absent fraud, misrepresentation, or a reason for vacatur set forth in the cross-referenced Section 10(a) of the Federal Arbitration Act ("FAA"), the IDR determination is the final, binding authority setting the "plan or coverage" amount

that insurers must pay to providers. *Id.*; *see id.* §§ 300gg-111(a)(1)(C)(vi)(II), 300gg-112(a)(3)(B). And the statute demands that payments "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* § 300gg-111(c)(6) ("Timing of Payment Provision"); *see id.* § 300gg-112(b)(6).

From the patient's perspective, the system functions as if the provider is in-network with the insurer. Under the NSA, patients satisfy their "cost-sharing requirement"—*i.e.*, copayment, coinsurance, or deductible—as they would with any in-network provider covered by their plan. *See id.* §§ 300gg-111(a)(1)(C)(ii), 300gg-112(a)(1). And out-of-network providers are prohibited from "balance billing" the patient for the remainder. *See id.* §§ 300gg-131, 300gg-135. But the system could not offer these benefits to patients if it did not also guarantee fair, prompt, and enforceable payment from insurers to out-of-network emergency providers (including air-ambulance providers). That payment guarantee ensures an equitable and sustainable system. *See* Brief of United States as Amicus Curiae at 6, *Reach Air Medical Servs., v. Kaiser Foundation Health Plan.*, No. 24-10135 (11th Cir. Aug. 28, 2024) (explaining that NSA provisions "that allow the provider to seek further compensation from the patient's health plan" "further Congress's goal" of protecting patients).

## C.   Procedural History

### 1.   HCSC Refuses to Pay.

This appeal arises from 33 air-ambulance transports completed by the Providers on behalf of patients covered by health plans insured and/or administered by one or more divisions of HCSC, operating under the Blue Cross and Blue Shield brand.  ROA.8 ¶ 12; ROA.14.  Each of the transported patients assigned to the Providers their plan benefits.  ROA.8 ¶ 12.  The Providers are out-of-network with HCSC in the relevant states.  ROA.5 ¶ 1.

For each transport, HCSC made an initial payment on the claim, and the Providers sought additional payment.  ROA.7–8 ¶¶ 9–12.  The parties' negotiations over the proper out-of-network rate failed, and the claims proceeded to IDR.  ROA.7–8 ¶¶ 9–11.  Every IDR determination at issue resulted in a binding award requiring additional payment from HCSC to the Providers.  ROA.8 ¶ 11.  But despite its legal obligation to pay the additional amounts owed to the Providers within 30 days, HCSC failed to do so.  ROA.9 ¶ 16.

The Providers were thus forced to file suit to recover what, at the time of filing, amounted to nearly $1 million in payments owed, as well as interest and attorneys' fees as provided by law.  ROA.12 ¶ 30; ROA.14.  First, the Providers argued that HCSC's refusal to timely pay the IDR-determined amounts owed violated HCSC's obligation to make full payment on the transports (and the

Providers' corresponding right to receive payment) within 30 days of the IDR determination. ROA.9 ¶¶ 15–17. Second, because the transported patients assigned to the Providers their benefits under their health plans, and because the NSA makes payment of out-of-network air-ambulance providers a benefit included in all ERISA plans providing coverage for emergency services, the Providers brought an ERISA claim for improper denial of benefits based on HCSC's failure to pay the IDR awards. ROA.9–11 ¶¶18–23. Third, the Providers brought a claim for unjust enrichment, arguing that HCSC received the benefit both of air-ambulance transports for its beneficiaries and of improperly retained funds after the NSA's 30-day payment window, all at the Providers' expense. ROA.11–12 ¶¶ 24–29.

HCSC moved to dismiss, generally arguing that the Providers (1) lack a private right of action to enforce IDR determinations under the NSA; (2) lack standing to assert an ERISA benefits claim; and (3) failed to state a claim for unjust enrichment because they did not provide services that benefited HCSC. ROA.42–43. The Providers opposed the motion and in the alternative requested leave to amend. ROA.81.

## 2. The District Court Dismisses the Claims.

The district court agreed with HCSC on all three claims.

*First*, the court dismissed the NSA claim because, it said, "the NSA does not confer a private cause of action to enforce an IDR award and convert that award to

14

a final judgment." ROA.105. In the court's view, the NSA is devoid of express language giving courts the authority to enforce IDR awards, and the Providers therefore have to overcome a presumption that Congress did not intend to create a private right of action. ROA.106. The court then purported to look to the text of the NSA to determine whether Congress intended to create private right and a private remedy. ROA.106. At the outset, the court acknowledged that the NSA "created a right" for the Providers to payment of IDR awards from insurers. ROA.107; *see* ROA.109. But in its view, "[t]here is no language in the NSA establishing that Congress intended to create a remedy for out-of-network providers"—that is, no language indicating "a procedural mechanism for Plaintiffs to enforce their IDR awards in federal court." ROA.107.

Curiously, in reaching that conclusion, the court did not consider the NSA language relied on by the Providers—the Timing of Payment Provision and the Effects of Determination Provision, *supra* 11–12—except to assert in conclusory fashion that those provisions "do not suggest that Congress intended to create a procedural mechanism for providers to convert IDR awards to final judgments." ROA.109. Instead, the court focused on the NSA's lack of precise procedures or direct reference to "the FAA provision that enables parties to confirm arbitration awards." ROA.107–108. Because Congress "could have incorporated" such a provision but "did not do so," the district court "interpret[ed] this omission in the

15

NSA to mean that Congress did not intend to create a remedy under the NSA." ROA.108. In addition, the court noted that the NSA "forbid[s] judicial review" except to vacate IDR determinations on four grounds not relevant here, which, it said, "strongly suggests" that Congress did not intend a private right of action to enforce IDR awards. ROA.108. Finally, the court brushed aside as irrelevant "policy arguments" the Providers' contentions that the ability to enforce IDR determinations in court would fatally undermine the NSA. ROA.109.

*Second*, the court concluded that the Providers lack standing to bring their ERISA improper-denial-of-benefits claim "assert[ing] the rights of some of HCSC's beneficiaries." ROA.110–112. As an initial matter, the court acknowledged that the Providers "received valid assignments from the beneficiaries." ROA.111. Thus, to establish standing, the Providers needed to "show that the beneficiaries would have had standing to bring" the claim. ROA.111. The court held that the beneficiaries would not have standing because they "suffered no concrete injury" as a result of HCSC's failure to pay the Providers. ROA.111. According to the court, the beneficiaries "incur no financial injury" because, per the NSA, the beneficiaries "are no longer financially responsible for balance billing," and the Providers "fail[ed] to assert any other non-financial injury" to the beneficiaries. ROA.111.

*Third*, the court concluded that the Providers failed to state a claim for unjust enrichment—or as it recharacterized the claim, quantum meruit—because they did not provide a direct benefit or service to HCSC. ROA.112–115.

Having dismissed all of the Providers' claims, the court further held that the Providers should not be given the customary leave to amend their complaint because, in the court's view, doing so would be futile. ROA.115–117. The court therefore dismissed the Providers' complaint with prejudice and without leave to amend.[5] ROA.116–117. The court entered final judgment the same day. ROA.118. The Providers timely appealed. ROA.119.

## SUMMARY OF THE ARGUMENT

**I.** When Congress creates a dispute-resolution system that results in a binding award, the award is enforceable in court. Analysis of the NSA confirms what is plainly and customarily true: The NSA grants Providers a private right of action to enforce their IDR-determined right to payment from insurers.

**A.** Statutory intent determines whether plaintiffs have a private right of action. Thus, courts look to statutory text and structure to determine whether Congress intended to grant a plaintiff both a private right and a remedy. A statute demonstrates Congress's intent to create a private right when it uses language that benefits a

---

[5] The court dismissed the ERISA claim without prejudice, as its decision was jurisdictional, but nevertheless denied leave to amend as futile. ROA.116–117.

particular class of individuals (as opposed to framing the statute as a general prohibition or command). Rights-creating language is a critical part of the private-right-of-action analysis. Without it, courts are reluctant to imply private rights of action. With it, reluctance dissipates—especially if (1) there are additional indications that Congress intended that right would be enforceable in court and (2) no alternative remedial scheme is set forth for its enforcement.

**B.** The NSA uses rights-creating language to give providers a right to payment. The Timing of Payment Provision requires that payment shall be made directly *to the provider.* This is precisely the kind of language that courts have found to establish a private right. And the "binding" language in the Effects of Determination Provision reinforces that conclusion.

**C.** The NSA also demonstrates Congress's intent to create a remedy for Providers—that is, intent that Providers be able to enforce their rights in court. Starting with the NSA's text, the Timing of Payment Provision and the Effects of Determination Provision both independently indicate that Congress intended to create a remedy for providers. First, the Timing of Payment Provision uses shall-pay language, which, in an analogous context, the Supreme Court has said reflects an intent to create both a right and a remedy. Second, the Effects of Determination Provision makes IDR awards "binding." The plain meaning of the term "binding" means that the thing in question has legal force. Indeed, courts and commentators

have long concluded as much in the context of binding arbitration awards arising from arbitration agreements. The relationship between a binding award and its enforceability in court is so well established that an agreement to "binding" arbitration is viewed as an agreement to judicial enforcement of an award resulting therefrom. Here, by expressly making IDR determinations "binding" under the NSA, Congress drew on this baseline understanding of the term and demonstrated clear intent for IDR determinations to be enforceable in court.

Next, the structure of the NSA reinforces Congress's intent to provide a judicial remedy to providers who have been denied their right to payment. First, the statute provides no alternative enforcement mechanism for providers to recover their right to payment. Second, and relatedly, the overarching structure of the NSA scheme depends on a functioning IDR process, the culmination of which is payment from an insurer to the provider of the amount determined by the IDR entity. If there is no way to give legal effect to that process, the whole scheme comes crashing down.

**D.** The district court's NSA analysis was mistaken. First, the district court erroneously applied a strong presumption against a private right of action even after concluding that the NSA creates a right to payment for providers. The court's overall framing thus applied a presumption that was contrary to the plain meaning of statutory language. Second, the court turned a blind eye to the relevant statutory text—*i.e.*, the Timing of Payment Provision and the Effects of Determination

Provision. Third, the district court wrongly ignored the centrality of the IDR system to the overall statutory structure and instead dismissed as mere policy concerns the consequences of not allowing providers to enforce their IDR awards in court. Finally, the court drew flawed textual inferences that it claimed demonstrated Congress's intent not to create a private remedy. The fact that judicial review is limited to certain challenges to IDR awards under Subsection (II) of the Effects Determination Provision says nothing about intent regarding judicial enforcement of IDR awards under Subsection (I). And the fact that the NSA does not specifically incorporate other enforcement mechanisms is no evidence that Congress did not intend to create one here.

**II.** The Providers have derivative standing to pursue an ERISA improper-denial-of-benefits claim because the beneficiaries who validly assigned their rights to the Providers would have standing to pursue that claim. The NSA, directly incorporated into ERISA, created a coverage mandate that requires health plans to cover out-of-network emergency care as if it were in-network. That coverage mandate becomes a plan term and a benefit to plan participants. HCSC's failure to cover that care by paying the Providers the NSA's rate thus denies the beneficiaries a plan benefit to which they are contractually entitled—an injury sufficient to establish constitutional standing.

The district court wrongly concluded that because HCSC's failure to pay creates no financial risk for the beneficiaries (due to the ban on balance billing), the beneficiaries are not injured by the failure to pay. But every circuit to have considered the issue—including this one—disagrees. Financial injury is not required. Denial of a bargained-for benefit to which a participant is contractually entitled is sufficient.

**III.** The Providers stated a claim for quantum meruit (or unjust enrichment). This is an equitable theory of recovery. HCSC received a benefit when the Providers served its beneficiaries and it continues to profit by withholding payment. Moreover, when the NSA transferred the ultimate payment obligation from patients to insurers, it effectively designated the insurer as the party to rectify unjust enrichment. It is within courts' equitable powers to require that they do so.

**IV.** At a minimum, the district court should have granted the Providers leave to amend their complaint rather than close and lock the door on effectuating a key aspect of Congress's scheme—prompt and fair payment for providers.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal of a claim on the merits under Federal Rule of Civil Procedure 12(b)(6) and dismissal for lack of jurisdiction under Rule 12(b)(1), applying the same standards used by the district court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

# ARGUMENT

The district court erred in dismissing each of the Providers' claims. First, the NSA gives providers a private right of action to enforce in court their explicit, IDR-determined right to payment. Second, because the beneficiaries were injured by HCSC's failure to provide a plan benefit to which they are contractually entitled (*i.e.*, coverage of out-of-network emergency care), they would have standing to pursue an improper-denial-of-benefits claim under ERISA—so their assignees, the Providers, do too. Third, the Providers stated a claim for quantum meruit or unjust enrichment. Finally, the Providers should have at least been given the customary chance to amend their complaint to raise additional theories of recovery on these facts. The district court's contrary conclusions have no grounding in statutory text, common law, or common sense.

## I. THE PROVIDERS MAY SUE TO ENFORCE THEIR RIGHT TO PAYMENT FROM HCSC UNDER THE NSA.

When Congress crafts a statutory alternative-dispute-resolution process that results in a binding award, that award is enforceable in court. Indeed, the Providers are aware of no statute in which Congress has created a scheme where such an award is not enforceable in court. *See, e.g.*, *Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68, 73–74 (D.D.C. 2002) (explaining that "absent a plain indication to the contrary" courts "must assume" that Congress intends a statutory scheme "to fit within existing arbitration law" that says "use of … terms" like "binding" means

22

"that an award will be enforceable in court"). The NSA's IDR scheme—which results in "binding" IDR determinations—should be treated no differently. IDR entities do not undertake the work of determining the appropriate "out-of-network rate" as an abstract academic exercise. The sole purpose of the IDR process is to determine what payment amount insurers owe providers and to make sure they pay promptly. And the Court's analysis could end there.

The district court's analysis missed the forest for the trees and ignored that straightforward conclusion. Worse, even the district court's more granular analysis ignored multiple clear textual and contextual indications of what should be obvious: Congress designed NSA IDR to have legal effect. It gives providers a right to payment from insurers, and it demonstrates Congress's clear intent that the right be enforceable in court.

### A. Congressional Intent Drives the Analysis.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). In evaluating whether Congress created a private right of action to enforce federal law, "[s]tatutory intent … is determinative." *Id.*; *see Stokes v. Sw. Airlines*, 887 F.3d 199, 202 (5th Cir. 2018). And the best indication of statutory intent is statutory "text and structure." *Sandoval*, 532 U.S. at 288. That means that when Congress speaks, its plain meaning controls, *id.* at 286; when Congress is silent, "the presumption" is that "Congress did not

intend to create a private cause of action," *see Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006); *see Sandoval*, 532 U.S. at 288 ("context shorn of text" does not give rise to an implication that Congress intended a private right of action); and when Congress speaks without crystal clarity, "legal context" may be useful "to the extent it clarifies text" and thereby gives effect to Congress's intent, *Sandoval*, 532 U.S. at 288.

Statutory intent to create a private right of action means intent to create both "a private right" and "a private remedy." *Id.* at 286. In this context, a "private remedy" is the ability to enforce a particular right in court. *Id.* at 289. Often, the battleground in cases addressing whether a statute provides a private right of action is the "private right" question, and the answer usually depends on whether "Congress intended to benefit" a particular class or whether instead Congress "framed the statute simply as a general prohibition or a command" to a regulated party. *Lundeen v. Mineta*, 291 F.3d 300, 311 (5th Cir. 2002); *see also Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (explaining, in the parallel context of § 1983-enforceable rights, that courts use "traditional tools of statutory construction to assess whether Congress has unambiguously conferred individual rights upon a class of beneficiaries to which the plaintiff belongs" or whether Congress "merely" intended those individuals to "fall within the general zone of

interest that the statute is intended to protect." (citations and quotations omitted))[6];

*Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979) ("Not surprisingly, the right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action."); *Love v. DeltaAirlines*, 310 F.3d 1347, 1352–53 (11th Cir. 2002) (similar).

Congress intends to benefit a particular class, and thereby create a private right, when a statute is phrased "with an unmistakable focus on the benefited class," *Cannon*, 441 U.S. at 691; *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). For example, rights-creating language is present in a statute that says "the State plan shall provide for payment for services *furnished by a Federally-qualified health center*." *See Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 371–72 (5th Cir. 2018), as revised (Feb. 1, 2018) (cleaned up) (emphases added) (discussing 42 U.S.C. § 1396a(bb)(1) and the similarly phrased § 1396a(bb)(5)(A)); *Pee Dee*

---

[6] *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002), and its progeny address "whether a statutory violation may be enforced through § 1983." "[I]n one meaningful respect," the analysis in that context completely "overlap[s]" with the inquiry involved in determining whether Congress intended a private right of action—"in either case [courts] must first determine whether Congress *intended to create a federal right*." *Id.* In other words, in the *Gonzaga* context, courts ask whether a statute contains "rights-creating terms," and if it does, § 1983 provides the remedy. *Id.* at 284. In the private-right-of-action context, courts ask whether the statute contains "rights-creating terms," and if it does, courts then ask whether the statute also provides a remedy. *Id.* Accordingly, the Providers rely here on some precedents from the *Gonzaga*/§ 1983 context.

*Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007) (same). Rights-creating language is present in a statute that says a state plan for medical assistance "must ... provide that … *any individual*" may choose his medical provider. *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 165 (4th Cir. 2024) (emphasis in original) (discussing 42 U.S.C. §1396a(a)(23)). And rights-creating language is present in a statute that says "*no person* … shall … be subjected to discrimination." *Sandoval*, 532 U.S. at 288 (emphasis added) (discussing 42 U.S.C. § 2000d). Congress uses different language when it intends to "benefit the public at large"—for example, it uses language like "[i]t shall not be lawful [to obstruct navigable waterways]," *Cannon*, 441 U.S. at 690–92 & n.13 (citing the discussion of 33 U.S.C. § 409 in *Wyandotte Transportation Co. v. United States*, 389 U.S. 191 (1967) as well as other duty-creating statutes), or "no funds shall be made available to [certain educational institutions]," *Gonzaga*, 536 U.S. at 287 (discussing 20 U.S.C. § 1232g(b)(1)).

The Supreme Court has been increasingly clear that courts should be "especially reluctant to imply causes of actions under statutes that create duties on the part of persons for the benefit of the public at large." *Cannon*, 441 U.S. at 692 n.13; *see Sandoval*, 532 U.S. at 287 (noting the shift). Put differently, statutes that focus exclusively "on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class." *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Thus,

for example, an individual injured by an obstructed waterway may not be able to sue to enforce the general prohibition on obstructing waterways, just a victim of a crime cannot sue to enforce a criminal statute. *See California*, 451 U.S. at 294.

By contrast, when a statute "provides for private rights" by focusing on particular individuals, courts are "decidedly receptive" to the notion that Congress also intended to provide a means of enforcing that right. *See Sambrano v. United Airlines, Inc*., No. 21-11159, 2022 WL 486610, at *4 (5th Cir. Feb. 17, 2022) (quoting *Cannon*, 441 U.S. at 703); *see also, e.g.*, *Cox v. Cmty. Loans of Am. Inc*., 625 F. App'x 453, 457 (11th Cir. 2015). To be clear, the existence of a private right does not necessarily dictate the existence of a remedy—for example, the inclusion of a remedial scheme in a statute may "suggest that Congress intended to preclude others," and, in rarer circumstances, may "overbear other evidence of congressional intent" to create a private right to enforce a statutory provision. *Sandoval*, 532 U.S. at 290–91. But "'rights-creating' language" is nevertheless "critical" to the overall inquiry and should dispel any reluctance to finding a private right of action where there is other textual and structural evidence of congressional intent to create one. *Id.* at 288 (citing *Cannon*, 441 U.S. at 690 n.13); *see Sambrano*, 2022 WL 486610, at *4 n.9.

In sum, a proper private-right-of-action analysis boils down to congressional intent. Courts look to text and structure—and, where appropriate, statutory

context—to determine intent. As a practical matter, where a statute lacks rights-creating language or includes clear evidence that Congress did not envision a private remedy (like an alternative enforcement mechanism), courts may find that Congress did not intended to create a private right of action. If, however, Congress intends for private parties to enforce their rights in court—which is often the case when Congress creates a right and provides no other enforcement mechanism for that right—courts must give effect to Congress's intent.[7]

### B. The NSA Gives Providers a Right to Payment.

The NSA grants providers a right to payment. At a high level, air-ambulance providers are plainly a group for whose benefit the NSA was created. *See supra* Statement of the Case Part B (discussing the NSA's creation of a process that

---

[7] This analysis dovetails with the four-factor test set forth in *Cort v. Ash*, 422 U.S. 66, 78 (1975): (1) "is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff?"; (2) "is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?" (3) "is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?"; (4) "is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Id.* (cleaned up). Today, "emphasis" is given to the second factor, *see Acara*, 470 F.3d at 571 n.1, "[n]o matter how the cause-of-action inquiry proceeds—explicitly or implicitly," *see Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 498 (5th Cir. 2020) (Oldham, J., concurring). But given that all of the *Cort* factors are "simply tools to divine the intent of Congress in the event of statutory silence," *Local 3–689, Oil, Chem. & Atomic Int'l Union v. Martin Marietta Energy Sys. Inc.*, 77 F.3d 131, 134 (6th Cir. 1996), they all continue to be helpful to the extent they do so, *see, e.g.*, *Wright v. Allstate Ins. Co.*, 500 F.3d 390, 395 (5th Cir. 2007).

facilitates fair and prompt payment to providers); 42 U.S.C. § 300gg-112 (extending the NSA to air ambulance bills). And the particular provisions at issue here unambiguously demonstrate a right to payment conferred on providers by the NSA.

First, the statute's Timing of Payment Provision explicitly requires that payment "shall be made directly *to the nonparticipating provider* not later than 30 days after the date on which such determination is made." 42 U.S.C. § 300gg-112(b)(6) (emphasis added); *see also id.* § 300gg-111(c)(6). This is precisely the kind of rights-creating language that evidences Congress's intent to grant providers a private right. *See supra* 24–27. Indeed, this Court recently held that similar language—providing that state plans "shall provide for payment to the center or clinic" and "shall provide for payment for services … furnished by [certain categories of providers]"—"seems to be rights-creating because it is mandatory and has a clear focus on the benefitted [providers]." *Legacy Cmty. Health Servs.*, 881 F.3d at 371–72 (cleaned up; quotation omitted); *see Pee Dee Health Care*, 509 F.3d at 212 (analyzing the same provision and concluding that it "contains rights-recreating language because it specifically designates the beneficiaries—the [providers]—and it mandates action on the part of the states"); *cf. Greene v. Sprint Commc'ns Co.*, 340 F.3d 1047, 1050–51 (9th Cir. 2003) (explaining that a particular provision of the FCC "does not establish a right … to compensation by IXCs" because "[t]he statute does not say," for example, "IXCs shall pay PSPs").

Moreover, Subsection (I) of the Effects of Determination Provision makes the IDR award determining what insurers must pay to providers "*binding* upon the *parties* involved." 42 U.S.C § 300gg-111(c)(5)(E)(i)(I) (emphases added); *see also id.* § 300gg-112(b)(5)(D). By speaking to and binding both parties—the provider and the insurer—Congress reiterated its focus on benefiting providers. *See Talevski*, 599 U.S. at 185 (explaining that the party benefited need not be the only party that is the focus of the statute). And by making the award "binding" on the parties and therefore enforceable, *see infra* I.C, the provision both reiterates the mandatory nature of the insurers' payment obligation and indicates that providers have a right that can be the subject of enforcement.

Because it demonstrates an unmistakable focus on the providers as a benefited class, the NSA Timing of Payment Provision, as reinforced by the Effects of Determination Provision, is exactly the kind of language that opens the door to recognizing a private right of action if the statute otherwise indicates that Congress intended providers to be able to enforce their right to payment in court.

C.     **The Text and Structure of the NSA Evince Congress's Intent for Providers to be Able to Enforce Their Right to Payment in Court.**

The next question is whether Congress intended for providers to have a remedy. All indications point to the same conclusion: it did.

### 1. Text

Here too the Timing of Payment and Effects of Determination Provisions make clear that Congress intended providers to be able to enforce their right to payment from insurers in court. Either provision alone would be sufficient indication of congressional intent to make the Providers' right to payment enforceable, but together they leave no doubt.

*First*, the Timing of Payment Provision states that payment "shall be made [by insurers] directly to the nonparticipating provider not later than 30 days after the date on which such determination is made." *See* 42 U.S.C. § 300gg-112(b)(6); *see also id.* § 300gg-111(c)(6). The mandatory nature of that language establishes not only a right to payment, *supra* 29–30, but also a remedy. In an analogous context, the Supreme Court held exactly that: mandatory "'shall pay' language often reflects congressional intent 'to create both a right and a remedy.'" *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324–25 (2020). There, the Supreme Court considered whether a provision in the Affordable Care Act that said the federal government "shall pay" insurance plans under certain circumstances was a money-mandating statute for purposes of the Tucker Act's immunity waiver. *See* 590 U.S. at 300–01, 322–23. But in answering that question, the Court explained that the "money mandating inquiry" is "precisely" the same as whether a statute "displays an intent to create not just a private right but also a private remedy." *Id*. at 323–24

31

n.12.  In the Court's view, "magic words explicitly inviting suit" are not necessary in either context, and "[s]tatutory 'shall pay' language" may be sufficient to establish a right and a remedy in both contexts.  *Id*. at 323–25 & n.12; *see also id.* at 330 (Alito, J., dissenting) (concluding that the Court's analysis "infers a private right of action").

That is consistent with the notion that explicit rights-creating language is a critical affirmative indication that Congress intended the right to be enforceable in court.  *See supra* 27.  Indeed, at one point, the Supreme Court noted that it had almost "never refused to imply a cause of action where the language of the statute explicitly conferred a right directly on a class of persons."  *Cannon*, 441 U.S. at 690 n.13.  And it has repeatedly held that mandatory "shall" language confers such rights.  *See, e.g.*, *Sandoval*, 532 U.S. at 279–80, 288–89 (explaining that Section 601 of Title VI of the Civil Rights Act and Title IX of the Education Amendments of 1972—both using "shall" language—confer private rights of action).  So too here, the mandatory "shall" pay language reflects Congress's intent to create a private *and enforceable* right.

*Second*, Subsection (I) of the Effects of Determination Provision says that IDR awards "shall be binding upon the parties involved." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I); *see also id.* § 300gg-112(b)(5)(D).  By making the effect of an IDR award "binding," Congress plainly intended to render payment required by IDR awards enforceable in court.  "Binding" means "having legal force to impose an obligation" or "requiring obedience."  BINDING, *Black's Law Dictionary* (11th ed.

2019).  Logic dictates that if an award is not enforceable in court by the parties, then it is not binding on the parties.  Thus, the plain meaning of the word "binding" demonstrates Congress's intent for Providers with a right to payment based on an IDR award to also have a remedy to enforce their right.

That plain meaning comes imbued with a long history of courts enforcing binding awards.  The parallel context of arbitration awards arising from arbitration agreements illustrates the point.  Prior to the enactment of the FAA, parties that concluded an arbitration pursuant to a contract routinely came to court to enforce awards.  The agreement to arbitrate—which was a contract—rendered any resulting arbitration award binding; in turn, the fact that the award was binding made it enforceable in court.  *See* 21 Williston on Contracts § 57:2, *Arbitration Agreements at Common Law* (4th ed.) ("[O]nce an arbitration award was made… [a]n award was binding on both parties and was enforced by the courts.").  Indeed, "United States courts have always been willing to 'promptly interfere to enforce [arbitration] awards … without hesitation or question" when those awards are "fairly and lawfully made" "pursuant to an executed arbitration agreement."  *Sverdrup Corp. v. WHC Constructors, Inc*., 989 F.2d 148, 154–55 (4th Cir. 1993) (quotation omitted) (collecting cases); *Red Cross Line v. Atl. Fruit Co*., 264 U.S. 109, 121 n.1 (1924) ("[Courts] have and can have no just objection to [arbitrations] and will enforce, and promptly interfere to enforce their awards when fairly and lawfully made.").

So strong is the relationship between the binding nature of an award and its consequent enforceability that courts have long concluded that "[t]o agree to binding arbitration *is to agree* that if your opponent wins the arbitration he can obtain judicial relief if you refuse to comply with the arbitrator's award." *Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 480 (7th Cir. 1997) (emphasis added); *see Specialty Healthcare Mgmt., Inc. v. St. Mary Par. Hosp.*, 220 F.3d 650, 655 n.20 (5th Cir. 2000) ("consent to binding arbitration may properly imply consent to confirmation"); *id.* at 658 (Garza, J., dissenting) ("Any reasonable person would believe that an agreement to 'binding' arbitration means that any resulting damages would be enforceable and collectable. Otherwise, why agree to arbitrate?"); *Kallen v. Dist. 1199, Nat'l Union of Hosp. & Health Care Emp., RWDSU, AFL-CIO*, 574 F.2d 723, 726 (2d Cir. 1978) (a party can "hardly avow that an award will be 'final, conclusive and binding' upon it without implicitly agreeing that federal court intervention may be sought to compel compliance").

Indeed, that stands true even with respect to the FAA, which by its terms states that judicial confirmation of an arbitration award via Section 9's procedures is appropriate only "[*i*]f the parties … have *agreed* that a judgment of the court shall be entered upon the award made pursuant to the arbitration." 9 U.S.C. § 9 (emphases added). Despite the express condition, courts do not require magic words about "judicial confirmation" to be included in an arbitration agreement before allowing

court enforcement. Rather, a "provision in [an] agreement that the arbitrator's determination would be *final and binding*, along with [a party's] full participation in the arbitration process, is sufficient *under* [*the FAA*] to confer authority on the district court to confirm the award." *Booth v. Hume Publ'g, Inc.*, 902 F.2d 925, 930 (11th Cir. 1990) (emphases added); *see also, e.g.*, *Qorvis Comm'cns, LLC v. Wilson*, 549 F.3d 303, 308 (4th Cir. 2008) (holding that the parties "contemplated binding arbitration with enforcement of any award through the entry of a judgment in a court" even though the agreement "d[id] not, *in haec verba*, provide that 'a judgment of the court shall be entered upon the award'"). In other words, when courts see an agreement to binding arbitration, they treat it as if the agreement *explicitly* called for confirmation via a judgment of the court.

Here, by expressly making IDR determinations "binding" under the NSA, Congress drew on this broad baseline understanding of the term and demonstrated clear intent for those awards to be enforceable in court. The Supreme Court has long held that when Congress uses a particular term, "it intend[s] that the customary legal incidents" of that term follow. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979). Given the long history of equating binding awards with enforceable awards, there is no question that Congress understands the import of a binding award and therefore uses the term "to mean that an award will be enforceable in court." *See Cheminova*, 182 F. Supp. 2d at 73 (interpreting the words "binding

arbitration proceedings" in the Federal Insecticide, Fungicide and Rodenticide Act). Indeed, just as "use of [that] term[] in an agreement between private parties is tantamount to consent to judicial enforcement," its "use in [the NSA] should not convey a different meaning." *See id*. at 74.

And this makes sense. When it passed the NSA, Congress implemented a novel scheme that has some attributes of arbitration—flexible, speedy resolution of payment disputes—but conspicuously lacks the element that, at common law, made arbitral awards binding and enforceable: an arbitration *agreement* manifesting the parties' mutual consent to arbitrate and be bound. *See supra* Statement of the Case Part B (discussing the *mandatory* IDR scheme). So Congress provided, in the statute, that IDR determinations will be "binding," and thereby granted parties the ability to enforce them in court, as they would have if the awards arose from arbitration agreements. Just as it would make no sense to *agree* to arbitration that results in a binding award but not agree that the award be enforceable, *see supra* 34, it would make even less sense for Congress to *mandate* participation in an alternative-dispute-resolution scheme that results in a binding award but not also mandate that the award be enforceable in court.

In sum, two separate provisions of the NSA plainly communicate Congress's intent to grant providers not only a right to payment but also a remedy, and that intent is reinforced by common sense. *See Sandoval*, 532 U.S. at 286.

## 2. Structure

The structure of the NSA further reinforces Congress's intent to provide a judicial remedy to providers who have been denied their right to payment because (1) the statute provides no alternative enforcement mechanism and (2) a contrary conclusion would undermine the statutory scheme.

To start, aside from allowing providers to enforce their rights to payment in court, the NSA provides no other enforcement mechanism to ensure payors pay providers what they are due. It is the "determination *of a certified IDR entity*" itself, made "[n]ot later than 30 days after" the IDR entity was selected that "shall be binding." 42 U.S.C. § 300gg-111(c)(5)(E) (referring to the determination made "under subparagraph (A)"); *see also id.* § 300gg-112(b)(5)(D). The determination does not trigger further administrative enforcement action. Indeed, the IDR determination is directly *judicially* reviewable under certain circumstances. *Id.* The NSA thus stands in stark contrast to other statutes in which Congress created a right, but then delegated effectuation of that right to enforcement by regulation. *See Sandoval*, 532 U.S. at 288–90.

Moreover and relatedly, if providers have no means of enforcing their right to payment, not only would the purpose of the NSA be frustrated, the very structure of the NSA would fall apart. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (statutory provisions must be read "with a view to their place in the

37

overall statutory scheme"). The NSA channels disputes over payment into mandatory IDR—providers cannot seek payment from patients or go outside the system. *See supra* Statement of the Case Part B. If providers cannot compel insurers to comply with the resulting IDR awards, the IDR process would be pointless. The Court can and must avoid that result by giving effect to Congress's intent as expressed through unambiguous text that establishes foundational elements of this statutory scheme. *See Sandoval*, 532 U.S. at 286.

### D. The District Court's Analysis Was Mistaken.

The district court's contrary analysis suffers from several independently fatal flaws.

*First*, the district court's framing of the issue was misguided. Even though it rightly concluded that the NSA gives providers a right to payment, ROA.106–107; ROA.109, the court was not at all receptive to the notion that Congress might also have granted a remedy; and it did not even consider whether the NSA provides an alternative enforcement mechanism to compel insurers to pay providers what they are due. *Cf. supra* 24–28. Instead, the court approached the remedy question in the NSA the way courts approach statutory provisions that operate "for the benefit of the public at large," *see Cannon*, 441 U.S. at 693, or focus only "on the person regulated rather than the individuals protected," *Sandoval*, 532 U.S. at 289—with skepticism and extreme reluctance to recognizing a private right of action. But the

NSA is not that kind of statute. By treating it as such, the district court confused the framing of the entire inquiry and erroneously imposed a presumption *against* the plain meaning of statutory language—all in the name of statutory intent. *See* ROA.106–109. That framing infected its entire analysis.

*Second*, the district court turned a blind eye to the relevant statutory text—text clear enough to overcome even unwarranted reluctance to finding a private right of action under the circumstances. The court began by stating that "[t]here is no language in the NSA establishing that Congress intended to create a remedy for out-of-network providers." ROA.107. But it reached that conclusion without meaningfully analyzing the Timing of Payment Provision *or* the Effects of Determination Provision. Indeed, the court dismissed both of those provisions out of hand in a single cursory sentence, stating only that while they "appear[] to create a right that out-of-network providers are entitled to recover their IDR awards within thirty days," they "do not suggest" that Congress intended a remedy. ROA.109. That does not follow—in fact, the rights-creating language suggests the opposite. By disregarding the plain meaning of the statutory language, the district court ignored congressional intent, contrary to the Supreme Court's clear instruction. *See Sandoval*, 532 U.S. at 286.

*Third*, the district court brushed aside statutory structure and scheme as mere and irrelevant policy considerations. ROA.109. To be sure, the district court's

decision would have serious negative policy consequences: Providers would be undercompensated for their services, which would threaten their survival, and in turn inhibit patient access to needed care. But the Providers' arguments are more fundamental than mere policy. The particular provisions of a statute must be read "with a view to their place in the overall statutory scheme." *Turkiye Halk Bankasi*, 598 U.S. at 275. If reading the provisions a particular way functions as the statutory equivalent of pulling the keystone out of an arch, then statutory structure reflects Congress's intent that the provisions should not be read that way.

Here, the NSA was intended to establish a workable system to resolve payment disputes between providers and insurers without risking surprise medical bills to patients. *See supra* Statement of the Case Part B. And "[t]he IDR system is integral to" that scheme. *See* Brief of United States as Amicus Curiae at 18, *Reach Air Medical Servs. v. Kaiser Foundation Health Plan*., No. 24-10135 (11th Cir. Aug. 28, 2024). If, as the district court held, insurers can simply opt not to pay what the IDR award dictates—the culmination of a mandatory process carefully crafted by Congress and overseen by the Departments—not only will Congress's efforts have been a waste, they will also have resulted in precisely the opposite outcomes than it intended. Indeed, instead of creating a streamlined, fair system to ensure that Providers receive appropriate reimbursement for their services without leaving patients holding the bag, Congress will have created a system that threatens to put

40

emergency providers out of business. That would leave patients in dire straits indeed. These are not mere policy concerns; they go to the very structure the statutory regime and cannot be ignored by any court truly attempting to discern congressional intent.

*Fourth*, the district court drew flawed textual inferences. After applying an atextual presumption, ignoring the relevant text, and discounting as mere policy the NSA's statutory scheme and design, the court pointed to what it saw as two affirmative indications that Congress did not intend to create a remedy. ROA.108. Neither holds water.

The district court noted that the NSA provides for "judicial review" of an IDR determination only in Subsection (II) of the Effects of Determination Provision, as a means of vacating the determination for one of four prescribed reasons. ROA.108 (citing 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II)). The court seemed to think that because *judicial review* was limited to circumstances not relevant here, *all judicial involvement* was foreclosed. But that fails to appreciate the distinction between judicial review and other forms of judicial action, like enforcement. *Cf. Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 591–92 (1985) (reserving the question whether a private party could sue to enforce a statutory arbitration decision while simultaneously acknowledging that the statute calls for limited judicial review). Put differently, not all judicial actions constitute "judicial review," which generally entails "[a] court's review of … an administrative body's factual or legal findings."

JUDICIAL REVIEW, *Black's Law Dictionary* (11th ed. 2019).  And it is commonplace for Congress to separate these distinct actions into distinct provisions.  Take the FAA as a prime example: Section 9 governs judicial enforcement, while Section 10 governs judicial review and vacatur.  So too here, the "binding" language in Subsection (I) of the Effects of Determination Provision governs enforcement (subject to limited grounds for invalidation due to fraud or misrepresentation), while Subsection (II) is focused on when a court may review and vacate an award.

The district court also noted that the NSA "did not incorporate the FAA provision that enables parties to confirm arbitration awards," and it "interpret[ed] this omission in the NSA to mean that Congress did not intend to create a remedy under the NSA."  ROA.108.  That is a nonsequitur.  Even in the arbitration context, the FAA does not supply exclusive procedures for enforcing awards.  The FAA presumes that an arbitration award falling within its purview is already (and remains) otherwise enforceable in an action at law, like a contract action.  Section 9 of the FAA simply offers a procedural "mechanism[] for enforcing arbitration awards" to "streamline[]" the path to an already available remedy.  *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008).  It is a *supplement* to other available procedures for enforcing binding arbitration awards.  *See, e.g.*, *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 159–60 (2d Cir. 2003); *Sverdrup Corp.*, 989 F.2d at 155.  Indeed, it takes the existence of other procedures for enforcing

arbitration awards as a baseline premise and, when invoked, simply "obviate[s] the separate contract action that would usually be necessary to enforce or tinker with an arbitral award in court." *Hall St.*, 552 U.S. at 582. Thus, any suggestion that "binding" awards are enforceable in court only because of the FAA has the analysis backwards. The FAA provides a streamlined procedure for enforcing certain awards when they are *already* binding and thus otherwise enforceable in court.

To the extent the district court relied on the lack of an explicit procedural mechanism for enforcement—rather than the lack of a reference to the FAA specifically—that was equally erroneous. None of the Supreme Court's or this Court's precedents on private rights of action suggest that just because a statute does not spell out a particular procedural mechanism for enforcement, the courts are not supposed to be involved. That argument is circular and self-defeating: the question comes up *because* Congress did not detail applicable procedural mechanisms. The point of the analysis is to look to the text and structure of the NSA to determine whether Congress intended an enforcement mechanism even absent "magic words" or precise procedures. *See Maine Cmty. Health Options*, 590 U.S. at 323–24 n.12; *see also Transamerica*, 444 U.S. at 18 (even though the statute "does not explicitly provide any private remedies whatever," "we conclude that the statutory language itself fairly implies a right to specific and limited relief in a federal court" because the statute "declar[es] certain contracts void," and "[a] person with the power to void

a contract ordinarily may resort to a court to have the contract rescinded"). Where Congress did so intend, courts have a toolkit ready to effectuate that intent, starting with the Federal Rules of Civil Procedure. And here, the text and structure of the NSA indicate that Congress so intended. *Supra* 31–38.

In short, the district court's supposed evidence of congressional intent is not actually evidence of anything, and it is certainly not evidence that overcomes the strong textual and structural indications of congressional intent to grant an *enforceable* private right to payment to the Providers.

## II. THE PROVIDERS HAVE DERIVATIVE STANDING TO ASSERT AN ERISA CLAIM FOR IMPROPER DENIAL OF BENEFITS.

ERISA health plan beneficiaries have a right to sue the plan administrator (here, HCSC) when they have been improperly denied plan benefits. *See* 29 U.S.C. § 1132(a)(1)(B). Beneficiaries may also assign that right to a third party, like a provider, and the assignee "may bring ERISA suits standing in the shoes" of the beneficiaries, including for standing purposes. *See N. Cypress Med. Ctr.*, 781 F.3d at 191. Here, as the district court acknowledged, the HCSC beneficiaries validly assigned their rights to the Providers. ROA.110–111. Thus, for standing purposes, the question becomes whether the beneficiaries would have standing to bring an improper-denial-of-benefits claim under ERISA; if they would, then the Providers have standing to assert that claim in this case.

To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The alleged injury must be "particularized" to the plaintiff and "concrete"—meaning "real," not "abstract" or "hypothetical." *Id*. at 339–40. As relevant here, the denial of a plan benefit plainly constitutes a concrete and particularized injury to a beneficiary. *N. Cypress*, 781 F.3d at 194; *Mitchell v. Blue Cross Blue Shield of N. Dakota*, 953 F.3d 529, 536 (8th Cir. 2020).

HCSC's obligation to cover out-of-network emergency care by paying IDR awards to the Providers is a health plan benefit to the covered beneficiaries. Again, the NSA's Coverage Provision requires health plans to cover beneficiaries for care received from out-of-network emergency providers (including air-ambulance providers) the same way they would for in-network providers, paid at a rate ultimately determined by an IDR award. *Supra* 8–10; *see* 42 U.S.C. § 300gg-111(a)(1); *id.* § 300gg-112(a) (requiring coverage for air transports). And the NSA is directly incorporated into ERISA itself. *See* 29 U.S.C. §§ 1185e(a)(1), 1185f(a). That means the coverage mandate in the NSA is an *ERISA* coverage mandate. It is thus "a global directive that regulates the substantive content of [health] plans," and, as such, it "adds a mandatory term" to all plans that provide coverage for in-network emergency services. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 750

(2004); *see also, e.g.*, *New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 980 F. Supp. 2d 527, 543 (S.D.N.Y. 2013) (explaining that the Parity Act has been "incorporated into ERISA" and that "its requirements automatically become terms of every ERISA plan" (quotation omitted)), *aff'd in part, vacated in part on other grounds*, 798 F.3d 125 (2d Cir. 2015). Like all coverage provisions, the fact that health plans must cover out-of-network emergency care—that is, pay providers for patient care—is one of the bargained-for benefits of HCSC's health plans.

HCSC's failure to cover that care by paying the Providers the total plan or coverage amount (ultimately determined by the IDR entity) denies the beneficiaries a plan benefit to which they are contractually entitled. The beneficiaries have thus suffered an injury traceable to HCSC's conduct and redressable by an order to pay the IDR awards. *Spokeo*, 578 U.S. at 338. In short, the beneficiaries have standing; therefore, so too do the Providers. *See N. Cypress Med. Ctr.*, 781 F.3d at 191.

The district court, however, held that the beneficiaries are not injured by the denial of benefits because, under the NSA ban on balance billing, beneficiaries are not left holding the bag for HCSC's failure to pay. ROA.111. Put differently, the district court reasoned that because HCSC's failure to pay will not alter the beneficiaries' financial obligations to the Providers, the beneficiaries suffer no concrete injury. But "[e]very circuit court to consider this issue"—including this one—disagrees with the district court. *See Springer v. Cleveland Clinic Emp. Health*

*Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018); *N. Cypress*, 781 F.3d at 192–194; *Mitchell*, 953 F.3d at 536; *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014); *HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1352 (11th Cir. 2008).

These courts have all held that "plan participants are injured not only when an underpaid healthcare provider charges them for the balance of a bill; they are also injured when a plan administrator fails to pay a healthcare provider in accordance with the terms of their benefits plan." *Mitchell*, 953 F.3d at 536. "This follows from the fact that plan participants are contractually entitled to plan benefits." *Id.* And an insurer's "failure to pay" is a breach of contract that "denies the patient the benefit of her bargain" regardless of whether that patient stands to lose or gain financially. *N. Cypress*, 781 F.3d at 193; *see Mitchell*, 953 F.3d at 536; *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. Cookson Am., Inc.*, 710 F.3d 470, 475 (2d Cir. 2013) (explaining in a different context that the fact that payment of a benefit "accrues to third parties … does not change the fact that [the plaintiff] has negotiated for the benefit and has incurred obligations in order to secure it"). "ERISA is designed" to protect against

such breach of "contractually defined benefits." *N. Cypress*, 781 F.3d at 193 (quotation omitted).

It does not matter that the injury to the beneficiaries is not distinctly financial or otherwise "tangible" because it is "nevertheless … concrete." *Mitchell*, 953 F.3d at 536. To determine whether an intangible harm satisfies the injury-in-fact requirement, courts look to whether the harm "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341. "Traditionally, a party to a breached contract has a judicially cognizable injury for standing purposes because the other party's breach devalues the services for which the plaintiff contracted and deprives them of the benefit of their bargain." *Mitchell*, 953 F.3d at 536. Thus, the denial of plan benefits constitutes a cognizable injury for purposes of standing. *Id.*; *see Springer*, 900 F.3d at 288 (noting that even without financial injury a plaintiff "does not allege bare procedural violations unconnected to an individual right under the plan" where there "is no dispute that [the party] alleges a specific contractual right owed to him and his son as plan participants").

In short, the NSA made coverage of out-of-network emergency care part of the plan participants' bargained-for benefit to in-network care to which they are contractually entitled. HCSC denied plan participants the benefit of that bargain when it failed to pay the IDR awards to the Providers. That harm to the beneficiaries

stands independent of any financial harm and sufficient for standing purposes, as many courts, including this one, have held. As assignees of the plan participants' rights, the Providers thus have standing to assert an improper-denial-of-benefits claim under ERISA.

## III. THE PROVIDERS STATED A QUANTUM-MERUIT CLAIM.

The district court—having rejected the Providers' private-right-of-action arguments and found no standing under ERISA—was wrong to dismiss the Providers' claim for quantum meruit. *See* ROA.112–115. A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its fact." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Quantum meruit (or unjust enrichment) is an "equitable theory of recovery" "based on an implied agreement to pay for benefits received." *MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 975 (5th Cir. 2014) (quotation omitted). To invoke this equitable remedy, a plaintiff must demonstrate that it rendered valuable services to the party sought to be charged and that those services were accepted but not paid for. *Id*. The Providers have adequately alleged that HCSC was (and continued to be) unjustly enriched in this way when it refused to pay the Providers for servicing HCSC policyholders. *See* ROA.11–12 ¶¶ 24–29.

To be sure, outside the context of the NSA, Texas courts have sometimes held that the patient—rather than the insurer—is the proper target of a healthcare

provider's quantum-meruit claim, as the party to whom services were provided. *See Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*, 659 S.W.3d 424, 437 (Tex. 2023). But that is a debatable proposition. *See* Restatement (Third) of Restitution and Unjust Enrichment §§ 20, 22 cmt. g, illus. 10. (Am. L. Inst. 2011). And regardless, it is upended by the NSA. Recall that without the NSA, the patient *would have* the fundamental obligation to pay for the medical services received. *See supra* 7–8. The NSA transfers that obligation to the patient's insurer. 42 U.S.C. § 300gg-111(a)(1),(c)(6); *id.* § 300gg-112(a),(b)(6); *id.* § 300gg-131(a). As a result, the insurer is the party with the ability and obligation to rectify any unjust enrichment. Equity requires that courts make them do so. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1577 (2024) ("Crafting fair and appropriate equitable relief necessitates the exercise of discretion—the hallmark of traditional equitable practice." (cleaned up)).

The district court was too hasty in concluding that the NSA functionally extinguished both Texas-emergency-healthcare quantum meruit claims and its equitable authority to remedy unjust enrichment. ROA.113–115. Indeed, by concluding that *no* party—not the patient and not the insurer—is a proper defendant, the court effectively interpreted the NSA to *facilitate* unjust enrichment: Providers provide care; patients are protected from balance billing because insurers are supposed to pay a fair rate for the Providers' services; but if insurers fail to comply

50

with their end of the bargain, there is nothing—according to the district court—that anyone can do about it. The district court was, of course, wrong to preclude the Providers from pursuing claims under the NSA and ERISA, but if the court was bent on closing those statutory doors to court, equity demands that the court should have drawn on the "breadth and flexibility" "inherent" in its equitable powers and allowed the Providers to pursue their quantum meruit claim here. *See Brown v. Plata*, 563 U.S. 493, 539 (2011) (quotation omitted).

## IV.  THE PROVIDERS SHOULD HAVE BEEN GIVEN LEAVE TO AMEND.

As if determined to foreclose all possible avenues for the Providers to receive payment, the district court also denied the Providers leave to file an amended complaint and ordered final judgment on the same day it dismissed the complaint. *See* ROA.115–118.  "Plaintiffs should usually be able to amend at least once, because 'fairness requires' it." *Jack v. Evonik Corp.*, 79 F.4th 547, 565 (5th Cir. 2023) (citation omitted).  That opportunity would have allowed the Providers to assert additional viable theories for relief and thereby to propose ways to make Congress's scheme work as intended—rather than frustrating one of its key features, prompt and fair payment to providers.

For instance, another court has held that NSA IDR awards can be confirmed under the FAA.  *See GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, 2023 WL 5815821, at *10 (D.N.J. Sept. 8, 2023).  That is sensible.  As

discussed above, "binding" not only means enforceable in court, it also means enforceable in court *under the FAA*. *See supra* 34–35. By making IDR determinations "binding," Congress may have intended to place them within the purview of the FAA's procedures for confirming binding awards. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). That Congress would extend the FAA to reach statutorily imposed dispute-resolution schemes is unremarkable. Take the Administrative Dispute Resolution Act, for example. There, Congress made clear that a "final" and "binding" award could be enforced under the FAA. *See* 5 U.S.C. § 580(c).[8] At the very least, the rich history of what it means for an award to be "binding" suggests that the district court should have allowed the Providers to pursue such a claim before dismissing the complaint with prejudice.

The district court's premature prejudicial dismissal foreclosed all potential relief. The court never explained why it thought Congress went to the trouble of setting up an IDR system to determine the payment due if there is *no way whatsoever*

---

[8] True, that statute explicitly notes that awards are enforceable under the FAA, but that is only to foreclose assertions of sovereign immunity not relevant in the NSA context. *See* 5 U.S.C. § 580(c). Similarly, it is of little consequence here that another provision of the NSA directly cites the FAA. *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). There too the citation was necessary to communicate the fact and extent of FAA incorporation. By contrast, the word "binding" speaks for itself and indicates that the corresponding enforcement mechanism the FAA, *see* 9 U.S.C. § 9, should apply. Alternatively, the ADRA may apply here on its own terms, obviating the need to consider its textual differences.

*under federal or state law* to enforce those payment determinations. Even if this Court agrees with the district court on its NSA private-right-of-action, ERISA-standing, and quantum-meruit holdings—which it should not—it should at least reverse and remand to allow the Providers leave to amend their complaint.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order dismissing the Providers' complaint.

September 27, 2024

Adam T. Schramek
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard, Suite 1100
Austin, TX 78701
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Respectfully submitted,

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor
Alexa R. Baltes
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
ctaylor@jonesday.com

*Counsel for Plaintiffs-Appellants*

# ADDENDUM OF STATUTORY PROVISIONS

## Table of Contents

42 U.S.C. § 300gg-111(a)(1)
*Coverage Provision*……………………………........................ A.1

42 U.S.C. § 300gg-111(c)(5)(E)(i)
*Effects of Determination Provision* ……………………............... A.3

42 U.S.C. § 300gg-111(c)(6)
*Timing of Payment Provision* …...................................... A.4

42 U.S.C. § 300gg-112(a)
*Air-Ambulance-Specific Coverage*.................................... A.5

42 U.S.C. § 300gg-112(b)(5)(D)
*Air-Ambulance-Specific Effects of Determination*....................... A.6

42 U.S.C. § 300gg-112(b)(6)
*Air-Ambulance-Specific Timing of Payment*.............................. A.7

# 42 U.S.C. § 300gg-111(a)(1) – Coverage Provision

**(a) Coverage of emergency services**

**(1) In general**

If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides or covers any benefits with respect to services in an emergency department of a hospital or with respect to emergency services in an independent freestanding emergency department (as defined in paragraph (3)(D)), the plan or issuer shall cover emergency services (as defined in paragraph (3)(C))—

(A) without the need for any prior authorization determination;

(B) whether the health care provider furnishing such services is a participating provider or a participating emergency facility, as applicable, with respect to such services;

(C) in a manner so that, if such services are provided to a participant, beneficiary, or enrollee by a nonparticipating provider or a nonparticipating emergency facility—

(i) such services will be provided without imposing any requirement under the plan or coverage for prior authorization of services or any limitation on coverage that is more restrictive than the requirements or limitations that apply to emergency services received from participating providers and participating emergency facilities with respect to such plan or coverage, respectively;

(ii) the cost-sharing requirement is not greater than the requirement that would apply if such services were provided by a participating provider or a participating emergency facility;

(iii) such cost-sharing requirement is calculated as if the total amount that would have been charged for such services by such participating provider or participating emergency facility were equal to the recognized amount (as defined in paragraph (3)(H)) for such services, plan or coverage, and year;

(iv) the group health plan or health insurance issuer, respectively—

(I) not later than 30 calendar days after the bill for such services is transmitted by such provider or facility, sends

A.1

to the provider or facility, as applicable, an initial payment or notice of denial of payment; and

   (II) pays a total plan or coverage payment directly to such provider or facility, respectively (in accordance, if applicable, with the timing requirement described in subsection (c)(6)) that is, with application of any initial payment under subclause (I), equal to the amount by which the out-of-network rate (as defined in paragraph (3)(K)) for such services exceeds the cost-sharing amount for such services (as determined in accordance with clauses (ii) and (iii)) and year; and

(v) any cost-sharing payments made by the participant, beneficiary, or enrollee with respect to such emergency services so furnished shall be counted toward any in-network deductible or out-of-pocket maximums applied under the plan or coverage, respectively (and such in-network deductible and out-of-pocket maximums shall be applied) in the same manner as if such cost-sharing payments were made with respect to emergency services furnished by a participating provider or a participating emergency facility; and

(D) without regard to any other term or condition of such coverage (other than exclusion or coordination of benefits, or an affiliation or waiting period, permitted under section 300gg-3 of this title, including as incorporated pursuant to section 1185d of Title 29 and section 9815 of Title 26, and other than applicable cost-sharing).

# 42 U.S.C. § 300gg-111(c)(5)(E)(i) – Effects of Determination Provision

**(E) Effects of determination**

### (i) In general

A determination of a certified IDR entity under subparagraph (A)—

(I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and

(II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

## 42 U.S.C. § 300gg-111(c)(6) – Timing of Payment Provision

**(6) Timing of payment**

The total plan or coverage payment required pursuant to subsection (a)(1) or (b)(1), with respect to a qualified IDR item or service for which a determination is made under paragraph (5)(A) or with respect to an item or service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made.

# 42 U.S.C. § 300gg-112(a) – Air-Ambulance-Specific Coverage

## (a) In general

In the case of a participant, beneficiary, or enrollee who is in a group health plan or group or individual health insurance coverage offered by a health insurance issuer and who receives air ambulance services from a nonparticipating provider (as defined in section 300gg-111(a)(3)(G) of this title) with respect to such plan or coverage, if such services would be covered if provided by a participating provider (as defined in such section) with respect to such plan or coverage—

(1) the cost-sharing requirement with respect to such services shall be the same requirement that would apply if such services were provided by such a participating provider, and any coinsurance or deductible shall be based on rates that would apply for such services if they were furnished by such a participating provider;

(2) such cost-sharing amounts shall be counted towards the in-network deductible and in-network out-of-pocket maximum amount under the plan or coverage for the plan year (and such in-network deductible shall be applied) with respect to such items and services so furnished in the same manner as if such cost-sharing payments were with respect to items and services furnished by a participating provider; and

(3) the group health plan or health insurance issuer, respectively, shall—

(A) not later than 30 calendar days after the bill for such services is transmitted by such provider, send to the provider, an initial payment or notice of denial of payment; and

(B) pay a total plan or coverage payment, in accordance with, if applicable, subsection (b)(6), directly to such provider furnishing such services to such participant, beneficiary, or enrollee that is, with application of any initial payment under subparagraph (A), equal to the amount by which the out-of-network rate (as defined in section 300gg-111(a)(3)(K) of this title) for such services and year involved exceeds the cost-sharing amount imposed under the plan or coverage, respectively, for such services (as determined in accordance with paragraphs (1) and (2)).

## 42 U.S.C. § 300gg-112(b)(5)(D) –
## Air-Ambulance-Specific Effects of Determination

**(D) Effects of determination**

The provisions of section 300gg-111(c)(5)(E) of this title shall apply with respect to a determination of a certified IDR entity under subparagraph (A), the notification submitted with respect to such determination, the services with respect to such notification, and the parties to such notification in the same manner as such provisions apply with respect to a determination of a certified IDR entity under section 300gg-111(c)(5)(E) of this title, the notification submitted with respect to such determination, the items and services with respect to such notification, and the parties to such notification.

## 42 U.S.C. § 300gg-112(b)(6) –
## Air-Ambulance-Specific Timing of Payment

**(6) Timing of payment**

The total plan or coverage payment required pursuant to subsection (a)(3), with respect to qualified IDR air ambulance services for which a determination is made under paragraph (5)(A) or with respect to an air ambulance service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider not later than 30 days after the date on which such determination is made.

## CERTIFICATE OF SERVICE

I certify that on September 27, 2024, I served a copy of the foregoing on all counsel of record by CM/ECF.

Dated:  September 27, 2024

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) & (7)(B), and Fifth Circuit Rule 32.1 & 32.2. The brief contains 12,850 words and was prepared using Microsoft Word and produced in Times New Roman 14-point font.

I further certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: September 27, 2024

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor

*Counsel for Plaintiffs-Appellants*