No. 24-10561

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

GUARDIAN FLIGHT, L.L.C.; MED-TRANS CORPORATION,

*Plaintiffs-Appellants,*

*v.*

HEALTH CARE SERVICE CORPORATION,

*Defendant-Appellee.*

———————————————

On Appeal from the United States District Court for the Northern
District of Texas

BRIEF OF AMERICAN HOSPITAL ASSOCIATION,
AMERICAN MEDICAL ASSOCIATION, FEDERATION OF
AMERICAN HOSPITALS, AND TEXAS MEDICAL
ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF
APPELLANTS AND REVERSAL

James E. Tysse
Kelly M. Cleary
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER &
 FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
jtysse@akingump.com

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

*Guardian Flight v. Health Care Service* (No. 24-10561)

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the briefs of the parties and other *amici curiae*, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Amici curiae*: The American Hospital Association is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

The American Medical Association is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

The Federation of American Hospitals is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

i

The Texas Medical Association is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

*Counsel*:  James E. Tysse, Kelly M. Cleary, and Kristen E. Loveland of Akin Gump Strauss Hauer & Feld LLP.


_s/James E. Tysse_
James E. Tysse

*Counsel of record for Amici Curiae*
*American Hospital Association,*
*American Medical Association,*
*Federation of American Hospitals,*
*and Texas Medical Association*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF INTEREST OF *AMICI CURIAE* .............................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 5

ARGUMENT ....................................................................................... 7

    I.    THE PRESUMPTION AGAINST INEFFECTIVENESS
    WEIGHS IN FAVOR OF JUDICIAL ENFORCEMENT ....... 7

        A.    Courts Should Favor Textually Permissible
        Interpretations Of Laws That Avoid Rendering
        Them Nugatory ............................................................ 7

        B.    The NSA Can And Should Be Read to Make It
        Effective ...................................................................... 11

    II.    JUDICIAL ENFORCEMENT IS NECESSARY TO
    AVOID SIGNIFICANT CONSTITUTIONAL
    CONCERNS ..................................................................... 14

    III.    PROVIDERS AND PATIENTS ARE SERIOUSLY
    HARMED BY INSURERS' FAILURE TO PAY IDR
    AWARDS ......................................................................... 20

CONCLUSION ..................................................................................... 26

CERTIFICATE OF SERVICE............................................................... 28

CERTIFICATE OF COMPLIANCE...................................................... 29

# TABLE OF AUTHORITIES

<u>C<span style="font-variant: small-caps">ASES</span></u>:

*Ballew v. Continental Airlines, Inc.*,
    668 F.3d 777 (5th Cir. 2012) .................................................................. 13

*Cheminova A/S v. Griffin L.L.C.*,
    182 F. Supp. 2d 68 (D.D.C. 2002) ................................................. 10, 12

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
    438 U.S. 59 (1978) ..................................................................................... 18

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. &
    Constr. Trades Council*,
    485 U.S. 568 (1988) .................................................................................. 20

*Garland v. Cargill*,
    602 U.S. 406 (2024) ..................................................................................... 8

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ......................................... 17, 18, 19, 20

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) .................................................................................. 14

*Judah v. M'Namee*,
    3 Blackf. 269 (Ind. 1833) ...................................................................... 15

*Lander Co. v. MMP Invs., Inc.*,
    107 F.3d 476 (7th Cir. 1997) ............................................................... 12

*Mooney v. Lloyd*,
    1819 WL 1927 (Pa. 1819) ...................................................................... 15

*Nehme v. I.N.S.*,
    252 F.3d 415 (5th Cir. 2001) ............................................................... 14

*New York Cent. R.R. Co. v. White*,
    243 U.S. 188 (1917) .................................................................................. 17

iv

*Place St. Charles v. J.A. Jones Constr. Co.*,
 823 F.2d 120 (5th Cir. 1987)........................................................ 12

*PruneYard Shopping Ctr. v. Robins*,
 447 U.S. 74 (1980)......................................................... 16, 17, 19

*Pynchon v. Brewster*,
 Quincy 224 (Mass. 1766)............................................................ 15

*Republic Bankers Life Ins. Co. v. Anglin*,
 433 S.W.2d 795 (Tex. Civ. App. 1968) ..................................... 15

*Saloojas, Inc. v. Aetna Health of Cal., Inc.*,
 80 F.4th 1011 (9th Cir. 2023) .................................................... 14

*Schneider v. California Dep't of Corr.*,
 151 F.3d 1194 (9th Cir. 1998)..................................................... 17

*SEC v. Hallam*,
 42 F.4th 316 (5th Cir. 2022) ...................................................... 12

*Sierra Club v. E.P.A.*,
 294 F.3d 155 (D.C. Cir. 2002) .................................................... 10

*Texas Health Harris Methodist Hosp. Fort Worth v.
 Featherly*,
 648 S.W.3d 556 (Tex. App. 2022)............................................... 15

*Texas Med. Ass'n v. United States Dep't of Health & Human
 Servs.*,
 No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) ......... 11

*Texas Workforce Comm'n v. United States Dep't of Educ.*,
 973 F.3d 383 (5th Cir. 2020)................................................... 7, 11

*The Emily*,
 22 U.S. (9 Wheat.) 381 (1824)..................................................... 8

*United States v. Castleman*,
 572 U.S. 157 (2014).................................................................. 5, 8

*United States v. Hartley,*
34 F.4th 919 (10th Cir. 2022) ............................................................ 8

*Webb v. B.C. Rogers Poultry, Inc.,*
174 F.3d 697 (5th Cir. 1999) .............................................................. 15

## STATUTES:

9 U.S.C.
§ 9 ......................................................................................................... 13
§ 10 ....................................................................................................... 13

42 U.S.C.
§ 300gg-111(a) ...................................................................................... 9
§ 300gg-111(a)(1) ................................................................................ 16
§ 300gg-111(a)(1)(C)(iv) ...................................................................... 9
§ 300gg-111(a)(2) .................................................................................. 9
§ 300gg-111(a)(3)(H) .......................................................................... 16
§ 300gg-111(b) ...................................................................................... 9
§ 300gg-111(b)(1)(C) ............................................................................ 9
§ 300gg-111(b)(1)(D) ............................................................................ 9
§ 300gg-111(c) ...................................................................................... 9
§ 300gg-111(c)(1)(A) ............................................................................ 9
§ 300gg-111(c)(1)(B) ............................................................................ 9
§ 300gg-111(c)(2) ................................................................................ 10
§ 300gg-111(c)(3) ................................................................................ 10
§ 300gg-111(c)(4) ................................................................................ 10
§ 300gg-111(c)(5) ................................................................................ 10
§ 300gg-111(c)(5)(E) ........................................................................... 14
§ 300gg-111(c)(5)(E)(i) .......................................................... 10, 12, 13
§ 300gg-111(c)(5)(E)(i)(II) ................................................................. 13
§ 300gg-111(c)(6) ................................................................................ 10
§ 300gg-111(c)(7) ................................................................................ 10
§ 300gg-112(a)(3) .................................................................................. 9
§ 300gg-112(b) ...................................................................................... 9
§ 300gg-134(a)(1) .................................................................................. 9
§ 300gg-134(b)(1) .................................................................................. 9

OTHER AUTHORITIES:

Americans for Fair Health Care, *No Surprises Act (NSA)
Impact Analysis* (2023) .................................................................. 20, 21

American Hosp. Ass'n, *America's Hospitals and Health
Systems Continue to Face Escalating Operational Costs
and Economic Pressures as They Care for Patients and
Communities* (May 2024).................................................................... 24

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................... 13

CMS, *Supplemental Background on Federal Independent
Dispute Resolution Public Use Files, January 1, 2023-
June 30, 2023* (Feb. 15, 2024)........................................................... 22

CMS, *Supplemental Background on Federal Independent
Dispute Resolution Public Use Files, July 1, 2023-
December 31, 2023* (June 13, 2024) .................................................. 22

Emergency Dep't Practice Mgmt. Ass'n, *No Surprises Act
Implementation and Compliance: Data Analysis* (April
2024)...................................................................................................... 21

FED. R. APP. P. 29(a)(4)(E) ......................................................................... 1

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020).............. 12

*Reduced Care for Patients: Fallout from Flawed
Implementation of Surprise Medical Billing Protections:
Hearing Before the H. Comm. on Ways and Means*, 118th
Cong. (2023) (statement of Jim Budzinski, Exec. Vice
President and Chief Fin. Officer, Wellstar Health System)............. 23

*Reduced Care for Patients: Fallout from Flawed
Implementation of Surprise Medical Billing Protections:
Hearing Before the H. Comm. on Ways and Means*, 118th
Cong. (2023) (statement of Seth Bleier, MD, FACEP, Vice
President of Fin., Wake Emergency Physicians, PA
(WEPPA)) ....................................................................................... 25, 26

Reed, Tina, *Doctors say insurers are ignoring orders to pay surprise billing disputes*, AXIOS (Aug. 3, 2023) ................................... 21

Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980 (Oct. 7, 2021) .................................................................... 26

SCALIA, ANTONIN & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ............................................. 8

Sloan, Judy Beckner, *Quantum Meruit: Residual Equity in Law*, 42 DEPAUL L. REV. 399 (1992) .................................................. 15

Tepper, Nona, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 15, 2022 ................... 24

WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2020) ............... 12

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The American Hospital Association, American Medical Association, Federation of American Hospitals, and Texas Medical Association submit this brief *amici curiae* in support of Plaintiffs-Appellants Guardian Flight LLC and Med-Trans Corporation.

The **American Hospital Association** ("AHA") represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations, including in Texas. Founded in 1898, the AHA educates its members on healthcare issues and advocates on their behalf so that their perspectives are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters. Its members are committed to improving the health of the communities that they serve, and to helping ensure that care is available to and affordable for all Americans.

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amici*, its members, and its counsel) has contributed money to fund the preparation or submission of this brief.

1

The **American Medical Association** ("AMA"), an Illinois not-for-profit corporation founded in 1847, is the country's largest medical society. Its physicians practice in all fields of medical specialization in every state, including Texas. The AMA is dedicated to promoting the science and art of medicine and the betterment of public health.[2]

The **Federation of American Hospitals** ("FAH") is the national representative of more than 1,000 leading tax-paying hospitals and health systems throughout the United States. FAH members provide patients and communities with access to high-quality, affordable care in both urban and rural areas across Texas and 45 other states, plus Washington, DC, and Puerto Rico. Accounting for nearly 20 percent of U.S. hospitals, its members include teaching, acute, inpatient rehabilitation, behavioral health, and long-term-care hospitals, and provide a wide range of inpatient, ambulatory, post-acute, emergency, children's, and cancer services.

---

[2] The AMA and the Texas Medical Association (described below) file this brief as members of the American Medical Association/State Medical Society Litigation Center ("Litigation Center"). The Litigation Center was formed in 1995 as a coalition of the AMA and private, voluntary, nonprofit state medical societies to represent the views of organized medicine in the courts.

The **Texas Medical Association** ("TMA"), a Texas nonprofit corporation, is an association of more than 57,000 Texas physicians and medical students. TMA was founded in 1853 to serve the people of Texas in matters of medical care, prevention and cure of disease, and improvement of public health. Its diverse physician members practice in all fields of medical specialization.

*Amici* regularly file *amicus* briefs and engage in other advocacy efforts to support the interests of physicians and hospitals nationwide.

*Amici* and their members strongly support Congress's goal of protecting patients from "surprise billing." For years, they have consistently advocated for a patient-first solution to surprise medical bills that would shield patients from unexpected payments, while enabling providers and insurers to determine fair payment among themselves and ensuring continued access to care. *Amici* thus supported the compromise set forth in the No Surprises Act, which both protected patients from surprise medical bills and established an independent dispute resolution process to ensure that providers would not remain underpaid for their services.

The district court's determination that IDR awards are judicially unenforceable, however, upsets the balance that Congress struck, and fails to achieve the goal of fair payment. The members of *amici* AHA, AMA, FAH, and TMA agree with Plaintiffs that the district court's decision misinterprets the No Surprises Act. They submit this brief to emphasize that the presumption against ineffectiveness and constitutional avoidance canons further counsel in favor of Plaintiffs' reading, as well as to explain the detrimental impact the district court's holding will have on the ability of physicians and hospitals to provide their patients with the excellent care they deserve.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The No Surprises Act ("NSA") bars out-of-network providers from seeking payment from patients for certain services and establishes a system whereby providers may seek reasonable reimbursement from insurers instead. When providers and insurers cannot agree on the amount of reasonable reimbursement in the required 30-day "open negotiation" period, the NSA funnels them into independent dispute resolution ("IDR"), where an arbitrator selects one of the parties' two offers.

In IDR arbitration to date, providers have prevailed much more often than not. Yet according to the district court, they cannot judicially enforce those awards, even though the NSA provides no alternative enforcement mechanism. *Amici* file this brief to explain why the district court's conclusion is inconsistent with longstanding canons of statutory interpretation and the NSA's plain text, as well as to emphasize the harm such an interpretation will have on providers and their patients.

"Congress presumably does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178 (2014) (Scalia, J., concurring in part). Yet the district court interpreted the NSA to render entire sections of it

nugatory. There is no need for an IDR process—or any of the NSA's other payment mechanisms—if *nothing* requires insurers to render payment upon an IDR determination. Such an interpretation contravenes the presumption against ineffectiveness and is not required by the NSA's text or structure, which mandates that determinations "shall be *binding* upon the parties involved"—a congressional command that determinations be legally constraining and thus judicially enforceable.

Were that not the case, the NSA would raise serious constitutional questions. Congress cannot take away a core common-law right, like the right to seek payment for services rendered, without providing a reasonable alternative remedy. A toothless "remedy" is hardly reasonable.

The district court's interpretation also threatens serious harm to providers. It gives insurers significant leverage to demand confiscatory discounts from out-of-network providers, as well as to exact across-the-board rate cuts from in-network providers, lest they be kicked out of network and not paid at all. Both in- and out-of-network providers will thus find themselves perpetually underpaid or even uncompensated for

their valuable services, and patients will lose providers and critical care as a result.

This Court, however, can avoid adopting such an unreasonable and unconstitutional construction—and the serious harm to providers that would result—simply by interpreting the law to work in the way Congress intended.

## ARGUMENT

## I.  THE PRESUMPTION AGAINST INEFFECTIVENESS WEIGHS IN FAVOR OF JUDICIAL ENFORCEMENT

### A.  Courts Should Favor Textually Permissible Interpretations Of Laws That Avoid Rendering Them Nugatory

For the reasons explained in Plaintiffs' brief, the NSA unambiguously provides for judicial enforcement of IDR awards.  *See* Appellants' Br. 22-44.  But to the extent this Court has any doubts, it should rely on the "presumption against ineffectiveness" to avoid rendering a broad swath of the NSA useless.

One of "the fundamental principles of reading law" is the "presumption against ineffectiveness," which instructs courts to favor "a textually permissible interpretation that furthers rather than obstructs the document's purpose." *Texas Workforce Comm'n v. United States Dep't*

*of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020). The presumption in particular "weighs against interpretations of a statute that would 'render the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner.'" *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (alteration omitted) (quoting *The Emily*, 22 U.S. (9 Wheat.) 381, 389 (1824)). More simply, the presumption reflects "the idea that Congress presumably does not enact useless laws." *Castleman*, 572 U.S. at 178 (Scalia, J., concurring in part); *see also United States v. Hartley*, 34 F.4th 919, 928 (10th Cir. 2022) (courts should "give effect to each statute Congress enacts because a statute's 'evident purpose always includes effectiveness.'" (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012))).

Because the NSA provides no alternative enforcement mechanism against insurers—and because, under the district court's view, there are no common-law enforcement mechanisms, either—if IDR awards are not judicially enforceable, there is no reason for a loser in the IDR process to pay an award. Nor, for that matter, would there be any reason for a party

to submit to *any* aspect of the NSA's extensive scheme for determining what the award should be.[3]

The district court's conclusion thus "render[s] nugatory" and allows insurers "to elude" whole sections of the NSA—including all of 42 U.S.C. § 300gg-111(c) and many parts of § 300gg-111(a) and (b).[4]  There is no reason for insurers to send "an initial payment or notice of denial of payment" to a provider if the provider can never force the insurer to render payment at all.  42 U.S.C. § 300gg-111(a)(1)(C)(iv), (b)(1)(C), (D). There is also no reason why the insurer should engage in the required 30-day "open negotiation" period to see if the parties can agree on a preliminary payment, *id.* § 300gg-111(c)(1)(A), much less submit to the IDR process "in case of failed negotiations," *id.* § 300gg-111(c)(1)(B).

---

[3] The NSA gives the relevant agencies enforcement authority to impose civil monetary penalties of up to $10,000 only on a "provider or facility" for violating the Act's patient-protection provisions.  42 U.S.C. § 300gg-134(a)(1), (b)(1) (authorizing agencies to impose fines against "a provider or facility," "including, as applicable, a provider of air ambulance services").  It provides no similar authority to penalize insurers who fail (even intentionally) to comply with their statutory obligation to make timely payments or otherwise participate in the IDR process.  *Cf. id.* § 300gg-111(a)(2) (providing authority only to conduct audits to determine whether Qualified Payments Amounts are properly calculated).

[4] The same analysis applies to the NSA's parallel provisions governing air ambulance bills.  *See* 42 U.S.C. § 300gg-112(a)(3), (b).

9

Equally "useless," then, are the NSA's extensive provisions governing the IDR process. Those provisions include directives on how to treat a provider's claims, how to select and certify IDR entities, how the IDR entity should make its payment determination, and what information should be published about the IDR process. 42 U.S.C. § 300gg-111(c)(2), (c)(3), (c)(4), (c)(5), (c)(7). Congress's specification that IDR determinations "shall be binding upon the parties involved," *id.* § 300gg-111(c)(5)(E)(i), is also wholly without effect, as is its instruction that payment should be made to a provider "not later than 30 days after the date on which such determination is made," *id.* § 300gg-111(c)(6). Under the district court's reasoning, Congress might as well not have enacted such provisions given that payers can refuse to pay the award without consequence.

More broadly, "the absence of judicial enforcement would frustrate Congress's attempt to" solve the problem of surprise billing while ensuring providers are properly compensated for their services. *Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68, 75 (D.D.C. 2002). "The most reliable guide to congressional intent is the legislation [that] Congress enacted," *Sierra Club v. E.P.A.*, 294 F.3d 155, 161 (D.C. Cir.

2002), and the NSA makes clear that Congress did not intend for providers to be left holding the bag.  As this Court's recent decision in *Texas Medical Association v. United States Department of Health and Human Services* confirms, the structure of IDR arbitration shows that Congress sought to ensure fair burden-sharing between healthcare providers and commercial insurers.  In *Texas Medical Association*, this Court considered whether Congress intended to "place a thumb on the scale in favor of the *insurer*-determined [Qualifying Payment Amount ("QPA")] in derogation of the other congressionally mandated factors." No. 23-40217, 2024 WL 3633795, at *10 (5th Cir. Aug. 2, 2024) (emphasis added).  It concluded that Congress did not, and that doing so would "distort the statutory scheme."  *Id.*  Here, the district court's interpretation would not just place a thumb on the scale in favor of insurers; it would let insurers throw the scale out the window.

## B.    The NSA Can And Should Be Read to Make It Effective

The district court need not have gone down this futile road.  As Plaintiffs outline, there is "a textually permissible interpretation that" avoids this outcome.  That interpretation "furthers rather than obstructs the [NSA]'s purpose," *Texas Workforce Comm'n*, 973 F.3d at 389, and

saves many of its provisions from futility, *see SEC v. Hallam*, 42 F.4th 316, 339 (5th Cir. 2022) ("Our mandate is to give effect to every word and every provision of [a statute]." (internal quotation marks omitted)).

The NSA states that an IDR determination "shall be *binding* upon the parties involved." 42 U.S.C. § 300gg-111(c)(5)(E)(i) (emphasis added). The term "binding" is "understood to mean that an award will be enforceable *in court*." *Cheminova*, 182 F. Supp. 2d at 73 (emphasis added). Indeed, the plain meaning of "to bind" is "to constrain with legal authority." *See Bind*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2020); *see also Bind*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2020) ("bind" means "to compel, as by oath, *legal restraint*, or contract" (emphasis added)). That is also the meaning the term has long had in private arbitration, the background context against which the NSA was drafted. *See Lander Co. v. MMP Invs., Inc.*, 107 F.3d 476, 480 (7th Cir. 1997) ("To agree to binding arbitration is to agree that if your opponent wins the arbitration he can obtain judicial relief if you refuse to comply with the arbitrator's award."); *Place St. Charles v. J.A. Jones Constr. Co.*, 823 F.2d 120, 124 (5th Cir. 1987) (arbitration clause stating a "decision shall be final and binding" rendered arbitration award

judicially enforceable); *see also* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (incorporating same four grounds for vacatur as Federal Arbitration Act).

The structure of 42 U.S.C. § 300gg-111(c)(5)(E)(i) confirms this understanding of "binding." The section has two prongs, the first stating that an IDR determination "shall be binding upon the parties involved" and the second that the determination "shall not be subject to judicial review," except in a limited set of circumstances. Similar to how the Federal Arbitration Act distinguishes between judicial confirmation (9 U.S.C. § 9) and vacatur (*id.* § 10), the NSA's two-pronged approach thus reflects the long-recognized distinction between judicial *enforcement* and judicial *review*. *See Ballew v. Continental Airlines, Inc.*, 668 F.3d 777, 783 n.3 (5th Cir. 2012) (noting that a certain type of award "[wa]s enforceable in federal court," but "subject only to very narrow judicial review"); *see also Judicial Review*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining judicial review generally as "[a] court's review of *** an administrative body's factual or legal findings").

The NSA's use of the term "binding" thus indicates that Congress intended IDR awardees to have a limited cause of action—to enforce their awards in federal court, though not to litigate their rights to awards in

13

the first place. That language, the limited right and remedy, and the fact that there is no other mechanism by which IDR awards may be enforced, distinguish the NSA's scheme from others where courts have found no private right of action. *Cf. Saloojas, Inc. v. Aetna Health of Cal., Inc.*, 80 F.4th 1011, 1015 (9th Cir. 2023) (no private right of action under CARES Act to litigate right to reimbursement where statute stated only that insurer "shall reimburse" provider and expressly provided other enforcement mechanism). The Court should thus adopt the only reading that makes the NSA effective, based on the text and structure of 42 U.S.C. § 300gg-111(c)(5)(E).

## II. JUDICIAL ENFORCEMENT IS NECESSARY TO AVOID SIGNIFICANT CONSTITUTIONAL CONCERNS

Because construing the statute to preclude judicial review would also raise significant constitutional concerns, this Court "must construe the statute to avoid those problems unless [the] construction is plainly contrary to the will of Congress." *Nehme v. I.N.S.*, 252 F.3d 415, 422 (5th Cir. 2001); *see Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) ("When a serious doubt is raised about the constitutionality of an Act of Congress, it is a cardinal principle that this Court will first ascertain whether a

14

construction of the statute is fairly possible by which the question may be avoided." (internal quotations and citations omitted)).

Prior to the enactment of the NSA, providers had common-law causes of action to seek payment from out-of-network patients for the medical services they received. *See, e.g.*, *Texas Health Harris Methodist Hosp. Fort Worth v. Featherly*, 648 S.W.3d 556, 578-579 (Tex. App. 2022); *Republic Bankers Life Ins. Co. v. Anglin*, 433 S.W.2d 795, 796 (Tex. Civ. App. 1968). Indeed, the right for a physician to seek payment for services rendered—even from a patient too incapacitated to consent to treatment—was established in the early days of the Republic. *See* Judy Beckner Sloan, *Quantum Meruit: Residual Equity in Law*, 42 DEPAUL L. REV. 399, 431 & n.197 (1992) (citing *Pynchon v. Brewster*, Quincy 224 (Mass. 1766); *Judah v. M'Namee*, 3 Blackf. 269 (Ind. 1833)); *see also Mooney v. Lloyd*, 1819 WL 1927, at *3 (Pa. 1819) (establishing that physicians can sue for fees in the United States); *see also Webb v. B.C. Rogers Poultry, Inc.*, 174 F.3d 697, 705 n.19 (5th Cir. 1999) (quantum

meruit "*obligated* the common law courts to enforce certain implied promises." (internal quotation marks omitted)).

The NSA now protects out-of-network patients from such surprise medical bills, removing them from the middle of payment disputes and ensuring that patients pay no more than a reasonable cost-sharing amount. *See* 42 U.S.C. § 300gg-111(a)(1), (3)(H). The NSA thus replaces providers' common-law right to seek payment from patients with a statutory scheme intended to ensure that providers have a reasonable means of obtaining the balance of their payment from insurers.

While *amici* strongly support this policy development, the district court's determination that parties have no means to enforce an IDR award raises significant constitutional concerns. Specifically, the district court's decision raises the question whether it is constitutional to wholly abrogate a core common-law right without providing a reasonable alternative remedy.

Courts and judges have suggested that the ability of government "to abolish [such] 'core' common-law rights *** without a compelling showing of necessity or a provision for a reasonable alternative remedy" is limited. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 93-94 & n.3

(1980) (Marshall, J., concurring); *see New York Cent. R.R. Co. v. White*, 243 U.S. 188, 201 (1917) (questioning "whether the state could abolish all rights of action *** without setting up something adequate in their stead"); *cf. Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1200-1201 (9th Cir. 1998) (O'Scannlain, J.) ("[T]here is, we think, a 'core' notion of constitutionally protected property"—defined in part by "common law pedigree"—"into which state regulation simply may not intrude[.]"); *id.* at 1200 n.4 (quoting Justice Marshall's concurrence in *PruneYard* because "[h]is comments bear repeating at some length").

Judge Berzon's separate opinion in *Ileto v. Glock, Inc.* is instructive. As she explained, "an individual [has] a weighty property interest in having *some* legal means available to redress an injury that would have been compensable at common law." 565 F.3d 1126, 1153 (9th Cir. 2009) (Berzon, J., concurring in part and dissenting in part). Supreme Court precedent has thus cast doubt on "whether rational basis review is the appropriate level of scrutiny for a statute that abrogates common-law remedies *without providing or leaving open a substitute remedial scheme*." *Id.* at 1150 (Berzon, J., concurring in part and dissenting in part). For example, the Supreme Court sustained against a due process

17

challenge a statute limiting federally licensed nuclear facilities' accident liability, in part because "the Act provided a compensation scheme that was a 'reasonably just substitute' to the common law, and perhaps even an improvement on the common law." *Id.* at 1152 (Berzon, J., concurring in part and dissenting in part) (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 88, 90-92 (1978)).  In blessing a scheme that wholly abrogated a common-law right, the Supreme Court thus "applied a modified rational basis test" and approved the scheme after observing that alternative remedial paths remained open.  *Id.* (Berzon, J., concurring in part and dissenting in part).  Given this precedent, Judge Berzon stated:  "For purposes of the avoidance canon, it is sufficient to determine that a serious constitutional question exists, and the case law I have just canvassed demonstrates that this is so. *** [T]hat is precisely the point of the constitutional avoidance canon—to avoid open questions." *Id.* at 1153 (Berzon, J., concurring in part and dissenting in part).

So too here.  Providers have a "weighty property interest" in seeking payment for services performed.  Doctors and hospitals have invested considerable resources in their careers and facilities with the assurance

that they will be able to seek *post hoc* compensation for the services they are professionally and legally obligated to render. If the district court's interpretation is correct, and the NSA provides no actual alternative remedy to the elimination of medical professionals' common-law right to seek payment from patients, then the NSA should likewise "be subject not to rational basis review but to a heightened form of scrutiny." *Ileto*, 565 F.3d at 1153 (Berzon, J., concurring in part and dissenting in part).

Without a means of allowing providers to enforce IDR awards, the NSA would necessarily fail heightened scrutiny because the government cannot make "a compelling showing" that eliminating providers' right to reasonable compensation resulted from "necessity." *PruneYard*, 447 U.S. at 94 (Marshall, J., concurring). To the contrary, the NSA's detailed IDR provisions demonstrate that Congress did not think the elimination of reasonable compensation was justified *at all*.

At the very least, "[r]eading the [NSA] to extinguish Plaintiffs' claims without providing any alternative scheme for compensation thus raises serious constitutional questions that neither [this Court] nor the Supreme Court have resolved." *Ileto*, 565 F.3d at 1154 (Berzon, J., concurring in part and dissenting in part). Consequently, this Court

19

should "apply the venerable maxim of statutory interpretation prescribing that where ambiguous statutory language is capable of bearing two or more interpretations, courts should adopt the interpretation that does not raise a serious constitutional question 'unless such construction is plainly contrary to the intent of Congress.'" *Id.* (Berzon, J., concurring in part and dissenting in part) (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).

## III.  PROVIDERS AND PATIENTS ARE SERIOUSLY HARMED BY INSURERS' FAILURE TO PAY IDR AWARDS

The harm providers will suffer if the district court's decision is affirmed should be obvious.  Under the NSA, it is usually providers who seek payment from insurers because it is providers who have rendered services without pre-payment.  If insurers' payment obligations are unenforceable, they will have no incentive to pay providers *at all*, much less in a timely manner.

Even prior to the district court's decision, a significant number of insurers were refusing to comply with IDR determinations.  A 2023 survey of more than 48,000 physicians across 45 states found that *52% of IDR awards owed providers had not been paid at all.*  Americans for Fair

Health Care, *No Surprises Act (NSA) Impact Analysis*, at 3-4 (2023).[5] Of the payments actually made, 49% were not remitted within the requisite 30-day timeframe, and 33% were made in an incorrect amount. *Id.* A survey of emergency department practices likewise found significant noncompliance, with 24% of respondents reporting that their IDR awards were either unpaid or paid incorrectly within the 30 business days required by the NSA. Emergency Dep't Practice Mgmt. Ass'n, *No Surprises Act Implementation and Compliance: Data Analysis*, at 3 (April 2024).[6] Moreover, some insurers were already explicitly telling providers they would not "honor an arbitration award because they view them as 'unenforceable' and 'not binding.'" Tina Reed, *Doctors say insurers are ignoring orders to pay surprise billing disputes*, Axios (Aug. 3, 2023).[7] Now that a federal court has held that IDR awards are unenforceable, those numbers and those refusals are only likely to increase.

---

[5] https://www.americansforfairhealthcare.org/_files/ugd/11639b_a39a37a219aa40ee8d68a219ec2e84ed.pdf.

[6] https://edpma.org/wp-content/uploads/2021/02/EDPMA-NSA-Implementation-and-Compliance-Data-Analysis-April-2024-1.pdf.

[7] https://www.axios.com/2023/08/03/insurers-refusing-pay-surprise-billing.

Providers will not be otherwise adequately compensated. As noted, after a patient receives service but before IDR arbitration, insurers must send either an "initial payment or notice of denial of payment," and then engage in a 30-day "open negotiation" period to see if the parties can agree on a reasonable payment amount. But insurers are not paying out-of-network providers adequate compensation during that pre-IDR process. To wit, providers overwhelmingly win IDR disputes. Between July and December 2023, "[p]roviders, facilities, or air ambulance providers were the prevailing party in approximately *82%* of payment determinations." CMS, *Supplemental Background on Federal Independent Dispute Resolution Public Use Files, July 1, 2023-December 31, 2023*, at 4 (June 13, 2024) (emphasis added).[8] That high number was not a fluke. In the six months prior, providers were the prevailing party in 77% of payment determinations. CMS, *Supplemental Background on Federal Independent Dispute Resolution Public Use Files, January 1, 2023-June 30, 2023*, at 3 (Feb. 15, 2024).[9] Without the crucial backstop

---

[8]     https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q3-2023-q4.pdf.

[9]     https://www.cms.gov/files/document/federal-idr-supplemental-background-2023-q1-2023-q2.pdf.

of the IDR process, insurers' lowball offers—and outright refusals to pay—will become even more commonplace.

Insurers' underpayments and noncompliance with the IDR process have already had serious consequences for health systems. Last year, the Chief Financial Officer of a not-for-profit, community-based health system, which operates 6 of the top 20 busiest emergency departments in Georgia and Georgia's largest trauma network, told Congress that the health system had received timely payment in just *one-third* of its winning IDR disputes, representing over *$40 million* in reimbursement still outstanding. *Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections: Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Jim Budzinski, Exec. Vice President and Chief Fin. Officer, Wellstar Health System), at 4-5. Another provider reported that the majority of its IDR awards remained unpaid past the 30-day statutory deadline, while a third stated it had over $5 million in unpaid IDR awards. U.S. GOV'T ACCOUNTABILITY OFF., GAO-24-106335, PRIVATE HEALTH INSURANCE: ROLL OUT OF INDEPENDENT DISPUTE RESOLUTION PROCESS FOR OUT-OF-NETWORK CLAIMS HAS BEEN CHALLENGING 30 (2023).

These long-delayed payments (and refusals to pay) come at a perilous time for hospitals in particular.  After weathering a once-in-a-century global pandemic, "[p]ersistent workforce shortages, severe fractures in the supply chain for drugs and supplies, and high levels of inflation have collectively fueled hospitals' costs as they care for patients 24/7."  American Hosp. Ass'n, *America's Hospitals and Health Systems Continue to Face Escalating Operational Costs and Economic Pressures as They Care for Patients and Communities* (May 2024).[10]  Hospitals are thus "operating with little to no margin," *id.* (emphasis omitted), and depend on adequate and timely payment to ensure excellent care.

Moreover, even before the district court's decision, in-network providers had seen abrupt demands from insurers for across-the-board rate reductions as high as 50%.  Nona Tepper, *Coming to a contract negotiation near you: the No Surprises Act*, MODERN HEALTHCARE, Aug. 15, 2022.  In one instance, two insurers unilaterally terminated the contracts of a physician-owned practice group of emergency doctors, pushing a third of the group's commercial patients out of network and paying "up to 70 percent less than our previous contracts for what are

---

[10] https://www.aha.org/costsofcaring.

now out of network services." *Reduced Care for Patients: Fallout from Flawed Implementation of Surprise Medical Billing Protections: Hearing Before the H. Comm. on Ways and Means*, 118th Cong. (2023) (statement of Seth Bleier, MD, FACEP, Vice President of Fin., Wake Emergency Physicians, PA (WEPPA)) ("Bleier Statement"), at 2.

At the time, these developments were considered to be in part due to the inordinate and unlawful weight the government had ordered IDR arbitrators to give a below-market lodestar, the QPA. *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-24-106335, PRIVATE HEALTH INSURANCE, *supra*, at 32. If this is what occurred when insurers had only an overweighted QPA in their back pocket, imagine what will happen when insurers realize they need not pay out-of-network providers *anything at all*. In-network providers will be forced to accept even greater take-it-or-leave-it rate cuts, knowing that their other choice is to be pushed out of network and potentially never paid (by anyone).

It is patients who will ultimately suffer. As the government has recognized, significant reductions in provider rates can "threaten the viability of *** providers [and] facilities," which "in turn, c[an] lead to participants, beneficiaries and enrollees not receiving needed medical

care, undermining the goals of the No Surprises Act." Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 56,044 (Oct. 7, 2021). Rural and other underserved patient populations will bear the brunt of the sea change, losing their access to readily available and personalized care. Bleier Statement 2. The representative for one emergency physician group serving rural populations explained that after being forced out of network by two of their insurers, his group feared they would have to "reduce salaries, reduce physician and advanced practice provider staffing hours, cut positions, or make difficult decisions about what areas we can realistically serve." *Id.* at 3. Emergency physician practices in rural and underserved areas may be "unable to afford to continue to operate in the areas where patients need them most," leaving millions with "less access to the lifesaving emergency care they need and deserve." *Id.* at 3-4.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court and hold that the IDR awards are judicially enforceable.

Dated:  October 4, 2024

Respectfully submitted,

_s/ James E. Tysse_____

James E. Tysse
Kelly M. Cleary
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 887-4000
jtysse@akingump.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*s/ James E. Tysse*
James E. Tysse

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,820 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word Version 2016, 14-point Century Schoolbook font.

*s/James E. Tysse*
James E. Tysse

October 4, 2024