No. 24-10561

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————

GUARDIAN FLIGHT, L.L.C.; MED-TRANS CORPORATION,

Plaintiffs-Appellants,

v.

HEALTH CARE SERVICE CORPORATION,

Defendant-Appellee.

———————

On Appeal from the United States District Court
for the Northern District of Texas

———————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

———————

SEEMA NANDA
  *Solicitor of Labor*

WAYNE R. BERRY
  *Associate Solicitor for Plan Benefits
  Security*

JEFFREY M. HAHN
  *Counsel for Appellate and Special
  Litigation*

ISIDRO MARISCAL
  *Trial Attorney*
  *U.S. Department of Labor*
  *Office of the Solicitor*
  *Plan Benefits Security Division*
  *200 Constitution Avenue NW, N4611*
  *Washington, DC 20210*
  *(202) 693-5600*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JOSHUA M. SALZMAN
KEVIN B. SOTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF THE UNITED STATES ............. 1

STATEMENT OF THE ISSUES ................................................. 2

STATEMENT OF THE CASE ................................................... 2

    A.    Statutory Background ................................................ 2

    B.    Factual and Procedural Background ........................... 6

SUMMARY OF ARGUMENT ................................................. 6

ARGUMENT ......................................................................... 7

I.    The district court erred in holding that IDR awards under the NSA are not judicially enforceable. ............................... 7

II.    Providers with assignments have standing to redress an insurer's failure to pay benefits in accordance with ERISA's surprise-billing provisions. ............................................................... 17

    A.    ERISA's surprise-billing provisions modify benefits due under plan terms. ................................................. 18

    B.    A denial of plan benefits confers an injury-in-fact regardless of whether a participant suffers a pocketbook injury .................. 22

CONCLUSION ...................................................................... 29

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004) ................................................................. 18

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ............................................................... 9, 10

*Amrhein v. eClinical Works, LLC*,
  954 F.3d 328 (1st Cir. 2020) ................................................... 24

*Arana v. Ochsner Health Plan*,
  338 F. 3d 433 (5th Cir. 2003) .................................................. 19

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................. 16

*Bauer v. Summit Bancorp*,
  325 F.3d 155 (3d Cir. 2003) .................................................... 18

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ................................................................. 16

*Central Laborers' Pension Fund v. Heinz*,
  541 U.S. 739 (2004) ......................................................... 18-19, 21

*Cheminova A/S v. Griffin L.L.C.*,
  182 F. Supp. 2d 68 (D.D.C. 2002) ......................................... 15

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011) ................................................................. 26

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995) ................................................................... 26

*Denning v. Bond Pharmacy, Inc.*,
  50 F.4th 445 (5th Cir. 2022) ................................................... 24

*DiCarlo v. St. Mary Hosp.*,
    530 F.3d 255 (3d Cir. 2008) ...................................................... 24

*GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*,
    No. 22-6614, 2023 WL 5815821 (D.N.J. Sept. 8, 2023) ............................ 14

*Hall St. Assocs., LLC v. Mattel, Inc.*,
    552 U.S. 576 (2008) .................................................................... 12

*Harrison v. Envision Mgmt. Holding, Inc.*,
    59 F.4th 1090 (10th Cir. 2023) .................................................... 13

*HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*,
    240 F.3d 982 (11th Cir. 2001) .................................................... 26

*Key Tronic Corp. v. United States*,
    511 U.S. 809 (1994) ...............................................................10-11

*Mitchell v. Blue Cross Blue Shield of N.D.*,
    953 F.3d 529 (8th Cir. 2020) ...................................................25, 26

*Montefiore Med. Ctr. v. Teamsters Local 272*,
    642 F.3d 321 (2d Cir. 2011) ...................................................... 27

*N.R. ex rel. S.R. v. Raytheon Co.*,
    24 F.4th 740 (1st Cir. 2022) ...................................................20, 22

*Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n*,
    499 U.S. 117 (1991) ................................................................ 20

*North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
    781 F.3d 182 (5th Cir. 2015) ..........................................22, 24, 27

*Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v.
    Cigna Health & Life Ins. Co.*,
    No. 20-cv-10345, 2022 WL 1567797 (D.N.J. May 18, 2022) ................20-21

*Plumb v. Fluid Pump Serv., Inc.*,
   124 F.3d 849 (7th Cir. 1997) ...............................................................19-20

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
   770 F.3d 1282 (9th Cir. 2014) .................................................... 26

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................. 23

*Springer v. Cleveland Clinic Emp. Health Plan Total Care*,
   900 F.3d 284 (6th Cir. 2018) .................................................... 26

*Stokes v. Southwest Airlines*,
   887 F.3d 199 (5th Cir. 2018) ...................................................... 9

*Tennessee Elec. Power Co. v. Tennessee Valley Auth.*,
   306 U.S. 118 (1939) .................................................................. 24

*Thorpe Insulation Co., In re*,
   677 F.3d 869 (9th Cir. 2012) .................................................... 24

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979) .................................................................... 16

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus.*
   *& Serv. Workers Int'l Union v. Cookson Am., Inc.*,
   710 F.3d 470 (2d Cir. 2013)...................................................... 26

*UNUM Life Ins. Co. of Am. v. Ward*,
   526 U.S. 358 (1999) .............................................................19, 21

*US Airways, Inc. v. McCutchen*,
   569 U.S. 88 (2013) ..............................................................18, 26

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
   529 U.S. 765 (2000) ............................................................22, 28

**Statutes:**

No Surprises Act,
   Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020) ......... 4

9 U.S.C. § 9 ............................................................................................ 12

9 U.S.C. § 10 .......................................................................................... 12

9 U.S.C. § 10(a) ..................................................................................... 12

9 U.S.C. § 10(a)(1) ................................................................................ 15

9 U.S.C. § 10(a)(1)-(4) .......................................................................... 12

9 U.S.C. § 10(a)(3)-(4) .......................................................................... 14

9 U.S.C. § 11(a)-(c) ............................................................................... 12

29 U.S.C. § 1001(b) ................................................................................. 2

29 U.S.C. § 1104(a)(1)(D) ..................................................................... 18

29 U.S.C. § 1132 ................................................................................... 1-2

29 U.S.C. § 1132(a)(1)(B) ...............................................................18, 20

29 U.S.C. § 1132(a)(5) ........................................................................... 13

29 U.S.C. § 1135 ..................................................................................... 2

29 U.S.C. § 1144(b)(2)(A) ..................................................................... 19

29 U.S.C. § 1185a ................................................................................... 20

29 U.S.C. § 1185e ................................................................................. 2, 4

29 U.S.C. § 1185f ................................................................................. 2, 4

29 U.S.C. § 1185f(a)(3)(B) ..................................................................... 21

29 U.S.C. § 1185f(b)(6) ...................................................... 10, 21, 28

42 U.S.C. § 300gg-22(b)(2) ...................................................... 13

42 U.S.C. § 300gg-111 *et seq.* .................................................. 4

42 U.S.C. § 300gg-111 ............................................................ 5

42 U.S.C. § 300gg-111(a)(1) ...................................................... 1

42 U.S.C. § 300gg-111(a)(1)(C)(ii)-(iii) ..................................... 5

42 U.S.C. § 300gg-111(a)(1)(C)(iv)(II) ................................... 5, 9

42 U.S.C. § 300gg-111(a)(3)(H)(ii) .......................................... 5

42 U.S.C. § 300gg-111(a)(3)(K) ............................................... 5

42 U.S.C. § 300gg-111(a)(3)(K)(ii)(II) ..................................... 8

42 U.S.C. § 300gg-111(b)(1)(A)-(B) ......................................... 5

42 U.S.C. § 300gg-111(b)(1)(D) ............................................... 9

42 U.S.C. § 300gg-111(c) ........................................................ 5

42 U.S.C. § 300gg-111(c)(1)(B) ............................................... 5

42 U.S.C. § 300gg-111(c)(5)(E)(i)(I) ............................. 5, 9, 11, 13

42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) ......................... 6, 11, 12, 15

42 U.S.C. § 300gg-111(c)(6) ..................................... 6, 10, 21

42 U.S.C. § 300gg-112 ............................................................ 5

42 U.S.C. § 300gg-112(a)(1)-(2) ............................................. 5

42 U.S.C. § 300gg-112(a)(3) ................................................... 5

42 U.S.C. § 300gg-112(a)(3)(B) ...................................................9, 21

42 U.S.C. § 300gg-112(b)(1)(B) ...................................................... 5

42 U.S.C. § 300gg-112(b)(5)(D) ..................................................... 6

42 U.S.C. § 300gg-112(b)(6) ..............................................6, 10, 22

42 U.S.C. § 300gg-131 ................................................................... 4

42 U.S.C. § 300gg-132 ............................................................... 4-5

42 U.S.C. § 300gg-135 ............................................................... 4-5

**Regulations:**

29 C.F.R. pt. 2590, subpart D ....................................................... 2

45 C.F.R. § 150.301 ..................................................................... 13

**Legislative Material:**

H.R. Rep. No. 116-615, pt. 1 (2020)......................................4, 5, 8

**Other Authorities:**

*Requirements Related to Surprise Billing; Part I*,
    86 Fed. Reg. 36,872 (July 13, 2021) ........................................ 3

Restatement (First) of Contracts § 328 cmt. a (Am. Law Inst. 1932) ............. 24

2 Lee R. Russ & Thomas F. Segalla,
    Couch on Insurance 3d § 19:1 (1996) ..................................19, 20

**INTRODUCTION AND INTEREST OF THE UNITED STATES**

The No Surprises Act (NSA) protects patients from potentially ruinous surprise medical bills.[1] To that end, the NSA created a mechanism—the independent dispute resolution (IDR) process—for resolving payment disputes between medical providers and insurers and for ensuring that providers receive fair compensation for their services. The IDR process is integral to the NSA. When the parties cannot agree on appropriate compensation, the IDR process culminates in a payment determination reached through binding arbitration. Yet, the district court held that a party to the IDR process cannot enforce an IDR award. If there were no private means to enforce IDR awards, one of the statute's core features would be frustrated, upending Congress's scheme.

The U.S. Departments of Health and Human Services (HHS), Labor, and the Treasury are jointly charged with implementing the NSA and the United States accordingly has a strong interest in the stability and sustainability of the IDR process. The Department of Labor also has a strong interest in enforcing the provisions of Title I of the Employee Retirement Income Security Act of 1974 (ERISA) to ensure fair and impartial plan administration and compliance by ERISA-governed health plans with ERISA's requirements and purposes. 29

---

[1] This brief uses the term "insurers" or "plans" to refer to "group health plans" and "health insurance issuers." *See* 42 U.S.C. § 300gg-111(a)(1).

U.S.C. §§ 1132, 1135. The NSA added surprise-billing provisions to ERISA, and ERISA-plan terms must be implemented in accordance with ERISA's substantive standards, including those stemming from these provisions and the Department of Labor's implementing regulation. *Id.* §§ 1185e, 1185f; 29 C.F.R. pt. 2590, subpart D. ERISA participants, beneficiaries, and assignees are entitled to "ready access to the Federal courts." 29 U.S.C. § 1001(b).

## STATEMENT OF THE ISSUES

1. Whether a party to an IDR proceeding can judicially enforce the arbitrator's payment determination; and

2. Whether plaintiffs, who were assigned benefits by patients participating in ERISA-governed health plans, have standing to assert a claim for wrongful denial of benefits under ERISA for failing to pay benefits in accordance with an IDR determination.[2]

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.** Medical services are not provided under uniform pricing models, and the amount a provider will charge for care to a given patient often depends on whether the patient has health insurance and, if so, whether the provider has

---

[2] The government expresses no view on plaintiffs' unjust enrichment claim.

entered into a contract with the patient's health plan agreeing to provide services to the plan's members at particular pre-negotiated rates.

Most health plans have a network of providers who have contractually agreed to accept pre-negotiated payment amounts for specific items or services. *See Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872, 36,874 (July 13, 2021). Plans encourage their members to receive care from these "in-network" providers, and when they do so, the patients' financial obligations are limited by the terms of their health plans. When, however, a patient receives care from an out-of-network provider, the patient's health plan may decline to pay the provider or may pay an amount lower than the provider's billed charges. In that circumstance, the patient is responsible for the balance of the bill, and because the rate charged was not pre-negotiated by the patient's health plan, it may cost immensely more than the item or service would have cost had the rate been pre-negotiated.

"A balance bill may come as a surprise for the individual." 86 Fed. Reg. at 36,874. Surprise billing may occur when a patient receives care from a provider whom the patient could not have chosen in advance, or whom the patient did not have reason to believe would be outside the network. For example, a patient in an emergency situation will often be unable to choose which emergency department she goes to or whether to receive care from an in-

network provider even if the emergency department happens to be in-network. *Id.* This situation arises frequently in connection with air ambulance providers, as individuals generally do not have the ability to select an air ambulance provider and consequently have little control over whether the provider is in-network. *See id.*

Under these circumstances, a patient with health insurance could receive a surprise medical bill. *See* 86 Fed. Reg. at 36,874. As Congress recognized, "[t]hese unexpected medical bills can result in financial ruin." H.R. Rep. No. 116-615, pt. 1, at 52 (2020).

**2.** Congress enacted the NSA to combat the crisis of surprise medical bills. Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-2890 (2020). The NSA made parallel amendments to three statutes: the Public Health Service Act (PHSA), *see* 42 U.S.C. § 300gg-111 *et seq.*; Part 7 of ERISA, which establishes requirements for group health plans, *i.e.*, employer-sponsored plans that provide medical benefits to employees and their dependents, *see* 29 U.S.C. §§ 1185e, 1185f; and the Internal Revenue Code.[3]

The NSA protects insured patients from unexpected liabilities by prohibiting balance billing by certain types of providers. 42 U.S.C. §§ 300gg-131,

---

[3] Unless otherwise noted, this brief cites to the NSA's amendments to the PHSA.

4

132, 135. When applicable, the NSA caps a patient's share of liability to an out-of-network provider at an amount comparable to what the individual would have owed had she received care from an in-network provider. *See id.* §§ 300gg-111(a)(1)(C)(ii)-(iii), (3)(H)(ii), (b)(1)(A)-(B), 300gg-112(a)(1)-(2).

In turn, the NSA also creates a process that allows the provider and insurer to determine an out-of-network rate in the absence of an in-network contract. 42 U.S.C. §§ 300gg-111, 300gg-112. Under these provisions, insurers are required to cover specified services furnished by non-participating providers, and "shall pay" those providers the difference between the participant's cost-sharing obligation and the "out-of-network rate" for the service. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D); *id.* § 300gg-112(a)(3); *see id.* § 300gg-111(a)(3)(K) (defining "out-of-network rate").

If the insurer and provider are not able to agree on a payment amount, either may initiate the IDR process. 42 U.S.C. §§ 300gg-111(c)(1)(B), 300gg-112(b)(1)(B). The IDR process involves "baseball-style" arbitration, whereby the decisionmaker (referred to as a "certified IDR entity" or "CIDRE") selects one of the parties' proposed payment amounts. *Id.* § 300gg-111(c); *see also* H.R. Rep. No. 116-615, pt. 1, at 56-57 (describing "the IDR process, also referred to as arbitration"). The CIDRE's determination "shall be binding upon the parties involved," 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I), and "shall not be subject to

judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9," a section of the Federal Arbitration Act, *id.* § 300gg-111(c)(5)(E)(i)(II). *See also id.* § 300gg-112(b)(5)(D) (incorporating these provisions with respect to air ambulance IDR determinations). The insurer's share of the payment "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* §§ 300gg-111(c)(6), 300gg-112(b)(6).

### B.     Factual and Procedural Background

Plaintiffs are air ambulance providers that engaged in the IDR process with defendant Health Care Service Corporation (HCSC), an insurance company. ROA.103-104; Compl. at 1. Plaintiffs allege they obtained IDR determinations that HCSC has refused to pay. Compl. at 4-5, Ex. A. The district court held, as relevant here, that the NSA does not contain an express or implied cause of action to enforce an IDR determination and that plaintiffs lacked standing to pursue their ERISA claim. ROA.106-112.

## SUMMARY OF ARGUMENT

**I.** The IDR process would make little sense if the parties to a CIDRE's payment determination lacked a means for judicial enforcement. The NSA's text, structure, purpose, and history support judicial enforcement of the payment determinations. Congress also modeled this statute's dispute resolution process

on binding arbitration between private parties—a proceeding where a central principle is that a party may judicially enforce the award. No adequate alternative means for enforcing an IDR award is apparent.

**II.** The district court also erred in concluding that plaintiffs lacked standing to assert claims for wrongful denial of benefits under ERISA section 502(a)(1)(B). The surprise-billing provisions added to ERISA by the NSA directly modify the benefits provided by ERISA-governed health plans by requiring that they cover out-of-network air ambulance services if covered in-network, and that they pay the providers of those services in accordance with IDR determinations. Because the NSA's payment requirements are tantamount to mandatory plan benefits, refusal to pay benefits in accordance with IDR determinations is a wrongful denial of plan benefits that imparts an injury-in-fact on plan participants, and, by extension, on plaintiffs suing based on assignments of benefits. In any event, and apart from any injury to participants, plaintiffs have also suffered an injury in their own right sufficient for Article III standing based on defendant's failure to make the statutorily required payments.

## ARGUMENT

### I.     The district court erred in holding that IDR awards under the NSA are not judicially enforceable.

The IDR provisions of the NSA would make little sense if there were no mechanism for the parties to an IDR proceeding to enforce a CIDRE's payment

determination. The NSA combats ruinous surprise medical bills by capping a patient's financial obligations for certain covered services at an amount similar to what the patient would have paid to an in-network provider. When Congress extinguished the provider's right to seek full compensation from the patient, it created a new statutory right to compensation from the patient's insurer through a new statutory procedure. *See* H.R. Rep. No. 116-615, pt. 1, at 56 ("A key element of any solution to address surprise billing comprehensively is the payment rate, which is the amount that payers must remit to providers for out-of-network items and services"). The amount of compensation is determined through a rate established by state law (if applicable), negotiation between the out-of-network provider and the patient's insurer, or, if necessary, binding IDR arbitration.

Specifically, Congress established an "out-of-network rate" defined as, in cases that proceed to an IDR determination, the rate selected by the CIDRE. 42 U.S.C. § 300gg-111(a)(3)(K)(ii)(II). Because the provider is now prohibited from balance billing patients, the provider's right to be promptly paid by the insurer based on the amount awarded by the CIDRE is a core feature of the statute's design. And in the provisions that are key to this appeal, Congress specified that a provider is owed a specific amount (as determined by the CIDRE's "binding" award), from a specific source (the insurer who participated in the IDR

proceeding), by a specific deadline (within 30 days). *See* 42 U.S.C. §§ 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D), (c)(5)(E)(i)(I), (c)(6), 300gg-112(a)(3)(B), (b)(6).

The district court held that IDR awards are not privately enforceable. But the district court read the statute too narrowly and placed undue weight on the absence of a specific statutory provision authorizing a provider to seek federal judicial enforcement of a CIDRE's award. With respect to whether the NSA itself establishes a private right of action, the text, structure, purpose, and history of the statute contain substantial "'affirmative' evidence of intent to allow private civil suits." *Stokes v. Southwest Airlines*, 887 F.3d 199, 202 (5th Cir. 2018) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 293 n.8 (2001)). Whether viewed as a private right of action under the NSA or a cause of action inherent in federal courts' equitable authority in these circumstances, plaintiffs' claim may proceed.

**A.** Congress made clear that it intended for IDR awards to be judicially enforceable. The awards "shall be binding upon the parties involved" (except in enumerated circumstances not at issue here). 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). The insurer "shall cover" the services, including by making "payment directly to" the provider when a payment amount is determined through IDR. *Id.* § 300gg-111(a)(1)(C)(iv)(II); *see also id.* § 300gg-111(b)(1)(D), § 300gg-112(a)(3)(B). And that direct payment from the insurer to the provider "shall be made . . . not later than 30 days after" the CIDRE renders its decision,

*id.* §§ 300gg-111(c)(6), 300gg-112(b)(6); 29 U.S.C. §1185f(b)(6). This language creates a "right" in the provider to recover the amount of the CIDRE's award. *See Sandoval*, 532 U.S. at 288 (stressing the importance of "rights-creating language" in determining whether a statute establishes a cause of action (quotation marks omitted)). That "right" would mean little if a provider that is not timely paid lacked a judicial remedy to enforce the CIDRE's award. And, unlike an action seeking monetary damages of an open-ended amount, plaintiffs seek to recover a fixed amount that is specified by the NSA's congressionally mandated dispute-resolution procedure and under a statutory directive that payment "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." 42 U.S.C. §§ 300gg-111(c)(6), 300gg-112(b)(6); 29 U.S.C. § 1185f(b)(6). These statutory features distinguish this case from circumstances where courts have declined to recognize implied rights of action.

The text, structure, and historical background of the NSA, which creates in the provider a right to be paid a fixed sum, establish that the NSA confers a right of action to enforce the insurer's statutory obligation to pay. Indeed, the Supreme Court in *Key Tronic Corp. v. United States*, 511 U.S. 809, 818 n.11 (1994), accepted the proposition that "'to say that A shall be liable to B is

the *express* creation of a right of action.'" *Id.* at 818 n.11 (quoting *id.* at 822 (Scalia, J., dissenting)).

The conclusion that IDR awards are judicially enforceable is reinforced by the fact that the IDR process is modeled in significant part on binding arbitration between private parties—a cornerstone of which is that the arbitrator's award is judicially enforceable. As in a binding arbitration, IDR proceedings involve multiple "parties" (here, a provider and an insurer) appearing before a neutral adjudicator who possesses the qualifications necessary to resolve the dispute (here, the CIDRE). As in a binding arbitration, Congress specified that the adjudicator's determination "shall be binding upon the parties involved," except in specified circumstances involving fraud and the like. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). And as in a binding arbitration subject to the Federal Arbitration Act (FAA), the merits of the adjudicator's determination "shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9," a part of the FAA addressing limited circumstances in which awards can be vacated. *Id.* § 300gg-111(c)(5)(E)(i)(II).

While Congress did not incorporate the FAA in its entirety into the NSA, the statute's express reliance on the FAA's provisions regarding judicial vacatur of an arbitration award in limited circumstances suggests that Congress expected

these determinations to be judicially enforceable in all other circumstances. A review of the FAA sections surrounding Section 10(a) underscores this common-sense conclusion. Under the FAA, an arbitration award could be judicially modified in specified circumstances, *see* 9 U.S.C. § 11(a)-(c), or could be judicially vacated for reasons specified in two subsections of 9 U.S.C. § 10: § 10(a) and § 10(c). If none of these criteria for modification or vacatur are satisfied, a court "must" enter an order confirming the award. 9 U.S.C. § 9; *see Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 587 (2008) (recognizing that the FAA "unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions" enumerated in Sections 10 and 11 applies (quoting 9 U.S.C. § 9)). Under the NSA, a CIDRE's payment determination can only be disturbed if it satisfies one of the criteria specified in 9 U.S.C. § 10(a). 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). To give meaningful effect to Congress's limitation on the circumstances in which an IDR award can be *disturbed*, it is necessary to recognize that Congress intended parties to be able to seek judicial *enforcement*.

If judicial enforcement were unavailable, a party dissatisfied with the result of an IDR proceeding could choose to avoid the need to demonstrate to a court that any of the narrow grounds specified in 9 U.S.C. § 10(a)(1)-(4) applies by simply ignoring the CIDRE's award rather than treating it as a determination

that is "binding upon the parties involved," 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). That is not a plausible understanding of Congress's intent.

The existence of a specific right in the provider to sue the insurer who fails to fulfill its statutory obligation under the NSA would perhaps be unnecessary if there were an adequate alternative means to ensure that insurers pay out-of-network providers the money owed under the statute. But no such alternative is apparent. While HHS might seek to impose civil monetary penalties if there were substantiated complaints of insurers subject to its jurisdiction failing to make timely payments of IDR determinations as required under the NSA, *see* 42 U.S.C. § 300gg-22(b)(2); 45 C.F.R. § 150.301, such enforcement would not ensure that CIDRE decisions are binding on the parties. The imposition of civil monetary penalties may indirectly encourage payment, but it would not be comprehensive, and it would not necessarily result in the provider compensation contemplated by Congress when it enacted the NSA. Similar shortcomings would apply to other available means of government enforcement. *See, e.g.*, 29 U.S.C. § 1132(a)(5) (recognizing an equitable cause of action for the Secretary of Labor to enforce ERISA); *Harrison v. Envision Mgmt. Holding, Inc.*, 59 F.4th 1090, 1112 (10th Cir. 2023) ("[I]t is unreasonable to assume that the DOL is capable of policing every employer-sponsored benefit plan in the country."). And while ERISA furnishes a means for a provider to obtain compensation if

the IDR award concerns an ERISA plan participant who has assigned his or her benefits to the provider, *see infra* Part II, that is likewise not comprehensive in multiple respects: the NSA applies to many non-ERISA plans, and relief under ERISA would be tethered to the existence of an assignment of benefits from a plan beneficiary. As explained below, the ERISA cause of action stems from Congress's judgment regarding a plan beneficiary's rights; independent of that, the NSA evinces Congress's judgment that a party to an IDR proceeding may seek an order compelling enforcement of a CIDRE's award regardless of the availability of a remedy under ERISA.

The availability of such a private cause of action under the NSA was confirmed in *GPS of New Jersey M.D., P.C. v. Horizon Blue Cross & Blue Shield*, No. 22-cv-6614, 2023 WL 5815821 (D.N.J. Sept. 8, 2023), a decision the district court did not cite. There, a provider sought to vacate an IDR award under the criteria specified in 9 U.S.C. § 10(a)(3)-(4), and the insurer filed a cross-motion to enforce the IDR award. *Id.* at *1, *3. The district court rejected the provider's challenge, *id.* at *4-10, and enforced the IDR award, explaining that the NSA "provides that any determination of the IDR entity is binding on the parties and is only subject to judicial review under the circumstances described in Section 10(a) of the Federal Arbitration Act." *Id.* at *10. The court correctly recognized that the NSA "gives the court the authority" to enforce the award. *Id.* That

conclusion also accords with the persuasive decision in *Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68, 73-74 (D.D.C. 2002), which held that a party may seek judicial enforcement of a final arbitration order issued under a different statutory scheme.

The district court believed that Congress "did not intend to confer Plaintiffs a cause of action to enforce IDR awards" because the NSA provision allowing for vacatur "includ[es] language almost entirely forbidding judicial review of IDR decisions" and indicates that Congress "notably did not incorporate the FAA provision that enables parties to confirm arbitration awards." ROA.108. The court drew precisely the wrong conclusion from that provision. For the reasons already discussed, the proper conclusion to draw from the limitations Congress placed on judicial review of IDR decisions is that Congress intended that, absent such a vacatur through judicial review, the parties would remain bound by the IDR award and that award would be judicially enforceable. By restricting the circumstances in which an IDR decision could be "subject to judicial review," 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II), the NSA indicates that a party seeking to vacate or modify an award would be able to do so only in especially narrow circumstances such as where the award was procured by corruption or fraud. *See* 9 U.S.C. § 10(a)(1). Correspondingly,

unless the award is disturbed based upon such review, there is judicial authority to enter an order enforcing the award—without reviewing its merits.

**B.** Moreover, equitable relief may be available in appropriate circumstances to enforce a duty under federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). And plaintiffs may rely on that traditional equitable remedy to require HCSC to comply with the statutory mandate under the NSA to pay them. As the Supreme Court has explained, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). A case is properly classified as an "equitable action for specific relief" when the plaintiff seeks "the recovery of specific property *or monies*" rather than "monetary compensation for an injury to his person, property, or reputation." *Id.* (quotation marks omitted). That is precisely the nature of the relief plaintiffs seek here: an order directing HCSC to pay the specific sum dictated by the NSA that the NSA requires HCSC to pay plaintiffs. In these circumstances, plaintiffs may invoke the courts' equitable jurisdiction to pursue that relief. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18-19 (1979) (holding that a statutory provision declaring certain contracts "void" "fairly implies a right to specific and limited relief in federal court"— there, an equitable right of rescission by the injured party to the contract).

## II.     Providers with assignments have standing to redress an insurer's failure to pay benefits in accordance with ERISA's surprise-billing provisions.

To the extent that they are assignees of benefits under plans covered by ERISA, plaintiffs are also entitled to enforce IDR awards through ERISA's cause of action for benefits due under a plan. The district court believed that plaintiffs lack standing to assert such a claim because the ERISA-plan participants the providers treated were not tangibly injured by defendant's alleged flouting of IDR awards. But those participants suffered a well-recognized, albeit intangible, contractual injury: the wrongful denial of ERISA plan benefits. As explained below, ERISA's surprise-billing provisions modify ERISA plan benefits by mandating coverage and payment requirements for certain out-of-network services. Plan participants thus have a contractual right to have the plan pay for this service. Violating these requirements is thus an invasion of contractual rights that plans and participants bargained for. That alone is sufficient to confer an injury-in-fact on plan participants, even in the absence of tangible harm like the threat of a balance bill. And as assignees standing in the shoes of plan participants, plaintiffs have standing to enforce that right to have HCSC make these payments to them as redress for these contractual injuries, in addition to their own independent injuries stemming from their statutory right to be paid in accordance with IDR awards.

### A.    ERISA's surprise-billing provisions modify benefits due under plan terms.

ERISA section 502(a)(1)(B) provides a plan participant or beneficiary a cause of action "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). "This provision is relatively straightforward. If a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004).

But while "[t]he plan . . . is at the center of ERISA," *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013), the interpretation and construction of its terms are not limited to the four corners of the plan itself. For one, ERISA provides that plan fiduciaries must interpret and apply plan terms consistent with ERISA's substantive provisions. 29 U.S.C. § 1104(a)(1)(D) (plan fiduciaries must apply the terms of the plan "insofar as such documents and instruments are consistent with the provisions of" Title I of ERISA); *see also Bauer v. Summit Bancorp*, 325 F.3d 155, 160 (3d Cir. 2003) ("We are required to enforce the Plan as written unless we find a provision of ERISA that contains a contrary directive." (quotation marks omitted)).

In addition, ERISA's substantive provisions can themselves directly modify plan benefits by supplying mandatory plan terms. *See Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 742, 750 (2004) (observing, in a suit "to

recover ... suspended benefits," that ERISA's prohibition on forfeitures provides "a global directive that regulates the substantive content of pension plans" and "adds a mandatory term to all retirement packages that a company might offer"). This principle extends even to state insurance laws that are "saved" from the scope of ERISA's preemption provision. *See* 29 U.S.C. § 1144(b)(2)(A). For example, in *UNUM Life Insurance Co. of America v. Ward*, the Supreme Court found that a saved state insurance law "effectively create[d] a mandatory contract term that require[d] the insurer to prove prejudice before enforcing a timeliness-of-claim provision," and "supplied the relevant rule of decision for this § 502(a) suit." 526 U.S. 358, 374, 376-77 (1999) (quotation marks omitted); *cf. Arana v. Ochsner Health Plan*, 338 F. 3d 433, 438–39 (5th Cir. 2003) (holding that a participant's claim under a Louisiana anti-subrogation law should be re-characterized as a section 502(a)(1)(B) claim "under the terms of his ERISA plan" because the plan was required to be construed "in light of Louisiana law[.]"). Indeed, "[i]t is fundamental insurance law that '[e]xisting and valid statutory provisions enter into and form a part of all contracts of insurance to which they are applicable, and, together with settled judicial constructions thereof, become a part of the contract as much as if they were actually incorporated therein.'" *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 861 (7th Cir. 1997) (second alteration in original) (quoting 2 Lee R. Russ &

Thomas F. Segalla, Couch on Insurance 3d § 19:1, at 19–2 to 19–4 (1996));

*Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991)

("Laws which subsist at the time and place of the making of a contract, and

where it is to be performed, enter into and form a part of it, as fully as if they

had been expressly referred to or incorporated in its terms." (quotation marks

omitted)).

Two recent examples highlight these concepts. In *N.R. ex rel. S.R. v.

Raytheon Co.*, 24 F.4th 740 (1st Cir. 2022), the First Circuit held that the plaintiff

properly stated a claim for benefits under section 502(a)(1)(B) where a plan term

allegedly violated ERISA's mental health parity provisions, 29 U.S.C. § 1185a.

The court explained that plaintiff "properly pleads that the [challenged term]

is trumped by ERISA and is accordingly unenforceable." *N.R.*, 24 F.4th at 752. As

such, the participant could proceed with his claim for benefits "due to him under

the terms of his plan" in accordance with ERISA's parity requirements. *Id.*

(quoting 29 U.S.C. § 1132(a)(1)(B)).

The district court in *Open MRI & Imaging of RP Vestibular Diagnostics, P.A.

v. Cigna Health & Life Insurance Co.* similarly held that an ERISA plan included

statutorily mandated terms enforceable by a provider acting on an assignment.

No. 20-cv-10345, 2022 WL 1567797, at *3 (D.N.J. May 18, 2022). In holding

that the plaintiff stated a claim for benefits under ERISA section 502(a)(1)(B),

the court reasoned that "Congress mandated that health insurance plans cover COVID-19 testing, raising it to the status of a benefit of those plans." *Id.* at *6. And because "Congress also allows insureds to sue for benefits due to them," the court went on, "[i]t therefore stands to reason that an insured can sue under ERISA when an insurer denies coverage." *Id.*

Similarly, because ERISA's surprise-billing provisions mandate that plans pay benefits to out-of-network air ambulance providers in accordance with IDR determinations, that mandate is enforceable through a claim under section 502(a)(1)(B). The NSA, as codified in the PHSA and ERISA, explicitly requires insurers to pay non-participating air ambulance providers "the amount by which the out-of-network rate . . . for such services . . . exceeds the cost-sharing amount" owed by the participant. 42 U.S.C. § 300gg-112(a)(3)(B); 29 U.S.C. § 1185f(a)(3)(B). The statute further requires that the payment "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made." *Id.* §§ 300gg-111(c)(6), 300gg-112(b)(6); 29 U.S.C. § 1185f(b)(6). These provisions thus impose "a global directive that regulates the substantive content" of group health plans, *Central Laborers' Pension Fund*, 541 U.S. at 750, and "effectively create[] a mandatory contract term"—*i.e.*, to pay benefits in accordance with IDR awards, *Ward*, 526 U.S. at 374 (quotation marks omitted). A plan's failure to do so would thus

violate the plan (as modified by ERISA) and give rise to a wrongful denial of benefits claim under section 502(a)(1)(B). Any plan terms to the contrary would be "trumped by ERISA" and "unenforceable." *N.R.*, 24 F.4th at 752.

## B. A denial of plan benefits confers an injury-in-fact regardless of whether a participant suffers a pocketbook injury.

Plaintiffs in this case are not the traditional plaintiffs in a wrongful denial of benefits claim under ERISA section 502(a)(1)(B), *i.e.*, plan participants and beneficiaries, but instead are providers that treated ERISA plan participants. Because plaintiffs asserted their ERISA claims as assignees of participants' rights to plan benefits, the district court treated plaintiffs' standing as derivative of the participants' standing. *See North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) ("It is well established that a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim." (quotation marks omitted)); *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 773 (2000) ("[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor."). But the court erred in concluding that plan participants—and by extension, plaintiffs—were not injured when HCSC failed to pay benefits to plaintiffs in accordance with IDR awards because (a) the providers are prohibited under the NSA from balance

22

billing participants, and (b) participants have no obligation to pay the awards themselves. ROA.111-112.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). While "tangible injuries are perhaps easier to recognize . . . intangible injuries can nevertheless be concrete." *Id.* at 340. "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* Specifically, the Supreme Court has deemed it "instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341.

One such recognized harm is predicated on the violation of contract rights. As Justice Thomas explained in his concurrence in *Spokeo*, "[h]istorically, common-law courts possessed broad power to adjudicate suits involving the alleged violation of private rights, even when plaintiffs alleged only the violation of those rights and nothing more," noting that "'[p]rivate rights' have traditionally included . . . contract rights." 578 U.S. at 344 (Thomas, J., concurring). On that basis, many courts have held that invasions of contractual

rights impart a concrete injury for standing purposes without any additional showing of tangible harm. *See, e.g.*, *Tennessee Elec. Power Co. v. Tennessee Valley Auth.*, 306 U.S. 118, 137-38 (1939) (standing is available where "the right invaded is a legal right . . . arising out of [a] contract"); *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) (finding that "a breach of contract is a sufficient injury for standing purposes"); *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 330-31 (1st Cir. 2020); *In re Thorpe Insulation Co.*, 677 F.3d 869, 887 (9th Cir. 2012); *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 263 (3d Cir. 2008) (similar); *see also* Restatement (First) of Contracts § 328 cmt. a (Am. Law Inst. 1932) ("A breach of contract always creates a right of action," even when no financial "harm was caused." (emphasis omitted)).

Based on these principles, this Court has held that ERISA plan participants—as well as providers acting on assignments—have standing to redress a denial of benefits even where participants face no threat of being balance billed. In *North Cypress Med. Ctr.*, the district court (like the court here) had held that the provider-assignee lacked standing because it did not balance bill patients for charges their ERISA plans refused to pay. *See North Cypress Med. Ctr.*, 781 F.3d at 190. This Court reversed, finding that the plan's failure to "fulfill its contractual obligations . . . is all that is required to demonstrate Article

III standing," as the failure to pay benefits promised under the plan "denies the patient the benefit of her bargain." *Id.* at 193 (quotation marks omitted).

The Eighth Circuit held the same in *Mitchell v. Blue Cross Blue Shield of North Dakota*, 953 F.3d 529 (8th Cir. 2020). There, a plan participant and her husband entered into an agreement with an air ambulance provider, whereby the participant agreed to sue Blue Cross to recover denied benefits but faced no liability to the provider if the litigation was unsuccessful. *Mitchell*, 953 F.3d at 533-34. Even though plaintiffs had not made a payment to the provider, were not balance billed by the provider, and were not even at risk of being balance billed, the Eighth Circuit found that they nonetheless had standing: "a party to a breached contract has a judicially cognizable injury for standing purposes because the other party's breach devalues the services for which the plaintiff contracted and deprives them of the benefit of their bargain." *Id.* at 536 (quotation marks omitted). The court explained that "history and the judgment of Congress both indicate that the denial of plan benefits constitutes a cognizable injury in fact for purposes of constitutional standing" and that "plan participants are injured not only when an underpaid healthcare provider charges them for

25

the balance of a bill; they are also injured when a plan administrator fails to pay a healthcare provider in accordance with the terms of their benefits plan." *Id.*[4]

So too here. HCSC's failure to pay benefits in accordance with IDR awards injured ERISA plan participants by depriving them of their contractual right to benefits. ERISA plans are essentially written "contracts" that govern the benefits that ERISA plan sponsors (typically employers) offer employees in exchange for their labor. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011). Indeed, ERISA's "scheme . . . is built around reliance on the face of written plan documents," *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995), and ERISA's "principal function[ is] to 'protect [those] contractually defined benefits,'" *US Airways*, 569 U.S. at 100. And as explained above, ERISA plan benefits are defined not just by what is contractually provided in written plan

---

[4] *See also Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289-91 (9th Cir. 2014) (concluding that the provider plaintiffs acting on assignments had Article III standing because the participants "had the legal right to seek payment" pursuant to their plan terms, regardless of whether or not they had been billed); *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018) (explaining that a plan participant "suffered an injury within the meaning of Article III because he was denied health benefits he was allegedly owed under the plan," and "[l]ike any private contract claim, his injury does not depend on allegation of financial loss"); *accord HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Cookson Am., Inc.*, 710 F.3d 470, 474-75 (2d Cir. 2013) (per curiam).

documents, but also by State and federal laws that impose mandated benefits and other requirements.

ERISA's surprise-billing provisions impose such a mandate, as they effectively modify group health plans to require that they pay benefits in accordance with IDR awards. Participants who receive services from air ambulance providers are assured that their plan will compensate those providers based on IDR awards (where the IDR process is invoked), with participants' liability capped at the applicable cost sharing. The requirement that plans pay providers in accordance with IDR awards is thus a benefit to the participant, no different than a plan's payment arrangement with in-network providers. *Cf. Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 329-30 (2d Cir. 2011) (explaining that "[t]he difference between [a participant] receiving 'health care at no cost' and receiving direct reimbursement of one's costs is largely one of form, rather than of substance"). It follows, then, that a plan's failure to pay benefits in accordance with an IDR award is a wrongful denial of plan benefits. This contractual injury alone provides a basis for Article III standing to plan participants and any assignee acting in their stead, regardless of whether participants suffer any tangible harm. *North Cypress Med. Ctr.*, 781 F.3d at 193.

In addition, the district court failed to consider plaintiffs' own injuries, apart from the injuries they may assert as assignees of plan participants. Plaintiffs

27

themselves have a legally cognizable interest in the IDR-based payments that HCSC is required by statute to make and yet has allegedly refused to pay. *See* 29 U.S.C. § 1185f(b)(6); *cf. Vermont Agency*, 529 U.S. at 773 ("Congress can[] define new legal rights, which in turn will confer standing to vindicate an injury caused to the claimant."). This direct injury independently supports plaintiffs' standing to sue under ERISA section 502(a)(1)(B) separate from any injury incurred by plan participants. *See Vermont Agency*, 529 U.S. at 772 (explaining that a legally protected interest for standing purposes is one that "consist[s] of obtaining compensation for, or preventing, the violation of a legally protected right") (citations omitted).

# CONCLUSION

For the foregoing reasons, the district court's order dismissing counts one and two of plaintiffs' complaint should be reversed.

Respectfully submitted,

SEEMA NANDA
*Solicitor of Labor*

WAYNE R. BERRY
*Associate Solicitor for Plan Benefits*
*Security*

JEFFREY M. HAHN
*Counsel for Appellate and Special*
*Litigation*

ISIDRO MARISCAL
*Trial Attorney*
*U.S. Department of Labor*
*Office of the Solicitor*
*Plan Benefits Security Division*
*200 Constitution Avenue NW, N4611*
*Washington, DC 20210*
*(202) 693-5600*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

JOSHUA M. SALZMAN

 *s/ Kevin B. Soter*

KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*kevin.b.soter@usdoj.gov*

OCTOBER 2024

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.


*s/ Kevin B. Soter*
Kevin B. Soter

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,419 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.


*s/ Kevin B. Soter*
Kevin B. Soter

**ADDENDUM**

## TABLE OF CONTENTS

42 U.S.C. § 300gg-111 (exceprts) .................................................................. A1

42 U.S.C. § 300gg-112 (excerpts) ................................................................ A4

29 U.S.C. § 1132(a)(1)(B) ........................................................................... A6

9 U.S.C. § 10 ............................................................................................... A7

**42 U.S.C. § 300gg-111**

**§ 300gg-111. Preventing surprise medical bills**

(a) Coverage of emergency services

    (1) In general

    If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides or covers any benefits with respect to services in an emergency department of a hospital or with respect to emergency services in an independent freestanding emergency department (as defined in paragraph (3)(D)), the plan or issuer shall cover emergency services (as defined in paragraph (3)(C))-

        . . .

    (C) in a manner so that, if such services are provided to a participant, beneficiary, or enrollee by a nonparticipating provider or a nonparticipating emergency facility-

        . . .

        (iv) the group health plan or health insurance issuer, respectively-

            (I) not later than 30 calendar days after the bill for such services is transmitted by such provider or facility, sends to the provider or facility, as applicable, an initial payment or notice of denial of payment; and

            (II) pays a total plan or coverage payment directly to such provider or facility, respectively (in accordance, if applicable, with the timing requirement described in subsection (c)(6)) that is, with application of any initial payment under subclause (I), equal to the amount by which the out-of-network rate (as defined in paragraph (3)(K)) for such services exceeds the cost-sharing amount for such services (as determined in accordance with clauses (ii) and (iii)) and year;

    . . .

    (3) Definitions

    . . .

        (K) Out-of-network rate

The term "out-of-network rate" means, with respect to an item or service furnished in a State during a year to a participant, beneficiary, or enrollee of a group health plan or group or individual health insurance coverage offered by a health insurance issuer receiving such item or service from a nonparticipating provider or nonparticipating emergency facility-

. . .

> (ii) subject to clause (iii), in the case such State does not have in effect such a law with respect to such item or service, plan, and provider or facility-
>
> . . .
>
> > (II) if such provider or facility (as applicable) and such plan or coverage enter the independent dispute resolution process under subsection (c) and do not so agree before the date on which a certified IDR entity (as defined in paragraph (4) of such subsection) makes a determination with respect to such item or service under such subsection, the amount of such determination

. . .

(b) Coverage of non-emergency services performed by nonparticipating providers at certain participating facilities

(1) In general

In the case of items or services (other than emergency services to which subsection (a) applies) for which any benefits are provided or covered by a group health plan or health insurance issuer offering group or individual health insurance coverage furnished to a participant, beneficiary, or enrollee of such plan or coverage by a nonparticipating provider (as defined in subsection (a)(3)(G)(i)) (and who, with respect to such items and services, has not satisfied the notice and consent criteria of section 300gg–132(d) of this title) with respect to a visit (as defined by the Secretary in accordance with paragraph (2)(B)) at a participating health care facility (as defined in paragraph (2)(A)), with respect to such plan or coverage, respectively, the plan or coverage, respectively-

> . . .
>
> (D) shall pay a total plan or coverage payment directly, in accordance, if applicable, with the timing requirement described in subsection (c)(6), to such provider furnishing such items and services to such participant,

beneficiary, or enrollee that is, with application of any initial payment under subparagraph (C), equal to the amount by which the out-of-network rate (as defined in subsection (a)(3)(K)) for such items and services involved exceeds the cost-sharing amount imposed under the plan or coverage, respectively, for such items and services (as determined in accordance with subparagraphs (A) and (B)) and year;

. . .

(c) Determination of out-of-network rates to be paid by health plans; independent dispute resolution process

. . .

   (5) Payment determination

      . . .

      (E) Effects of determination

         (i) In general

         A determination of a certified IDR entity under subparagraph (A)-

            (I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and

            (II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9.

         . . .

   (6) Timing of payment

   The total plan or coverage payment required pursuant to subsection (a)(1) or (b)(1), with respect to a qualified IDR item or service for which a determination is made under paragraph (5)(A) or with respect to an item or service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made.

. . .

A3

## 42 U.S.C. § 300gg-112

### § 300gg-112. Ending surprise air ambulance bills

(a)  In general

In the case of a participant, beneficiary, or enrollee who is in a group health plan or group or individual health insurance coverage offered by a health insurance issuer and who receives air ambulance services from a nonparticipating provider (as defined in section 300gg–111(a)(3)(G) of this title) with respect to such plan or coverage, if such services would be covered if provided by a participating provider (as defined in such section) with respect to such plan or coverage-

. . .

(3) the group health plan or health insurance issuer, respectively, shall-

(A) not later than 30 calendar days after the bill for such services is transmitted by such provider, send to the provider, an initial payment or notice of denial of payment; and

(B) pay a total plan or coverage payment, in accordance with, if applicable, subsection (b)(6), directly to such provider furnishing such services to such participant, beneficiary, or enrollee that is, with application of any initial payment under subparagraph (A), equal to the amount by which the out-of-network rate (as defined in section 300gg–111(a)(3)(K) of this title) for such services and year involved exceeds the cost-sharing amount imposed under the plan or coverage, respectively, for such services (as determined in accordance with paragraphs (1) and (2)).


(b)  Determination of out-of-network rates to be paid by health plans; independent dispute resolution process

. . .

(5) Payment determination

. . .

(D) Effects of determination

The provisions of section 300gg–111(c)(5)(E) of this title shall apply with respect to a determination of a certified IDR entity under subparagraph (A), the notification submitted with respect to such determination, the services with respect to such notification, and the parties to such

notification in the same manner as such provisions apply with respect to a determination of a certified IDR entity under section 300gg–111(c)(5)(E) of this title, the notification submitted with respect to such determination, the items and services with respect to such notification, and the parties to such notification.

. . .

(6) Timing of payment

The total plan or coverage payment required pursuant to subsection (a)(3), with respect to qualified IDR air ambulance services for which a determination is made under paragraph (5)(A) or with respect to an air ambulance service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider not later than 30 days after the date on which such determination is made.

. . .

**29 U.S.C. § 1132**

**§ 1132. Civil enforcement.**

(a) Persons empowered to bring a civil action

A civil action may be brought-

(1) by a participant or beneficiary-

. . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

. . .

## 9 U.S.C. § 10

### § 10. Same; vacation; grounds; rehearing

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.

(c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.