No. 24-10561

IN THE
# United States Court of Appeals for the Fifth Circuit

GUARDIAN FLIGHT, L.L.C.; MED-TRANS CORPORATION,
*Plaintiffs-Appellants,*

v.

HEALTH CARE SERVICE CORPORATION,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS, HON. JANE J. BOYLE
CASE NO. 3:23-CV-01861-B

## DEFENDANT-APPELLEE HEALTH CARE SERVICE CORPORATION'S RESPONSE BRIEF

Martin J. Bishop
REED SMITH LLP
2850 N Harwood St., Suite 1500
Dallas, TX 75201
(469) 680-4200

Jason T. Mayer
REED SMITH LLP
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606-7507
(312) 207-1000

Raymond A. Cardozo
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94150
(415) 543- 8700
rcardozo@reedsmith.com

Colin E. Wrabley
Michael J. McCune
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3548

*Counsel for Defendant-Appellee Health Care Service Corporation*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10561

*Guardian Flight, LLC and Med-Trans Corporation v. Health Care Service Corporation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Plaintiffs-Appellants**

Guardian Flight, LLC is a wholly owned subsidiary of Global Medical Response, Inc. through a holding company, Air Medical Group Holdings LLC;

Med-Trans Corporation is a wholly owned subsidiary of Global Medical Response, Inc. through a holding company, Air Medical Group Holdings LLC

**Counsel for Plaintiffs-Appellants**

Charlotte H. Taylor
Alexa R. Baltes
Jones Day
51 Louisiana Ave., NW
Washington, DC 20001

Abraham Chang
Dewey Jude Gonsoulin, III
Norton Rose Fulbright US LLP
1550 Lamar St., Suite 2000
Houston, TX 77010

Adam T. Schramek
Norton Rose Fulbright US LLP
98 San Jacinto Blvd., Suite 1100
Austin, TX 78701

**Defendant-Appellee**

Health Care Service Corporation

**Counsel for Defendant-Appellee**

Raymond A. Cardozo
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94150

Martin J. Bishop
REED SMITH LLP
2850 N Harwood St.
Suite 1500
Dallas, TX 75201

Jason T. Mayer
REED SMITH LLP
10 South Wacker Drive
Suite 4000
Chicago, IL 60606-7507

Colin E. Wrabley
Michael J. McCune
REED SMITH LLP
225 Fifth Avenue
Suite 1200
Pittsburgh, PA 15222

**Amici Curiae**

United States of America; American Hospital Association; American Medical Association; Federation of American Hospitals; Texas Medical Association

**Counsel for Amici Curiae**

United States of America:

Brian M. Boynton
Leigha Simonton
Joshua M. Salzman
Kevin B. Soter
Seema Nanda
Wayne R. Berry
Jeffrey M. Hahn
Isidro Mariscal

American Hospital Association; American Medical Association; Federation of American Hospitals; Texas Medical Association:

James E. Tysse
Kelley M. Cleary
Kristen E. Loveland
Akin Gump Straus Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006

_/s/ Raymond A. Cardozo_
_Counsel of Record_
_for Defendant-Appellee_

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The district court properly dismissed Plaintiffs' claims, and its clear and sound reasoning renders oral argument unnecessary.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS .................................................i

STATEMENT REGARDING ORAL ARGUMENT ....................................iv

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................... 6

STATEMENT OF THE CASE ........................................................7

I.    Air Ambulance Providers and Other Surprise Billers Capitalized on Market Failures to Exploit Patients. ............................................7

II.   In 2022, Congress Enacted The No Surprises Act to Protect Consumers from Surprise Medical Bills. ........................................................10

     A.    The NSA Bans Surprise Medical Bills and Limited Patients' Financial Responsibility. .................................................10

     B.    The NSA Removes Patients from the Middle of Surprise Billing Disputes by Creating a Non-Judicial Process for Payors and Providers to Resolve Them. ..............................................11

          1.    Open Negotiations and the IDR Process. .....................11

          2.    Limited Judicial Review .....................................12

          3.    Agency Oversight and Enforcement Authority .............13

III.  Plaintiffs and Other Surprise Billing Providers Initiated Hundreds of Thousands of Disputes Through the IDR Process. ...........................14

IV.   Plaintiffs Commenced This Lawsuit Against HCSC Seeking Payment Of The IDR Awards. .................................................................16

V.    The District Court Granted HCSC's Motion to Dismiss. ...................18

SUMMARY OF ARGUMENT .......................................................22

**Page**

STANDARDS OF REVIEW ............................................................24

ARGUMENT ................................................................................25

I.  The District Court Correctly Concluded The NSA Does Not Grant Plaintiffs a Private Right Of Action To Sue HCSC In Federal Court To Enforce IDR Awards. ....................................................................25

  A.  The NSA Contains No Clear and Unambiguous Terms Granting Plaintiffs a Private Cause of Action, and Its Text Indicates That Congress Intended to Preclude Any Such Action. ...................27

    1.  The NSA Prohibits Judicial Review Except for Actions to Vacate an IDR Determination under Section 10(a) of the FAA. ....................................................................28

    2.  In the NSA, Congress Chose to Omit Text Authorizing a Private Action to Confirm an IDR Award. ......................29

    3.  Congress Granted HHS the Authority to Enforce a Payor's Failure to Timely Pay an IDR Award. ...............................31

    4.  Congress's Intent to Preclude Plaintiffs' Proposed Right of Action Mirrors What Prompted Congress to Enact The NSA. ....................................................................32

  B.  Plaintiffs Fail To Meet Their Heavy Burden Of Overcoming The Presumption Against Implying a Private Right Of Action. ....................33

    1.  Plaintiffs Disregard the Purpose of the NSA. ................34

    2.  Plaintiffs Cannot Square Their Arguments and Authority with the Text and Structure of the NSA. .........................34

  C.  The Amici's Additional Arguments Were Not Raised Below and Do Not Support an Implied Right of Action. ...............................39

II.  The District Court Correctly Dismissed Plaintiffs' ERISA Claim Seeking Payment Of IDR Awards For Lack Of Standing. ................................41

**Page**

III.    The District Court Correctly Dismissed Plaintiffs' Quantum Meruit Claim Because Plaintiffs Cannot Show That They Provided Any Benefits To HCSC.................................................................................................................47

IV.    The District Court Properly Exercised Its Discretion In Denying Plaintiffs Leave To Amend Their Complaint.........................................................................49

CONCLUSION ...............................................................................................................50

CERTIFICATE OF COMPLIANCE................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ..................................................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................... 41, 49

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) ...................................................................30

*Brewster v. Dretke,*
587 F.3d 764 (5th Cir. 2009) .....................................................50

*Cantu v. Moody,*
933 F.3d 414 (5th Cir. 2019) .....................................................26

*Casas v. Am. Airlines, Inc.,*
304 F.3d 517 (5th Cir. 2002) .....................................................26

*Cheminova A/S v. Griffin L.L.C.,*
182 F. Supp. 2d 68 (D.D.C. 2002) ........................................ 36, 37

*Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,*
508 U.S. 602 (1993) ...................................................................28

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,*
144 S. Ct. 2440 (2024) ...............................................................27

*Crocker v. Austin,*
115 F.4th 660 (5th Cir. 2024) ................................................ 24, 25

*Delancey v. City of Austin,*
570 F.3d 590 (5th Cir. 2009) .....................................................27

*Egbert v. Boule,*
596 U.S. 482 (2022) ...................................................................25

*Firefighters' Ret. Sys. v. Eisneramper, L.L.P.,*
898 F.3d 553 (5th Cir. 2018) .......................................................8

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ............................................................................ 27, 33

*Gonzalez v. Holder*,
  771 F.3d 238 (5th Cir. 2014) .....................................................................29

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
  552 U.S. 576 (2008) ...................................................................................28

*Highmark, Inc. v. United States*,
  161 Fed. Cl. 240 (2022) .............................................................................16

*Jackson v. Johns-Manville Sales Corp.*,
  781 F.2d 394 (5th Cir. 1986) (en banc) .....................................................48

*Kater v. Churchill Downs Inc.*,
  886 F.3d 784 (9th Cir. 2018) ....................................................................... 8

*Lacy v. Fulbright & Jaworski Ltd. Liab. P'ship Long Term Disability Plan*,
  405 F.3d 254 (5th Cir. 2005) .....................................................................45

*Lewis v. Cont'l Bank Corp.*,
  494 U.S. 472 (1990) ...................................................................................46

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ...................................................................................37

*Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*,
  614 F.3d 485 (8th Cir. 2010) .....................................................................28

*Mid Atl. Capital Corp. v. Bien*,
  956 F.3d 1182 (10th Cir. 2020) ..................................................................28

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
  781 F.3d 182 (5th Cir. 2015) ................................................................ 42, 46

*Nielsen v. Preap*,
  586 U.S. 392 (2019) ...................................................................................40

*Nola Spice Designs, L.L.C. v. Haydel Enters.*,
  783 F.3d 527 (5th Cir. 2015) .....................................................................45

*Porretto v. City of Galveston Park Bd. of Trs.*,
  113 F.4th 469 (5th Cir. 2024) ............................................................... 25, 49

*Quality Infusion Care, Inc. v. Health Care Serv. Corp.*,
   628 F.3d 725 (5th Cir. 2010) .......................................................................42

*Seago v. O'Malley*,
   91 F.4th 386 (5th Cir. 2024) ................................................................. 25, 30

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ...................................................................................40

*Sierra Club v. U.S. EPA*,
   964 F.3d 882 (10th Cir. 2020) ...................................................................39

*Sigmon v. Southwest Airlines Co.*,
   110 F.3d 1200 (5th Cir. 1997) .........................................................26, 31, 32

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ...................................................................................25

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .........................................................................42, 45, 46

*Squyres v. Heico Cos., LLC*,
   782 F.3d 224 (5th Cir. 2015) .....................................................................39

*Terrebonne v. Blackburn*,
   646 F.2d 997 (5th Cir. 1981) .......................................................................8

*Tex. Med. Ass'n v. Dep't of Health & Human Servs.*,
   110 F.4th 762 (5th Cir. 2024)................................................................ 1, 10

*Tex. Med. Res., L.L.P. v. Molina Healthcare of Tex., Inc.*,
   659 S.W.3d 424 (Tex. 2023) ..................................................... 19, 21, 47, 48

*Tex. v. Yellen*,
   105 F.4th 755 (5th Cir. 2024).....................................................................40

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020) ...........................................................................*passim*

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985) ...................................................................................35

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979) ...................................................................................30

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................42, 45, 46

*Williams v. Lew,*
    819 F.3d 466 (D.C. Cir. 2016) ............................................................. 8

*Zummer v. Sallet,*
    37 F.4th 996 (5th Cir. 2022) .............................................................41

**Statutes**

5 U.S.C. § 580(c) ................................................................................*passim*

9 U.S.C. § 9 ...............................................................................3, 5, 29, 36

26 U.S.C. § 9816 ...................................................................................1

29 U.S.C. § 1132(a)(1)(B) .............................................................41, 42, 45

29 U.S.C. § 1185e ..................................................................................1

29 U.S.C. § 1185f ..................................................................................1

33 U.S.C. § 2236(b)(2) ..........................................................................28

42 U.S.C. § 300gg-22(b)(2) .............................................2, 13, 31, 34

42 U.S.C. § 300gg-111 ..........................................................................11

42 U.S.C. § 300gg-111(c)(1)(B) .............................................................13

42 U.S.C. § 300gg-111(c)(2)(A) .............................................................13

42 U.S.C. § 300gg-111(c)(3) ..................................................................13

42 U.S.C. § 300gg-111(c)(4) ..................................................................13

42 U.S.C. § 300gg-111(c)(5)(E) .............................................................12

42 U.S.C. § 300gg-111(c)(5)(E)(i)(I) ......................................................33

42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) ...............................................28, 30

42 U.S.C. § 300gg-111(c)(5)(E) and (b)(6) ............................................12

42 U.S.C. § 300gg-111(c)(7) ..................................................................13

42 U.S.C. § 300gg-111(c)(8) ................................................................13

42 U.S.C. § 300gg-111(c)(9) ................................................................13

42 U.S.C. § 300gg-111 *et seq.* ............................................................1

42 U.S.C. § 300gg-112 ..................................................... 11, 13, 43, 44

42 U.S.C. § 300gg-112(b)(1)(A) ...................................................... 11, 12

42 U.S.C. § 300gg-112(b)(1)(B) ............................................................11

42 U.S.C. § 300gg-112(b)(2) ..................................................................2

42 U.S.C. § 300gg-112(b)(4) ........................................................... 2, 12

42 U.S.C. § 300gg-112(b)(5) ........................................................... 2, 12

42 U.S.C. § 300gg-112(b)(5)(B) ...........................................................12

42 U.S.C. § 300gg-112(b)(5)(D) .................................................12, 30, 33

42 U.S.C. § 300gg-112(b)(6) ........................................................*passim*

42 U.S.C. § 300gg-131 .......................................................................10

42 U.S.C. § 300gg-132 .......................................................................10

42 U.S.C. § 300gg-135 ...............................................................*passim*

42 U.S.C. § 300gg-139(b) ...................................................................11

42 U.S.C. § 7604(e) ...........................................................................49

42 U.S.C. § 10139(b) .........................................................................28

47 U.S.C. § 414...................................................................................49

**Rules**

Fed. R. Evid. 201(b)(2) .........................................................................8

Fed. R. Evid. 201(d) .............................................................................8

**Regulations**

45 C.F.R. § 150.301 *et seq.*.................................................................*passim*

86 Fed. Reg. 36872, 36901 (July 13, 2021) ....................................... 10, 47

**Other Authorities**

*Featured Investments*, KOCH EQUITY DEVELOPMENT,
  https://www.kochequity.com/investments#AirMedicalHoldings
  (last visited November 15, 2024) ...................................................................15

*Federal Independent Dispute Resolution Process – Status Update*, CMS,
  https://www.cms.gov/files/ document/federal-idr-processstatus-
  update-april-2023.pdf (April 27, 2023)...........................................................14

Gov't Accountability Off., GAO-17-637, Air Ambulance: Data
  Collection and Transparency Needed to Enhance DOT Oversight,
  https://www.gao.gov/assets/690/686167.pdf (July 2017) ........................................8

Gov't Accountability Off., GAO-24-106335, Private Health Insurance:
  Roll Out of Independent Dispute Resolution Process for Out-of-
  Network Claims Has Been Challenging,
  https://www.gao.gov/assets/870/864587.pdf (Dec. 2023) ....................................13

H.R. Rep. No. 116-615.........................................................................*passim*

H.R. Rep. No. 116-615.........................................................................11, 12, 43

Independent Dispute Resolution Reports, CMS,
  https://www.cms.gov/nosurprises/policies-and-resources/reports........................15

*No Surprises Complaint Form*, CMS, https://nsa-
  idr.cms.gov/providercomplaints/s/...............................................................14

*Private Equity-Owned Air Ambulances Receive Higher Payments, Generate Larger
  and More Frequent Surprise Bills*, BROOKINGS (November 16, 2021),
  https://www.brookings.edu/articles/private-equity-owned-air-
  ambulances-receive-higher-payments/ (last visited November 15,
  2024) .......................................................................................... 9, 10

*Partial Report on the Independent Dispute Resolution (IDR) Process October 1 – December 31, 2022*, CMS, https://www.cms.gov/files/document/partial-report-idr-process-octoberdecember-2022.pdf ............................................................................15

## PRELIMINARY STATEMENT

In this appeal, Plaintiffs-Appellants (Plaintiffs) urge the Court to rewrite a statute so that they may bring a private right of action. Congress did not authorize such an action, and by all indications, meant to preclude it. The district court correctly adhered to the statute's text and structure. This Court should affirm.

Congress enacted the No Surprises Act (NSA or the Act) "to protect consumers from surprise medical bills." H.R. Rep. No. 116-615, at 47 (2020); *Tex. Med. Ass'n v. Dep't of Health & Human Servs.*, 110 F.4th 762, 767 (5th Cir. 2024). To accomplish that goal, Congress specified two clear directives in the NSA's text.

First, the Act prohibits out-of-network providers—including air ambulance providers like Plaintiffs—from "balance billing" patients or otherwise holding patients liable for any amount beyond the patient's in-network cost-sharing amount. *E.g.*, 42 U.S.C. § 300gg-135,[1] *Tex. Med. Ass'n*, 110 F.4th at 767-68.

Second, Congress found "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. Thus, the Act creates a separate framework outside the judicial process—including an independent dispute

---

[1] With the NSA, Congress made parallel amendments to three acts: the Public Health Service Act (PHSA), 42 U.S.C. § 300gg-111 *et seq.*; the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1185e, 1185f; and the Internal Revenue Code, 26 U.S.C. § 9816 *et seq.* For consistency with the other briefs before the Court, Defendant-Appellee Health Care Service Corporation (HCSC) will cite to the PHSA.

resolution (IDR) process—for health care payors and providers to resolve surprise billing disputes. *See* 42 U.S.C. § 300gg-112(b)(2), (b)(4), (b)(5), (b)(6). Under this framework, payors and providers who fail to negotiate an agreed payment rate may submit the dispute through the IDR process, and a certified IDR entity (CIDRE) issues an award that determines the out-of-network rate for the provider's services. *Id.* The NSA specifies that IDR awards are "binding," "shall be made directly to the nonparticipating provider" within 30 days, and "shall not be subject to judicial review," except for lawsuits seeking to vacate such awards under Section 10(a) of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (FAA). *See id.* Congress granted Health and Human Services (HHS) the authority to enforce non-compliance with the NSA, including due to a payor's failure to timely pay an IDR award. 42 U.S.C. § 300gg-22(b)(2); 45 C.F.R. § 150.301 *et seq.*; *see* Brief for the United States as Amicus Curiae (DOL Amicus), at 13.

Under settled law, Congress alone has the authority to create a private right of action. Therefore, courts cannot "imply" one unless a statute's text reflects "clear and unambiguous" congressional intent to create both a private right and private remedy. The NSA does not contain clear and unambiguous terms showing that Congress intended to grant Plaintiffs a private right and remedy to convert IDR awards into a federal judgment any time a payor does not pay the award within 30 days. Indeed, the statute's text and structure indicate just the opposite: Congress ***did not*** intend to grant Plaintiffs such a right for at least three reasons.

First, the Act expressly bars any "judicial review" of IDR awards other than under the vacatur provisions of 9 U.S.C. § 10(a). Congress and courts broadly use the term "judicial review" to refer to private causes of action and the full scope of judicial review—vacatur, modification, and confirmation. Second, despite expressly referencing the vacatur section of the FAA, Congress chose to omitt any parallel provision authorizing a private action to confirm or enforce IDR awards, even though it expressly included such a provision in other dispute resolution legislative contexts. *E.g.*, 9 U.S.C. § 9; 5 U.S.C. § 580(c). Third, Congress granted HHS the authority to enforce a payor's failure to timely pay an IDR award, and HHS has acted on that authority by soliciting provider complaints and compelling payors to pay IDR awards where appropriate. The existence of this enforcement scheme further shows that Congress intended the administrative remedy to be exclusive, without a private action.

This clear statutory text and structure did not deter Plaintiffs from bringing this action. Plaintiffs are air ambulance providers whose surprise billing abuses the NSA was enacted to curb. Each year, they institute thousands of IDR process disputes against payors to contest the out-of-network compensation they received for services rendered to the payors' beneficiaries, including some against HCSC. When HCSC did not pay a few IDR awards within 30 days, Plaintiffs did not seek HHS enforcement; they sued HCSC directly, alleging that the NSA granted them an "implied" private cause of action to sue and convert the IDR awards into a federal court judgment. As an alternative theory, Plaintiffs also brought a cause of action under Section

502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), claiming they had standing to sue to enforce the plan beneficiaries' supposed right to have the IDR awards paid. And as a second alternative theory, Plaintiffs brought a cause of action under Texas law for unjust enrichment/quantum meruit, contending Plaintiffs provided emergency transport services for the benefit of HCSC, and HCSC would thus be unjustly enriched if it were not compelled to pay the IDR awards.

The district court dismissed all of Plaintiffs' causes of action. Reviewing the NSA's text against the settled case law governing implied private rights of action, the district court correctly concluded that the NSA did not authorize Plaintiffs' cause of action to convert an IDR award into a federal judgment. The district court also correctly dismissed the ERISA cause of action because Plaintiffs did not have derivative standing as plan beneficiary assignees; the NSA removes the patient from the IDR process altogether, so beneficiaries have no concrete stake in IDR enforcement and hence lack standing to seek payment of IDR awards. Finally, the district court correctly dismissed the quantum meruit claim based on settled Texas precedent that Plaintiffs' transport services were for the beneficiary's benefit and not that of HCSC, the payor.

On appeal, Plaintiffs argue that the NSA implicitly grants them a private right and remedy because the Act states that IDR award payments "shall be made directly" to the provider, and IDR determinations are "binding." Plaintiffs' arguments are not consistent with the text, structure, and purpose of the NSA.

For example, Plaintiffs' core presumption that "air-ambulance providers are plainly a group for whose benefit the NSA was created," *see* Plaintiffs-Appellants' Opening Brief (Op. Br.) 28, is wrong; Congress passed the NSA to protect consumers ***from*** Plaintiffs' practice of exploiting consumers with surprise bills. Plaintiffs claim that the NSA does not provide ***any*** enforcement mechanism, *see* Op. Br. 37-38, even though (as the Department of Labor (DOL) acknowledges) Congress ***did*** grant HHS the authority to enforce a payor's non-payment of IDR awards, and HHS has acted on that authority to compel payor compliance. Plaintiffs cannot reconcile Congress's decision in the NSA to prohibit all forms of "judicial review"—which includes confirmation and enforcement proceedings—except as provided under 9 U.S.C. § 10(a). Plaintiffs also cannot reconcile that when Congress legislates and intends to grant parties a private right and remedy to enforce dispute resolution awards, it does so explicitly, *see* 9 U.S.C. § 9; 5 U.S.C. § 580(c), yet Congress decidedly chose not to here. And Plaintiffs' contention that "the very structure of the NSA would fall apart" if the Court does not grant them a private action, *see* Op. Br. 37-38, ignores that (1) Congress chose to delegate enforcement authority to HHS, and (2) "courts may not create" a statutory right of action, "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).

As for Plaintiffs' ERISA theory, they and the DOL argue that they have standing because the beneficiaries who assigned their rights to health plan benefits

sustained a denial of benefits due to HCSC's supposed failure to timely pay the disputed IDR awards. But as DOL regulations specify, the IDR process does not implicate plan benefits or ERISA claim procedures. And as the district court correctly noted, this abstract theory of injury fails because the beneficiaries indisputably do not participate in the IDR process, are not entitled to or responsible for IDR award payments, and thus have no concrete stake in that process or the payment of awards.

Plaintiffs further argue that this Court should recognize an exception for NSA disputes to the controlling Texas Supreme Court precedent that providers cannot state a claim against payors for unjust enrichment/quantum meruit based on services rendered to the payor's beneficiary. No such exception is warranted. While the NSA created a framework for Plaintiffs and HCSC to resolve disputes over rates, Plaintiffs still seek payment for services they provided to plan beneficiaries and not to HCSC. Moreover, the NSA's bar on "judicial review" forecloses equitable relief relating to the IDR awards and reflects Congress's intent to provide other remedial mechanisms.

Finally, while Plaintiffs ask this Court for leave to amend their complaint, they do not identify what facts they would add that would save it—just as they failed to do in the district court. This Court should affirm.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the NSA contains "clear and unambiguous" terms implying that Plaintiffs have a private right and private remedy to bring a lawsuit against HCSC to convert IDR awards into a federal court judgment.

2.       Whether Plaintiffs, as beneficiary-assignees, have derivative standing to compel payment of IDR awards as health-plan benefits under Section 502(a)(1)(B) of ERISA where (i) the beneficiaries have no rights, interests, or liabilities in the IDR process or the IDR award payments, and (ii) the IDR process does not implicate plan terms or ERISA claim procedures.

3.       Whether Plaintiffs have adequately pleaded a state law unjust enrichment/quantum meruit claim against HCSC based on transport services that Plaintiffs provided to plan beneficiaries and not to HCSC.

4.       Whether Plaintiffs were entitled to amend their complaint when they failed to specify how an amendment would cure the deficiencies in their complaint and any amendment would be futile.

## STATEMENT OF THE CASE

### I.    AIR AMBULANCE PROVIDERS AND OTHER SURPRISE BILLERS CAPITALIZED ON MARKET FAILURES TO EXPLOIT PATIENTS.

Before 2022, out-of-network health care providers widely engaged in "balance billing" patients to collect the difference between what the provider arbitrarily charges the patient for the service and what the patient's health plan covers. H.R. Rep. No. 116-615, at 51. Particularly in urgent and emergency settings, such as when patients "are transported by an out-of-network ambulance[,]" patients typically have "little or no control over whether a provider is in- or out-of-network[.]" *Id.* In such cases, patients receive "surprise medical bills" and "are subject to higher-than-expected out-

of-pocket costs." *Id.* The financial liability from surprise medical bills "can be staggering," *id.* at 52, and air ambulance bills were among the main culprits.

The price of air ambulance services is exorbitant, driven by lack of competition in the industry and patients' inability to shop for alternative providers when facing medical emergencies. *See* Gov't Accountability Off., GAO-17-637, Air Ambulance: Data Collection and Transparency Needed to Enhance DOT Oversight, https://www.gao.gov/assets/690/686167.pdf, at 11, 18-19 (July 2017) (GAO-17-637).[2] When drafting the NSA, Congress observed that air ambulance providers and other surprise billers "hold substantial market power" and "face highly inelastic demands for their services because patients lack the ability to meaningfully choose or refuse care," enabling the providers "to charge amounts for their services that . . . result[ ] in compensation far above what is needed to sustain their practice." H.R. Rep. No. 116-615, at 53.

---

[2] "[A]t any stage of the proceeding," the Court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2), (d). This Court and other federal courts routinely hold that government records and reports, such as the Government Accountability Office (GAO) and Centers for Medicare & Medicaid Services (CMS) reports cited in this brief, are appropriate matters for judicial notice under Rule 201. *See, e.g.*, *Firefighters' Ret. Sys. v. Eisneramper, L.L.P.*, 898 F.3d 553, 558, n.2 (5th Cir. 2018) (taking judicial notice of records from a state's Board of Certified Public Accounts); *Terrebonne v. Blackburn*, 646 F.2d 997, 1000 n.4 (5th Cir. 1981) (taking judicial notice of state agency's statistical report); *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.3 (9th Cir. 2018) (granting request of judicial notice of government documents on government website); *Williams v. Lew,* 819 F.3d 466, 473 (D.C. Cir. 2016) (noting "[t]he Court may take judicial notice of [a] GAO Report" and considering facts presented in the report). Accordingly, this Court may, and should, take judicial notice of the GAO and CMS reports cited herein.

When the NSA was drafted, nearly 70% of air ambulance providers were out-of-network. H.R. Rep. No. 116-615, at 52-53. Most such providers remained out-of-network because it was more financially advantageous to balance bill patients according to the provider's charges rather than accept pre-negotiated rates with health plans. *See* GAO-17-637, at 18 ("[B]eing out of network with insurance is advantageous to the [air ambulance] provider because a patient receiving a balance bill will ask for a higher payment from the insurance company, which often results in higher payment to the air ambulance provider than having a pre-negotiated payment rate with the insurer."). Unlike those pre-negotiated rates, air ambulance provider charges are "inflated," "non-market-based rates" stemming from the "market failure" of the surprise billing industry. H.R. Rep. No. 116-615, at 53, 57.

While air ambulance providers reaped massive profits from this market failure by remaining out-of-network, their practices were having "devastating financial impacts on Americans and their ability to afford needed health care." H.R. Rep. No. 116-615, at 52. "The high share of claims resulting in potential balance bills combined with elevated charges . . . [left] many air ambulance patients at risk of receiving an enormous medical bill after their transport." Loren Adler et al., *Private Equity-Owned Air Ambulances Receive Higher Payments, Generate Larger and More Frequent Surprise Bills*, BROOKINGS (November 16, 2021), https://www.brookings.edu/articles/private-equity-owned-air-ambulances-receive-higher-payments/ (last visited November 15,

2024). Air ambulance patients were "frequently at risk of surprise out-of-network bills averaging nearly $20,000." *Id.*

## II.  IN 2022, CONGRESS ENACTED THE NO SURPRISES ACT TO PROTECT CONSUMERS FROM SURPRISE MEDICAL BILLS.

Congress recognized that the market failure of the surprise billing industry—including air ambulance providers like Plaintiffs—was exploiting American consumers, leaving many in financial ruin. H.R. Rep. No. 116-615; *supra.* Effective January 1, 2022, Congress enacted the NSA "to protect consumers from surprise medical bills." H.R. Rep. No. 116-615, at 47; *see Tex. Med. Ass'n*, 110 F.4th at 767. The NSA protects consumers by (1) banning surprise medical bills and (2) removing consumers from surprise billing disputes by creating a separate non-judicial process for payors and providers to resolve them without any further patient liability.

### A.  The NSA Bans Surprise Medical Bills and Limited Patients' Financial Responsibility.

First, the NSA prohibits emergency providers, air ambulance providers, and out-of-network providers who provide care at in-network facilities from balance billing or otherwise holding patients liable for anything beyond the patient's in-network cost sharing (*e.g.*, deductible, copayment, or coinsurance). *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135.[3] If a provider bills a patient for more than the

---

[3] Under NSA regulations, cost-sharing for nonparticipating air ambulance services is calculated using the plan's median contracted rate. 86 Fed. Reg. 36872, 36977 (July 13, 2021).

patient's in-network cost sharing, "the provider shall reimburse the enrollee for the full amount paid by the enrollee in excess of the in-network cost-sharing amount for the treatment or services involved, plus interest, at an interest rate determined by the [HHS] Secretary." 42 U.S.C. § 300gg-139(b).

### B. The NSA Removes Patients from the Middle of Surprise Billing Disputes by Creating a Non-Judicial Process for Payors and Providers to Resolve Them.

Second, Congress determined "that any surprise billing solution must comprehensively protect consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. No. 116-615, at 55. To meet this directive, the NSA created a separate non-judicial framework—including the creation of an IDR process—for payors and providers to resolve disputes over surprise medical bills without any involvement from the patient. *See* 42 U.S.C. §§ 300gg-111, 300gg-112; *see also* H.R. Rep. No. 116-615, at 55-58. In the NSA, Congress specified that the framework includes open negotiations and an IDR process, limited judicial review, and agency oversight and enforcement.

### 1. Open Negotiations and the IDR Process.

Providers who are dissatisfied with the payment they receive from a payor may attempt to negotiate with the payor on an agreed-upon payment rate for the relevant services. *See* 42 U.S.C. § 300gg-112(b)(1)(A). If open negotiations fail, then the provider or the payor may initiate the IDR process within four days after the open negotiation period is exhausted. *Id.* at § 300gg-112(b)(1)(B). Under the IDR process,

the parties select, or HHS appoints, a CIDRE to determine whether the dispute is eligible and make a payment determination. *Id.* at §§ 300gg-112(b)(4), (b)(5).

The IDR process resembles "baseball-style" arbitration where the provider and the payor each submit an offer, and the CIDRE selects one party's offer as the out-of-network payment rate. *Id.* In the absence of a fraudulent claim or evidence of a misrepresentation of facts to the CIDRE, an IDR award is "binding," and payment of the award "shall be made . . . not later than 30 days after the date on which such determination is made." *Id.* at § 300gg-112(b)(5)(D) (incorporating 42 U.S.C. § 300gg-111(c)(5)(E) and (b)(6)). Consistent with Congress's directives to "'tak[e] the consumer out of the middle' of surprise billing disputes," H.R. Rep. No. 116-615, at 55, patients have no involvement in open negotiations or the IDR process, and payors are directed to issue any IDR award payments directly to the provider. *See* 42 U.S.C. §§ 300gg-112(b)(1)(A), (b)(5)(B), (b)(6).

## 2. Limited Judicial Review

The NSA provides that an IDR award "shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a)" of the FAA. 42 U.S.C. § 300gg-112(b)(5)(D) (incorporating 42 U.S.C. § 300gg-111(c)(5)(E)). Section 10(a)(1)-(4) of the FAA states that a party may file an application to vacate an arbitration award in "the United States court in and for the district wherein the award was made" based on certain enumerated circumstances. 9 U.S.C. § 10(a)(1)-(4). The

NSA does not cite any other provision of the FAA or otherwise contemplate any other form of private action or judicial review. *See generally* 42 U.S.C. § 300gg-112.

### 3.    Agency Oversight and Enforcement Authority

Coinciding with limited judicial review, Congress vested HHS with oversight and enforcement authority over the IDR process. Regarding oversight, the NSA specifies that HHS shall establish the IDR process, specify the criteria for batching items and services, establish a process for certifying CIDREs and oversee the certification and decertification of CIDREs, manage the selection of CIDREs in disputes, publicize certain information regarding the IDR process, establish and collect administrative fee for managing the IDR process, and that HHS "may modify any deadline or other timing requirement specified under this subsection . . . in cases of extenuating circumstances, as specified by the Secretary . . ." 42 U.S.C. §§ 300gg-111(c)(1)(B), (c)(2)(A), (c)(3), (c)(4), (c)(7), (c)(8), (c)(9).

Regarding enforcement, Congress specified that HHS may enforce payor and provider non-compliance with the NSA's provisions. 42 U.S.C. §§ 300gg-22(b)(2) (providing for HHS enforcement against payors for NSA non-compliance), 300gg-134 (providing for HHS enforcement against providers for NSA non-compliance); 45 C.F.R. § 150.301 *et seq.*; *see also* DOL Amicus 13. The DOL and Centers for Medicare & Medicaid Services (CMS), an agency within HHS, "oversee the IDR process through complaint reviews and market conduct examinations." *See* Gov't Accountability Off., GAO-24-106335, Private Health Insurance: Roll Out of

Independent Dispute Resolution Process for Out-of-Network Claims Has Been Challenging, https://www.gao.gov/assets/870/864587.pdf, at 34-35 (Dec. 2023) (GAO-24-106335). CMS maintains an online portal through which providers may submit complaints regarding the IDR process. *See* No Surprises Complaint Form, CMS, https://nsa-idr.cms.gov/providercomplaints/s/.

Relevant to this case, CMS explains "that complaints against issuers and plans are usually due to a failure to make a payment within 30 calendar days after an IDR payment determination has been made." GAO-24-106335, at 35. If a payor fails to timely issue payment on an IDR award, CMS "would require the issuer to pay the provider the determined award amount." *Id.* Over 100 complaints have been filed against health plans and issuers relating to IDR awards, 40 of which had been closed as of April 2023. *Id.* "Of those 40 closed complaints, CMS determined that the issuer had not made a required payment in 30 cases and CMS made the issuer pay the providers in these instances." *Id.*

## III.  PLAINTIFFS AND OTHER SURPRISE BILLING PROVIDERS INITIATED HUNDREDS OF THOUSANDS OF DISPUTES THROUGH THE IDR PROCESS.

After less than a year in effect, the government reported that initiating parties—99% of which are providers—overwhelmed the IDR process, initiating nearly 335,000 disputes through the federal IDR portal. *See* Federal Independent Dispute Resolution Process – Status Update, CMS, https://www.cms.gov/files/document/federal-idr-processstatus-update-april-2023.pdf (April 27, 2023); *see also*

Partial Report on the Independent Dispute Resolution (IDR) Process October 1 – December 31, 2022, CMS, https://www.cms.gov/files/document/partial-report-idr-process-octoberdecember-2022.pdf, at 16-17. That was more than fourteen times the volume that HHS anticipated. *See id.* The most recent government data shows the figure doubled in 2023, with providers initiating more than 677,000 disputes through the IDR process. *See* Independent Dispute Resolution Reports, CMS, https://www.cms.gov/nosurprises/policies-and-resources/reports.

Plaintiffs were primary contributors to the overwhelming number of IDR disputes. Plaintiffs are affiliates of Global Medical Response, Inc. (GMR) (Record on Appeal (ROA) 6, ¶¶ 2-3), "the largest independent provider of air and ground ambulatory services in the United States." *See Featured Investments*, KOCH EQUITY DEVELOPMENT, https://www.kochequity.com/investments#AirMedicalHoldings (last visited November 15, 2024). GMR has initiated approximately 40% of all air ambulance provider disputes, by far the most of any air ambulance provider and more than double the number of disputes initiated by the next closest provider. *See* Partial Report on the Independent Dispute Resolution (IDR) Process, October 1 – December 31, 2022, *supra*, at 25-26; *accord* Initial Report on the Independent Dispute Resolution (IDR) Process, April 15 – September 30, 2022, CMS, https://www.cms.gov/files/document/initial-report-idr-april-15-september-30-2022.pdf, at 25-26; IDR Reports, CMS, *supra*. According to the most recent government data, GMR air ambulance providers initiated 4,794 IDR disputes in 2023.

*See* Independent Dispute Resolution Reports, CMS, *supra*. Plaintiffs filed 2,294 IDR disputes in 2023, accounting for nearly half of those filed by GMR providers. *See id.*

Some of the thousands of IDR disputes that Plaintiffs initiated were against HCSC. ROA.8, ¶¶ 11-12. HCSC, an Illinois Mutual Legal Reserve Company, administers Blue Cross and Blue Shield (BCBS) health insurance and health benefit plans in Illinois, Montana, New Mexico, Oklahoma, and Texas through five unincorporated divisions. ROA.5, ¶ 1. Plaintiffs have network contracts that govern payment and other terms for services rendered to BCBS plan members in Texas and Oklahoma, but they are "out-of-network" for BCBS members in Illinois, Montana, and New Mexico. ROA.5, ¶ 1.[4]

## IV. Plaintiffs Commenced This Lawsuit Against HCSC Seeking Payment Of The IDR Awards.

In this case, Plaintiffs alleged that they followed the IDR process to dispute certain out-of-network payments they received from HCSC, and "[e]ach IDR proceeding resulted in Plaintiffs being owed additional payments . . ." ROA.8, ¶¶ 11-12. Plaintiffs contended that "[d]espite the legal requirement that it pay the additional

---

[4] In addition to administering BCBS plans in five states, HCSC, through its unincorporated divisions, serves as a "host plan" for out-of-state BCBS plans under the "BlueCard" program. *See Highmark, Inc. v. United States*, 161 Fed. Cl. 240, 243 (2022). The BlueCard program enables members of a BCBS health plan to obtain health care services while traveling or living in another BCBS plan's service area. *See id.* When acting as a "host plan," HCSC's unincorporated divisions will receive claims and communicate with providers in their respective states, but the "home plan" (*i.e.*, the out-of-state BCBS plan that insures or administers the patient's health plan) is ultimately responsible for adjudicating and paying the claim. *See id.*

amounts owed within 30 days, HCSC has failed to do so." ROA.8, ¶ 13. Plaintiffs

claimed that HCSC had not timely paid a total of 33 IDR awards. ROA.14.[5]

Nevertheless, Plaintiffs filed suit, seeking not only payment of the 33 IDR

awards, but also costs, attorney's fees, "damages" in the form of "the return on

investment or interest rate realized by HCSC on the amount owed for each IDR

award from the 31st day after each decision was issued until the date Plaintiffs

received payment," and pre- and post-judgment interest. ROA.12, Prayer. To support

their request for such relief, Plaintiffs asserted three causes of action:

***First***, Plaintiffs brought an "Action for Nonpayment of IDR Determinations"

under the NSA's "Timely Payment" provision, 42 U.S.C. § 300gg-112(b)(6). ROA.9,

Count One (capitals removed). Plaintiffs alleged that "[t]hirty days passed without

payment for all of the IDR determinations at issue herein," and "Plaintiffs entitled to

have the IDR determinations converted into a federal judgment and the assistance of

[the district court] in post-judgment collection efforts." ROA.9, ¶¶ 16-17.

---

[5] If Congress had authorized the action below in the NSA's text, thereby enabling the action to survive the pleadings, the post-pleadings evidence would show that HCSC **had** paid many of the disputed awards at the time the Complaint was filed, and it has since paid or ensured payment on all the disputed awards to which it was a party. Most of the awards that had not been paid at the time Plaintiffs filed their Complaint were BlueCard awards for patients with out-of-state BCBS health plans; HCSC's unincorporated division merely served as the host plan and did not insure or administer coverage for the patient. *See supra*, n.4. As explained in the argument section *infra*, the likelihood that aggressive providers would deluge the federal courts with lawsuits that concerned merely the timing of payments may very well have been among the reasons Congress in the NSA's text precluded the private right of action Plaintiffs propose.

***Second***, Plaintiffs asserted a claim under ERISA Section 502(a)(1)(B), alleging that they "have been assigned the right to payment and benefits from HCSC's beneficiaries" and thus "step into the shoes of, and are now considered, ERISA beneficiaries[.]" ROA.9-10, ¶ 19. They claimed that HCSC's failure to timely pay the IDR awards breached "its obligations to the self-funded plans it administers and to the plan beneficiaries," ROA.10, ¶ 20, and Plaintiffs, as assignees, are entitled "to obtain their plan benefits" through HCSC's use of "plan funds to pay Plaintiffs the IDR awards[.]" ROA.11, ¶ 23.

***Third***, Plaintiffs asserted a state law claim for unjust enrichment. ROA.11, Count Three. Plaintiffs claimed that "HCSC received the benefit of air ambulance transports for its beneficiaries during times of emergent medical needs," and the "transports were provided at Plaintiffs' expense and under circumstances that would make it unjust for HCSC to retain the benefit without commensurate compensation." ROA.11, ¶ 25.

## V.    THE DISTRICT COURT GRANTED HCSC's MOTION TO DISMISS.

HCSC moved to dismiss Plaintiffs' Complaint under Rules 12(b)(1) and 12(b)(6). ROA.35-63. First, HCSC argued that Plaintiffs failed to state a claim for relief under the NSA because the Act did not expressly or impliedly grant Plaintiffs a private cause of action to convert IDR awards into a federal judgment. ROA.52-56. Second, HCSC argued that Plaintiffs lack standing and fail to state an ERISA claims because (1) the patient-assignees who supposedly gave Plaintiffs derivative standing

have no concrete stake in this dispute because they have no rights, liabilities, or involvement in IDR award payments, and (2) Plaintiffs failed to identify any plan terms that compelled HCSC to pay the alleged IDR awards from plan funds; that obligation arises solely from the NSA, which eliminates any stake for the patients in the IDR award process. ROA.56-59. Third, HCSC argued that Plaintiffs fail to state a state claim for unjust enrichment because Plaintiffs' "services aren't directed to or for the benefit of" HCSC. ROA.59-61 (quoting *Tex. Med. Res., L.L.P. v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 437 (Tex. 2023)).

Plaintiffs opposed HCSC's motion, asserting arguments similar to those raised in this appeal. ROA.64-82. In one sentence in their opposition brief, Plaintiffs stated that if the court granted HCSC's motion, Plaintiffs should "be granted an opportunity to amend." ROA.81. Plaintiffs did not indicate what facts they would add to an amended complaint or attach a proposed amended complaint. *See id.*

The district court granted HCSC's motion. ROA.102-118. Regarding Plaintiffs' cause of action under the NSA's Timely Payment provision, the court first observed that the "NSA does not contain any provisions expressly allowing Plaintiffs to file a lawsuit in federal court seeking to enforce an IDR award[.]" ROA.106. To the contrary, "the NSA includes language that almost entirely prohibits judicial review of IDR decisions." ROA.108 (citations omitted). "Including language almost entirely forbidding judicial review of IDR decisions[,]" the court reasoned, "strongly suggests that Congress did not intend to confer Plaintiffs a cause of action to enforce IDR

awards." *Id.* The court also found it significant that "although Congress borrowed from § 10 of the FAA, it notably did not incorporate the FAA provision that enables parties to confirm arbitration awards"—*i.e.*, Section 9 of the FAA—"which further indicates that Congress did not intend to create a private cause of action under the NSA." *Id.* "If Congress intended to create such a procedural mechanism under the NSA," the court explained, "it simply could have incorporated one more section from the FAA, yet Congress did not do so[.]" The court interpreted "this omission . . . to mean that Congress did not intend to create a remedy under the NSA." *Id.*

The court rejected Plaintiffs' suggestion that the NSA provisions stating IDR awards are "binding" and must be paid within 30 days establish a private right of action." ROA.108-109. "While the NSA appears to create a right that out-of-network providers are entitled to recover their IDR awards within thirty days," the court reasoned, these provisions "do not suggest that Congress intended to create a procedural mechanism for providers to convert IDR awards to final judgments." ROA.109. Thus, the court reasoned, "these provisions only suggest that Congress created a right, but there is nothing to suggest that Congress also intended to confer a corresponding remedy." *Id.*

The court also dismissed Plaintiffs' ERISA claim due to lack of standing. ROA.110-12. The court explained that in their capacity as assignees of plan beneficiaries, Plaintiffs were required to "show that the beneficiaries would have had standing to bring an ERISA claim to require HCSC to pay Plaintiffs the IDR awards."

ROA.111. But the "beneficiaries suffered no concrete injury from a dispute between HCSC and Plaintiffs" over IDR award payments because the beneficiaries "do not have to pay the IDR awards[,]" so Plaintiffs—as assignees—lacked standing. *Id.*

The court further found that Plaintiffs' final cause of action for "unjust enrichment" failed to state a claim. ROA.112-15 (citing, among other things, *Tex. Med. Res.*, 659 S.W.3d at 436). The court held that Plaintiffs "did not provide their air ambulance services for HCSC's benefit." ROA.113-14. Rather, it was only "HCSC's beneficiaries who received" those services, and "healthcare providers generally cannot maintain a quantum meruit claim against health insurance companies based on allegations that the providers performed services solely for the health insurance companies' insureds." *Id.* The court also noted that to the extent Plaintiffs were stating a claim based on HCSC's nonpayment of IDR awards, the claim similarly fails "because Plaintiffs did not perform any services for HCSC when HCSC allegedly withheld the IDR awards." ROA.115 (citing *Tex. Med. Res.*, 659 S.W.3d at 436).

Finally, the district court held that granting Plaintiffs leave to amend would be futile. ROA.115-17. The court concluded that (1) Plaintiffs' NSA claim was incurable because the NSA does not grant Plaintiffs a private cause of action, (2) "the Court is convinced that any amended complaint would also fail to allege facts establishing that HCSC's beneficiaries suffered a concrete injury from HCSC alleged not paying Plaintiffs" the disputed IDR awards to support Plaintiffs' ERISA claim, and (3)

"Plaintiffs would not be able to allege any facts to establish they provided any benefits directly to HCSC, as necessary to maintain a quantum meruit claim." ROA.116-17.

## SUMMARY OF ARGUMENT

This Court should affirm because Plaintiffs' Complaint fails to state a claim, Plaintiffs lack standing to bring an ERISA claim, and any amendment would be futile.

A.    The district court correctly ruled that Plaintiffs have no implied private right of action under the NSA to confirm and enforce IDR awards. The statute contains no text providing for such an action, let alone the "clear and unambiguous" language showing that Congress intended to grant Plaintiffs a private right and private remedy. In fact, the NSA's text indicates that Congress intended to preclude such a right. The NSA expressly bars "judicial review" of IDR awards, except in the narrow and specific circumstance where a party seeks to vacate an award on one of the four grounds set forth in the FAA, 9 U.S.C. § 10(a). That explicit judicial review prohibition applies to award-enforcement actions and reflects Congress's intent to preclude an implied right of action. Moreover, Congress's inclusion of 9 U.S.C. § 10(a) in the NSA and conspicuous omission of any reference to the FAA's confirmation provision in 9 U.S.C. § 9—even though it has expressly included such reference in other federal legislation—likewise refutes any congressional intent to create the implied remedy Plaintiffs advance. And the administrative enforcement scheme Congress created for federal agencies—including to compel payment of IDR

awards—further shows that Congress did not intend to grant Plaintiffs a private right and remedy to confirm and enforce IDR awards in federal court.

Plaintiffs' contentions that the NSA's purpose, text, and structure show Congress intended to create an implied right to sue to enforce IDR awards do not withstand analysis. The text Plaintiffs cites—that awards are "binding" and must be paid within 30 days—says nothing about a court action and supports the administrative enforcement scheme that Congress created. Plaintiffs' construction of the "judicial review" prohibition as limited to vacatur actions ignores its plain meaning of "judicial review," as used by Congress and courts. Plaintiffs' citation to cases involving arbitration agreements disregards that when Congress legislates and intends to grant private enforcement of a dispute resolution award, it does so explicitly; yet Congress chose not to do so here. Indeed, Plaintiffs do not cite a single case finding an implied right of action based on those (or similar) statutory terms.

Plaintiffs' stark warnings that the Act would be "pointless," "ineffective," and would collapse absent a private right of action ring hollow, too. The absence of a private right of action for providers does not impair the statute's central purpose of protecting patients from surprise medical bills. Moreover, even considering only the interests of providers—who were the target of the Act's protections for consumers— federal agencies have extensive powers to enforce the statute's IDR provisions and compel payment of IDR awards and have exercised them accordingly.

B.     The district court also correctly dismissed Plaintiffs' ERISA claim seeking to compel payment of the IDR awards. Plaintiffs, as assignees of HCSC's plan beneficiaries, have standing coterminous with that of the beneficiaries. But the NSA explicitly removes beneficiaries from the IDR process altogether and the awards that are issued through it. Thus, beneficiaries suffered no concrete injury due to HCSC's alleged failure to make timely payments of the IDR awards to Plaintiffs. Plaintiffs' repackaged version of that injury—as the denial of a plan benefit—does not meet Article III's concrete injury requirement for standing and fails to state a claim.

C.     The district court properly dismissed Plaintiffs' quantum meruit claim as well. The Texas Supreme Court expressly rejected a quantum meruit claim by a provider against a payor for services provided to the payor's beneficiary. That is precisely what Plaintiffs' quantum meruit claim here is. The NSA's broad bar on judicial review of IDR determinations independently precludes this equitable claim, and the Act contains no savings clause or exception allowing such a claim.

D.     Finally, the district court did not abuse its discretion in denying Plaintiffs leave to amend their Complaint. Plaintiffs did not move for leave in the district court or specify what facts they would add to an amended pleading that would cure the legal deficiencies in their case, and they fail to do so that in their opening brief.

## STANDARDS OF REVIEW

The Court reviews de novo a district court's dismissal "for failure to state a claim pursuant to Rule 12(b)(6)." *Crocker v. Austin*, 115 F.4th 660, 664 (5th Cir. 2024)

(citation and internal quotations omitted). "Legal questions relating to standing . . . are also reviewed de novo." *Id.* So are issues of statutory interpretation. *See Seago v. O'Malley*, 91 F.4th 386, 389 (5th Cir. 2024) (citation omitted). The "denial of leave to amend is reviewed for an abuse of discretion." *Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 491 (5th Cir. 2024) (citation omitted).

## ARGUMENT

### I.   THE DISTRICT COURT CORRECTLY CONCLUDED THE NSA DOES NOT GRANT PLAINTIFFS A PRIVATE RIGHT OF ACTION TO SUE HCSC IN FEDERAL COURT TO ENFORCE IDR AWARDS.

Despite the statutory text that Congress included—and omitted—in the NSA, Plaintiffs ask this Court to create a private cause of action for them that Congress did not authorize and likely meant to preclude. The district court correctly adhered to the statute's text in rejecting Plaintiffs' proposed rewriting of the statute.

"[C]reating a cause of action is a legislative endeavor." *Egbert v. Boule*, 596 U.S. 482, 491 (2022). That is because "[t]o create a new cause of action is to assign new private rights and liabilities—a power that is in every meaningful sense an act of legislation." *Id.* at 503 (Gorsuch, J., concurring). Asking a court to imply a private right of action therefore implicates serious separation of power concerns because the "creation of a private right of action raises [policy choices] beyond the mere consideration whether primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004).

25

Because only Congress—and not the courts—can create a private cause of action, the key inquiry when deciding if one exists is whether Congress demonstrated an intent to create both a private right and private remedy for the plaintiff:

> Like substantive federal law, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Sandoval*, 532 U.S. at 286-87 (citations and internal quotations omitted); *accord Cantu v. Moody*, 933 F.3d 414, 424 (5th Cir. 2019).

Here, the parties do not dispute that the NSA contains no text expressly authorizing a private right of action for Plaintiffs and other providers to enforce IDR awards in federal court. Where Congress does not expressly authorize a private cause of action in the statute's text, this Court applies "a 'presumption that Congress did not intend to create a private right of action.'" *Sigmon v. Southwest Airlines Co.*, 110 F.3d 1200, 1206 (5th Cir. 1997) (citation omitted). To overcome this presumption, Plaintiffs must show "that Congress affirmatively contemplated private enforcement when it passed the relevant statute.'" *Id.* (citation omitted); *see also Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 521–22 (5th Cir. 2002) (noting plaintiffs' "heavy burden" to "overcome the familiar presumption that Congress did not intend to create a private cause of action"). Only where Congress, through "clear and unambiguous terms," shows its intention to create a new private right and remedy will courts imply a private

right of action. *Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002) (internal quotations omitted)). This aligns with ordinary statutory construction, where "the text of a law controls over purported legislative intentions unmoored from any statutory text," and courts "may not 'replace the actual text with speculation as to Congress' intent.'" *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2454 (2024) (citations omitted).

Plaintiffs do not come close to meeting this high bar. They cannot show that Congress clearly and unambiguously intended to grant them a private right and private remedy to sue HCSC in federal court to enforce IDR awards.

### A. The NSA Contains No Clear and Unambiguous Terms Granting Plaintiffs a Private Cause of Action, and Its Text Indicates That Congress Intended to Preclude Any Such Action.

Far from containing "clear and unambiguous terms" demonstrating an intent to grant Plaintiffs' proposed private right of action, every indication from the NSA's text is that Congress intended to ***preclude*** Plaintiffs from bringing such an action. The Act bars any "judicial review" of IDR awards other than the vacatur provisions of 9 U.S.C. § 10(a), omits any terms authorizing a private action to confirm an IDR award, such as through 9 U.S.C. § 9, and establishes an administrative scheme to enforce a payor's failure to timely pay an IDR award.

1. **The NSA Prohibits Judicial Review Except for Actions to Vacate an IDR Determination under Section 10(a) of the FAA.**

The NSA expressly prohibits "judicial review" of IDR awards except as provided under the vacatur sections of Section 10(a) of the FAA. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (IDRs "shall not be subject to judicial review, except in a case described" in 9 U.S.C. § 10(a)), 300gg-112(b)(5)(D) (incorporating the same)). "Judicial review" broadly describes lawsuits seeking to vacate, modify, or confirm or enforce a dispute resolution award. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008) ("The Federal Arbitration Act … provides for expedited judicial review to confirm, vacate, or modify arbitration awards.") (citation omitted) (emphasis added); *see also Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 611 (1993) (noting ERISA "provides for judicial review of the arbitrator's decision by an action in the district court to enforce, vacate, or modify the award"); *Mid Atl. Capital Corp. v. Bien*, 956 F.3d 1182, 1194 (10th Cir. 2020) ("Sections 9 through 11 of the FAA provide for 'expedited judicial review to confirm, vacate, or modify arbitration awards.'") (citation omitted); *Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 488 (8th Cir. 2010) (FAA "provides judicial review to confirm, vacate, or modify arbitration awards") (citation omitted). Congress routinely uses the term "judicial review" to address private causes of action. *See, e.g.,* 33 U.S.C. § 2236(b)(2) (creating private right of "action to seek judicial review"); 42 U.S.C. § 10139(b) (referring to a "civil action for judicial review").

28

The NSA's prohibition of "judicial review" of IDR awards, except as provided under 9 U.S.C. § 10(a), confirms that Congress did not intend to create a private right of action for Plaintiffs to bring a federal lawsuit to enforce them. In enacting the NSA, Congress is presumed to know the settled understanding of "judicial review" as encompassing the full range of lawsuits in this context—vacatur, modification, and confirmation and enforcement. *See Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (applying the "'well-settled presumption that Congress understands the state of existing law when it legislates'") (citation omitted). Congress, likewise, is presumed to understand—as reflected in its own statutes—that private rights of action are a means of seeking "judicial review." *Id.* Thus, the NSA's preclusion of "judicial review" of IDR awards plainly extends to private actions to confirm and enforce them.

## 2.    In the NSA, Congress Chose to Omit Text Authorizing a Private Action to Confirm an IDR Award.

Federal legislation in similar settings reinforces that Congress will expressly grant parties a private right and remedy to confirm and enforce dispute resolution awards where it intends to do so, but Congress chose not to with the NSA. As Plaintiffs note, the FAA contains a section authorizing a lawsuit to confirm an arbitration award where parties have an agreement to arbitrate. 9 U.S.C. § 9; Op. Br. 41-42. Congress has expressly incorporated this section of the FAA in other contexts, such as the Administrative Dispute Resolution Act ("ADRA"), to grant parties a right of action to confirm a dispute resolution award. *See* 5 U.S.C. § 580(c) ("A final award

is binding on the parties to the arbitration proceeding, and may be enforced pursuant to ***sections 9 through 13 of*** the FAA) (emphasis added).[6] "Obviously, then, when Congress wished to provide" parties with a private action to confirm and enforce a dispute resolution award, "it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington, 44*2 U.S. 560, 571-72 (1979).

Congress chose not to do so here. Specifically, Congress prohibited all forms of judicial review except as provided under 9 U.S.C. § 10(a). 42 U.S.C. §§ 300gg-111(c)(5)(E)(i)(II), 300gg-112(b)(5)(D). Despite explicitly referencing Section 10(a) of the FAA, Congress conspicuously omitted any reference to Section 9 of the FAA or any other method for confirmation. Under settled principles of construction, that choice reflects Congress's intent not to allow private lawsuits seeking to confirm awards. *See Seago*, 91 F.4th at 391 (rejecting plaintiff's construction of statute because "[i]f Congress had intended" that construction, "surely it would have said so, but it did not") (citation omitted); *e.g.*, *Azar v. Allina Health Servs.*, 587 U.S. 566, 576-77 (2019) (holding that where "[i]n the Medicare Act, Congress expressly borrowed one

---

[6]     Plaintiffs acknowledge the stark contrast between ADRA and the NSA but suggest the ADRA "explicitly" makes awards enforceable under the FAA merely "to foreclose assertions of sovereign immunity not relevant in the NSA context." Op. Br. 52 n.8. Not so. The second sentence of the provision is what forecloses assertions of sovereign immunity, not the first. *See* 5 U.S.C. § 580(c) ("A final award is binding on the parties to the arbitration proceeding, and may be enforced pursuant to sections 9 through 13 of [the FAA]. ***No action brought to enforce such an award shall be dismissed nor shall relief therein be denied on the grounds that it is against the United States or that the United States is an indispensable party***.") (emphasis added).

of the [Administrative Procedure Act's (APA)] exemptions . . . by cross-referencing it" but did not cross-reference another of the APA's exemptions, "Congress's choice to include a cross-reference to one but not the other of the APA's neighboring exemptions strongly suggests it acted 'intentionally and purposefully in the disparate' decisions") (citation omitted).

### 3. Congress Granted HHS the Authority to Enforce a Payor's Failure to Timely Pay an IDR Award.

The structure of the NSA further shows that Congress did not intend for Plaintiffs to privately enforce IDR awards in federal court. Instead, Congress delegated that authority to HHS. *See* 42 U.S.C. § 300gg-22(b)(2); 45 C.F.R. § 150.301 *et seq.*; *see also* DOL Amicus, 13; *supra*, 13-14. CMS has acted on that authority by soliciting provider complaints and compelling payors to pay IDR awards where appropriate. GAO-24-106335, at 35; *supra*, 13-14.

The "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290 (citation omitted); *Sigmon*, 110 F.3d at 1206 (holding that the "'existence of [an] administrative scheme of enforcement is strong evidence that Congress intended the administrative remedy to be exclusive'" and not did not intend to create a private right of action) (citation omitted). By delegating to HHS the authority to enforce a payor's failure to pay an IDR award within 30 days, Congress showed that it did not intend to create a private enforcement scheme.

### 4. Congress's Intent to Preclude Plaintiffs' Proposed Right of Action Mirrors What Prompted Congress to Enact The NSA.

Congress also had good reason to preclude Plaintiffs' proposed right of action, as shown through the text and structure of the NSA, because it likely did not want to burden the federal judiciary with IDR award enforcement lawsuits. Aggressive and exploitative provider billing practices prompted Congress to pass the NSA in the first place. Given that history, Congress understandably might have anticipated that these providers would, if authorized, clog the federal courts with lawsuits seeking every last penny imaginable—such as the costs, attorney's fees, "damages" in the form of "the return on investment or interest rate realized by [the payor] on the amount owed for each IDR award from the 31st day after each decision was issued until the date Plaintiffs received payment," and pre- and post-judgment interest that Plaintiffs seek in this lawsuit—even if, as in this case, many (or all) the awards had been paid. *See* ROA.12, Prayer; *supra*, n.5.

Indeed, in the NSA's short existence, Congress's concerns about potential overrun of the courts have proven prescient. In less than a year, providers filed more than fourteen times the number of IDR disputes than what HHS anticipated. *See supra*, 14-16. By 2023, the number doubled; providers initiated more than 675,000 disputes. *See id.* If those providers could file enforcement lawsuits any time a payor did not pay an award within 30 days, the federal courts would be deluged. But Congress

channeled all provider-payor disputes into the IDR process in the first instance, and into agency enforcement, if necessary, thereafter, to avoid that very result.

**B.    Plaintiffs Fail To Meet Their Heavy Burden Of Overcoming The Presumption Against Implying a Private Right Of Action.**

Plaintiffs fail to establish that the NSA "displays an intent to create not just a private right but also a private remedy" for Plaintiffs to enforce IDR awards in federal court through "clear and unambiguous terms." *Gonzaga Univ.*, 536 U.S. at 290; *Sandoval*, 532 U.S. at 286 (citation omitted).[7] In attempting to meet their burden, Plaintiffs point to two provisions that they claim grant them a private right of action: (1) the "Timing of Payment" provision, which states that "[t]he total plan or coverage payment" for "a qualified IDR item or service for which a determination is made" under the IDR process "shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made," and (2) the provision stating that IDR determinations "shall be binding." *See* 42 U.S.C. §§ 300gg-111(c)(5)(E)(i)(I), 300gg-112(b)(5)(D), 300gg-112(b)(6). Their arguments ignore the purpose, text, and structure of the NSA.

---

[7] Plaintiffs repeatedly blend the "private right" and "private remedy" requirements to try to lessen their burden. Op. Br. 27, 31-32. The Supreme Court was clear that these are two distinct requirements; both must be met to imply a private cause of action. *Sandoval*, 532 U.S. at 286.

### 1. Plaintiffs Disregard the Purpose of the NSA.

Plaintiffs argue that "[a]t a high level, air-ambulance providers are plainly a group for whose benefit the NSA was created." Op. Br. 28. That is wrong. Congress passed the NSA "to protect consumers from surprise medical bills" **from** air ambulance providers like Plaintiffs. H.R. Rep. 116-615, at 47, 55; *see supra*, 7-14. This context informs Congress's intent behind the "Timing of Payment" provision. By directing payors to pay IDR awards to providers, Congress was furthering its goal of "comprehensively protect[ing] consumers by 'taking the consumer out of the middle' of surprise billing disputes." H.R. Rep. 116-615, at 55. There is no evidence that Congress intended to create a new private right and remedy for Plaintiffs.

### 2. Plaintiffs Cannot Square Their Arguments and Authority with the Text and Structure of the NSA.

Plaintiffs' arguments and authority also misinterpret, are distinguishable from, or simply ignore the text and structure of the NSA. For example, Plaintiffs wrongly claim that "aside from allowing providers to enforce their rights to payment in court, the NSA provides no other enforcement mechanism to ensure payors pay providers what they are due." Op. Br. 37. But in the NSA, Congress **did** grant HHS the authority to enforce a payor's non-payment of IDR awards, and CMS has acted on that authority to compel payor compliance. *See* 42 U.S.C. § 300gg-22(b)(2); 45 C.F.R. § 150.301 *et seq.*; GAO-24-106335, at 35; DOL Amicus, at 13; *supra*, 13-14. The NSA's administrative enforcement scheme is consistent with the "Timing of Payment" and

"shall be binding" provisions without having to impose a private cause of action. Because the "Timing of Payment" provision directs payors to pay providers to protect consumers, and IDR awards are "binding," CMS can wield its enforcement authority to compel a payor to pay a provider if a payor is non-compliant. And it has. *See id.*

Separate from their failure to acknowledge the NSA's administrative enforcement provisions, Plaintiffs cannot reconcile their interpretation of the NSA with Congress's decision to prohibit all forms of "judicial review," except as provided under 9 U.S.C. § 10(a). Plaintiffs claim that there is a "distinction between judicial review and other forms of judicial action, like enforcement," but Plaintiffs' authority does not support their proffered distinction. Op. Br. 41-42. They identify the FAA as "a prime example" of the distinction because "Section 9 governs judicial enforcement, while Section 10 governs judicial review and vacatur." Op. Br. 42. However, the FAA's text does not support this distinction; Section 9 does not use the term "judicial enforcement," and Section 10 does not use the term "judicial review." Moreover, courts have long described "judicial review" under the FAA to include applications to vacate, modify, and confirm and enforce arbitration awards. *See supra*, 28-29.[8]

---

[8]     Plaintiffs cite one case and Black's Law Dictionary to try to shore up their distinction of "judicial review" and "judicial enforcement," (Op. Br. 41-42), but neither does. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 591-92 (1985), did not reach any determination on the meaning of "judicial review" in the arbitral context, as Plaintiffs acknowledge. And the Black's Law Dictionary definition of the term does not exclude court action on applications to confirm and enforce arbitration awards.

Plaintiffs also cannot square their interpretation of the NSA with Congress's decision to omit any terms authorizing a private action to confirm an IDR award, such as 9 U.S.C. § 9. Plaintiffs argue that when a party enters into an ***arbitration agreement*** and ***agrees*** that the award is "binding," courts have found that the award is enforceable in court. Op. Br. 32-36. But as Plaintiffs acknowledge, the IDR process at issue here "conspicuously lacks the element that, at common law, made arbitral awards binding and enforceable: an arbitration *agreement* manifesting the parties' mutual consent to arbitrate and be bound." Op. Br. 36. When ***Congress legislates*** and intends to grant private enforcement of a dispute resolution award, it does so explicitly. *See* 9 U.S.C. § 9; 5 U.S.C. § 580(c). Congress did not do so here. The NSA's incorporation of 9 U.S.C. § 10(a) actions to vacate awards as an exception to the NSA's judicial review bar, but non-incorporation of 9 U.S.C. § 9 confirmation suits, reflects that Congress had the FAA top of mind when crafting the NSA and was not considering any pre-FAA or extra-FAA procedures for confirming (or vacating) arbitration awards.

Additionally, none of the cases that Plaintiffs raise are analogous to the NSA's text and the circumstances of Plaintiffs' cause of action. For example, *Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68 (D.D.C. 2002), did not consider whether a statute created an implied right of action. Moreover, the legislation at issue in *Cheminova*—the Federal Insecticide, Fungicide, and Rodenticide Act—states that its arbitral proceedings shall proceed under the rules of the Federal Mediation and Conciliation

Services, which explicitly provide "that the parties 'shall be deemed to have consented that judgment upon the arbitration award may be entered' in federal or state court.'" *Id.* at 72-73. Such language is glaringly absent from the NSA.

Similarly, Plaintiffs' reliance on *Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020), is inapposite. As Plaintiffs acknowledge, the question in that case was whether a provision of the Affordable Care Act (ACA) stating that the federal government "shall pay" insurance plans was a "money mandating" statute that could be enforced against the federal government under the Tucker Act. The issue was not whether the ACA created an implied private right and remedy. Notably, while the Court found that the ACA's "shall pay" provision was a "money-mandating" directive, it did not find that that language created any private remedy enforceable under the ACA itself. And in determining whether the ACA itself created a "separate remedial scheme supplanting the Court of Federal Claims' power to adjudicate petitioners' claims" under the Tucker Act, the Supreme Court found that it did not. *Maine Cmty. Health Options*, 590 U.S. at 326.[9] *Maine Community* thus does not support granting Plaintiffs a private cause of action under the NSA against HCSC, another private party.

---

[9]    The Tucker Act is itself the remedial vehicle, the "missing ingredient" that allows claims to be asserted against the federal government that are "not otherwise judicially enforceable." *Maine Community*, 590 U.S. at 323-24 n.12 (citation omitted).

For their final argument, Plaintiffs rely on their false assumption that the NSA has no enforcement mechanism to warn that "the very structure of the NSA would fall apart" and "the IDR process would be pointless" if the Court does not grant them a private action. Op. Br. 37-38. Plaintiffs' admonishments ring hollow given that the NSA ***has*** an administrative enforcement mechanism, and CMS uses its congressionally authorized authority to solicit provider complaints and compel payors to pay IDR awards where appropriate. *See supra*, 13-14. Plaintiffs also ignore that they and other providers are filing hundreds of thousands of disputes every year, and as a matter of policy, Congress may not have wanted to clog the federal courts with lawsuits every time a payor does not timely pay an IDR award within 30 days. *See supra*, 32-33. Regardless of Congress's reasoning or the potential consequences of it, "courts may not create" a statutory right of action, "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 287 (citations and internal quotations omitted).

None of Plaintiffs' arguments demonstrate the "clear and unambiguous" congressional intent required to imply their proposed right of action, and they cannot answer the statutory text that expresses instead an intention to preclude such an action.

### C.  The Amici's Additional Arguments Were Not Raised Below and Do Not Support an Implied Right of Action.

The DOL Amicus and the Brief of the American Hospital Association, American Medical Association, Federation of American Hospitals, and Texas Medical Association (AHA) as *Amici Curiae* in Support of Appellants and Reversal (AHA Amici) assert two additional arguments not raised by Plaintiffs. AHA Amici argue that rejecting an implied right of action here raises constitutional problems that should be avoided by construing the NSA to provide for one. AHA Amici 14-20. The DOL Amicus contends that courts have non-statutory "equitable" jurisdiction to compel payment of IDR awards. DOL Amicus 16. Neither argument is properly presented and neither has merit.

"'Absent exceptional circumstances, an issue waived by appellant cannot be raised by amicus curiae.'" *Squyres v. Heico Cos., LLC*, 782 F.3d 224, 233 (5th Cir. 2015) (citation omitted). An "amicus is not a party, and we ordinarily decline to consider arguments raised only by an amicus." *Sierra Club v. U.S. EPA*, 964 F.3d 882, 897 n.15 (10th Cir. 2020). Amicus briefs that "present[ ] arguments forgone by the parties themselves or effectively and unilaterally expand[ ] the word limits established by rule for a favored party[ ]" are not considered. *Id.* (citation omitted). Plaintiffs did not raise AHA Amici's constitutional-avoidance argument or the DOL's equitable-relief contention below or in their opening brief, so they are not properly before this Court.

Turning to the merits, AHA's constitutional-avoidance argument fails. "'[C]onstitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction. The canon has no application absent ambiguity.'" *Nielsen v. Preap*, 586 U.S. 392, 419 (2019) (citation omitted). As discussed, there is no ambiguity here over whether the NSA creates an implied right to sue in federal court to enforce IDR awards. The Court therefore must "take Congress at its word." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 230 (2020).

Moreover, even if there were an ambiguity, the constitutional-avoidance principle could not be used to create an implied right of action because only "clear *and un*ambiguous" statutory terms can give rise to an implied private right of action. *See supra*, 25-27. The constitutional-avoidance canon cannot trump this controlling standard or transform a (supposedly) ambiguous statute—which does not establish a private right of action—into an unambiguous one that does. *Tex. v. Yellen*, 105 F.4th 755, 766 (5th Cir. 2024) (rejecting application of canon where, "[t]o apply that canon here would be to essentially reason that, given [the statute's] ambiguity" on the question of implied right of action, "we should interpret it to be unambiguous").

Apart from this, AHA Amici fail to tether the asserted constitutional concern to the purported need to imply a right to sue payors in order to ameliorate that concern. Nor, as evidenced by the AHA's reliance on concurring and dissenting Supreme Court and Ninth Circuit decisions, is the constitutional issue one to which

there is an "obvious . . . answer." Thus, construing the NSA to not include the proposed private right of action would not create "grave[]… doubt" as to the statute's constitutionality. *Zummer v. Sallet*, 37 F.4th 996, 1009 (5th Cir. 2022) (citation and internal quotations omitted).

The DOL's equitable-relief argument fares no better. "'Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015) (citations omitted). Here, the NSA expressly precludes "judicial review" of IDR awards except for actions seeking to vacate those awards. That prohibition extends to lawsuits to confirm IDR awards, *supra* 28-29, and includes no exception for "equitable" claims. A court therefore cannot invoke some "equitable" authority to "circumvent Congress's exclusion of private enforcement" in the NSA. *Armstrong*, 575 U.S. at 327 (citation omitted). And that is true here because the NSA creates an administrative scheme for enforcing IDR awards, which further "establish[es] Congress's intent to foreclose' equitable relief." *Id.* (citation omitted).

## II. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' ERISA CLAIM SEEKING PAYMENT OF IDR AWARDS FOR LACK OF STANDING.

The district court also dismissed for lack of standing Plaintiffs' claim under ERISA, 29 U.S.C. § 1132(a)(1)(B), because "Plaintiffs' ERISA claim asserts the rights of some of HCSC's beneficiaries," but "[t]he ERISA beneficiaries suffered no

concrete injury from HCSC allegedly failing to pay IDR awards to Plaintiffs." ROA.110-11. This Court should affirm.

ERISA Section 502(a)(1)(B) "empowers a plan participant to sue 'to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the plan.'" *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 194 (5th Cir. 2015) (quoting 29 U.S.C. § 1132(a)(1)(B)). This right does not extend to health care providers. 29 U.S.C. § 1132(a)(1)(B) (permitting only "a participant or beneficiary" to bring an action for plan benefits). Providers may only sue under ERISA by obtaining an assignment of benefits from a plan participant or beneficiary. *See N. Cypress Med. Ctr. Operating Co.*, 781 F.3d at 191. "[A]n assignee takes all of the rights of the assignor, no greater and no less," and "stands in the same position as its assignor stood." *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (citations and quotations omitted).

To have standing under Section 502(a)(1)(B), the plan beneficiary must have Article III standing. *See Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020) ("There is no ERISA exception to Article III."). This requires proof of "a concrete injury even in the context of a statutory violation." *Id.* at 541 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021) ("No concrete harm, no standing.").

In *Thole*, two participants in U.S. Bank's retirement plan brought a putative class action under ERISA, claiming mismanagement of the plan's investments. 590 U.S. at 540-41. The plaintiffs' retirement plan was a defined-benefit plan under which retirees received a fixed payment each month, and the payments did not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions. *Id.* Thus, if plaintiffs "were to *lose* this lawsuit, [the beneficiaries] would still receive the exact same . . . benefits they are already slated to receive, not a penny less," and if they "were to *win* this lawsuit, [the beneficiaries] would still receive" the exact same benefits they had thus far received and would receive going forward, and "not a penny more." *Id.* at 541. The Supreme Court concluded that "[t]he plaintiffs have no concrete stake in this dispute and therefore lack Article III standing." *Id.* at 547.

That is exactly the case here. The plan beneficiaries who assigned their rights to Plaintiffs already received services from Plaintiffs, and they are responsible for their in-network cost-sharing only, regardless of any further dispute over payments. *See* 42 U.S.C. § 300gg-135. The NSA takes "the consumer out of the middle of surprise billing disputes," H.R. Rep. No. 116-615, at 55, by creating a separate IDR process that is strictly for payors and providers to resolve surprise billing disputes without any involvement of the beneficiary. *See* 42 U.S.C. § 300gg-112(b). By design, Congress made sure that beneficiaries are not involved in the IDR process, they are not entitled to receive any portion of awards issued through it, and regardless of the outcome of the IDR process, out-of-network providers are prohibited from seeking any additional

payments from the beneficiary for the services. *Id.*; 42 U.S.C. § 300gg-135 (non-participating air ambulance providers "***shall not bill, and shall not hold liable,*** [the] participant, beneficiary, or enrollee for a payment amount for such service furnished by such provider" beyond the patient's cost-sharing for the service) (emphasis added). No matter what happens in the IDR process or whether or when the payor pays the IDR award (if applicable), the plan beneficiaries "would still receive the exact same . . . benefits they are already slated to receive, not a penny less," and "not a penny more." *Thole*, 590 U.S. at 541. Therefore, the beneficiaries—and Plaintiffs, who stand in the shoes of the beneficiaries—"have no concrete stake in this dispute and therefore lack Article III standing." *Id.* at 547.

Plaintiffs and DOL maintain that HCSC's plan beneficiaries have suffered a denial of their purported plan benefit that IDR awards be timely paid to providers. Op. Br. 44-49; DOL Amicus 22-28. This is wrong and irrelevant. As the DOL states in its own regulations, the NSA's IDR process exists outside of ERISA and does not implicate plan benefits or ERISA claim procedures:

> The Departments note that there is also a significant distinction between an [adverse benefit determination (ABD)], which may be disputed through a plan's or issuer's claims and appeals process, and a denial of payment or an initial payment that is less than the billed amount under these interim final rules, which may be disputed through the open negotiation process or though the IDR process. In general, when adjudication of a claim results in a participant, beneficiary, or enrollee being personally liable for payment to a provider or facility, this determination may be an ABD that can be disputed through a plan's or issuer's claims and appeals process. Conversely, when: (1) The adjudication of a claim results in a decision that does not affect the

amount the participant, beneficiary, or enrollee owes; (2) the dispute only involves payment amounts due from the plan to the provider; and (3) the provider has no recourse against the participant, beneficiary, or enrollee, ***the decision is not an ABD and the payment dispute may be resolved through the open negotiation or the IDR process***.

86 Fed. Reg. at 36901 (emphasis added).

Accordingly, Plaintiffs cannot even plead the elements of a Section 502(a)(1)(B) ERISA claim, much less demonstrate standing to bring such a claim. They cannot identify an adverse benefit determination, "the terms of the plan" they seek to enforce, and facts demonstrating exhaustion of administrative remedies. *See* 29 U.S.C. § 1132(a)(1)(B); *Lacy v. Fulbright & Jaworski Ltd. Liab. P'ship Long Term Disability Plan, 405* F.3d 254, 256 (5th Cir. 2005) ("A claimant who is denied benefits under an ERISA plan must exhaust all administrative remedies afforded by the plan before instituting litigation for recovery of benefits."). Since they cannot even state an ERISA claim, they certainly cannot meet the Article III requirement of demonstrating the ERISA claim involves a concrete injury to a plan injury.[10]

Independently, Plaintiffs' and DOL's theory of harm—based on a technical "violation that did not personally harm" the beneficiaries—is precisely the kind of abstract theory of harm that *TransUnion*, *Thole*, and *Spokeo* rejected. *TransUnion LLC,*

---

[10] Although Plaintiffs' inability to state an ERISA claim is subsumed within the district court's lack of standing ruling, even if it were not, this Court may affirm the dismissal of Plaintiffs' ERISA claim on this alternative ground. *Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 550 (5th Cir. 2015).

594 U.S. at 427; *see Thole*, 590 U.S. at 541-42, 547; *Spokeo*, 578 U.S. at 341. Nor is Plaintiffs' bare request for their own attorneys' fees and costs under ERISA sufficient to establish *the beneficiaries*' stake in this litigation. ROA.11, ¶ 23; *see Thole*, 590 U.S. at 541-42; *see also Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) ("[I]nterest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim."). Tellingly, neither Plaintiffs nor the DOL attempt to address, much less distinguish, *Thole* and *TransUnion*.[11]

Plaintiffs' cases—all of which predate the NSA—are distinguishable because they involve general out-of-network plan payments, not IDR award payments. Outside of the NSA and the IDR process, beneficiaries have "the legal right to seek payment directly from the Plans for charges by non-network health care providers" under their plan terms, and they face potential liability to the providers if the plan failed to pay the providers. *See N. Cypress Med. Ctr. Operating Co.*, 781 F.3d at 192 (citation omitted). Here, the beneficiaries have no legal right to seek IDR award payments from HCSC, they do not face any liability if HCSC fails to pay them, and there are no adverse benefit determinations or plan terms to enforce through ERISA.

---

[11] DOL cites to *Denning v. Bond Pharmacy, Inc.*, which relied on cases that predated *TransUnion*, *Thole*, or *Spokeo* to find that "a breach of contract is a sufficient injury for standing purposes." 50 F.4th 445, 451-52 (5th Cir. 2022). *Denning* did not mention or reconcile its holding with *TransUnion*, *Thole*, or *Spokeo*. Plaintiffs here did not bring a breach of contract claim or identify the ERISA plan terms that they are seeking to enforce. *See supra*. And *Denning* still held that the plaintiff did not have standing. 50 F.4th at 452.

*See* 42 U.S.C. §§ 300gg-112(b)(6), 300gg-135; 86 Fed. Reg. 36872, 36901 (July 13, 2021). In sum, the beneficiaries "have no concrete stake in this dispute and therefore lack Article III standing." *Thole*, 590 U.S. at 547.

## III. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' QUANTUM MERUIT CLAIM BECAUSE PLAINTIFFS CANNOT SHOW THAT THEY PROVIDED ANY BENEFITS TO HCSC.

The district court faithfully applied Texas Supreme Court precedent to dismiss Plaintiffs' unjust enrichment/quantum meruit claim. ROA.113-14 (citing, among other things, *Tex. Med. Res.*, 659 S.W.3d at 436). Plaintiffs do not dispute that *Tex. Med. Res.* applies where a provider is suing a payor for services that the provider rendered to a beneficiary. Op. Br. 49-50. Instead, Plaintiffs ask this Court to create an exception to this precedent for the NSA, which they claim "upended" this dynamic. Op. Br. 50-51. They are wrong. The Court should follow Texas law and affirm dismissal of Plaintiffs' state law claim.

Under Texas law, "[q]uantum meruit is a [state-law] equitable theory 'founded in unjust enrichment.'" *Tex. Med. Res.*, 659 S.W.3d at 436 (citation omitted). To state such a claim, a plaintiff must show that (1) it rendered valuable services (2) "for the defendant," (3) the defendant accepted the services, and (4) the defendant had reasonable notice that the plaintiff was expecting to be paid. *Id.* (citation omitted). A health care provider who renders services for a patient cannot maintain such a claim against a third-party payor:

> Serving a defendant's *customers* is hardly the same as serving the defendant *itself* . . . Recovery in quantum meruit cannot be had from an insurer based on services rendered to an insured, because those services aren't direct to *or* for the benefit of the insurer. As our sister district courts have repeatedly pointed out, "a ripened obligation to pay money to the
>
> insured [or to Plaintiffs on behalf of the insured] . . . hardly can be called a benefit."

*Id.* at 437.

This ruling applies here. Plaintiffs did not render any services for HCSC. Instead, Plaintiffs provided "air ambulance transports **for [HCSC] beneficiaries**." ROA.11, ¶ 25 (emphasis added). The NSA created a framework for Plaintiffs and HCSC to resolve disputes over the rate for those services, but Plaintiffs still provided the services for HCSC beneficiaries, not for HCSC. *See id.*; ROA.113-14. Nothing about the NSA changes the application of *Tex. Med. Res.* to this case. And because the Texas Supreme Court has spoken directly to the circumstances presented here, "'it is not for [this Court] to adopt innovative theories of [state law], but simply to apply that law as it currently exists . . .'" *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir. 1986) (en banc) (citation omitted).

Apart from what Texas law provides, the NSA forecloses Plaintiffs' quantum meruit claim. On that claim, Plaintiffs "seek payment of the [IDR] awards" and any "benefits obtained by HCSC as a result of not timely paying the award[s]." ROA.18. But the NSA expressly prohibits "judicial review" of any IDR "determination," and Plaintiffs' quantum meruit claim falls squarely within that prohibition. Moreover, by

establishing the IDR process for resolving disputes over unpaid services and providing for administrative enforcement of that process, the NSA reflects Congress's intent to preclude a duplicative equitable remedy. *See Armstrong*, 575 U.S. at 327 (holding that courts cannot invoke "equitable" authority to "circumvent Congress's exclusion of private enforcement" and its "intent to foreclose' equitable relief") (citation omitted).

Plaintiffs ignore the plain import of the NSA, insisting that courts retain broad and "inherent" equitable authority to provide the quantum meruit relief Plaintiffs seek. Op. Br. 51. As noted, however, the NSA forecloses that authority, and there is no indication Congress intended to preserve it—though it knows how to do that. *E.g.,* 47 U.S.C. § 414 ("Nothing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies."); 42 U.S.C. § 7604(e) (similar).

## IV.   THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN DENYING PLAINTIFFS LEAVE TO AMEND THEIR COMPLAINT.

Lastly, the district court did not abuse its discretion in denying Plaintiffs leave to amend their complaint. A "'bare bones' request to amend pleadings"—such as Plaintiffs' one-sentence statement at the end of their opposition to HCSC's motion to dismiss—"'remains futile when it fail[s] to apprise the district court of the facts that [the plaintiff] would plead in an amended complaint.'" *Porretto*, 113 F.4th at 491 (citation omitted); *see* ROA.81. Indeed, in their opening brief, Plaintiffs still do not explain what "material facts [they] would have included in an amended complaint"

that would avoid dismissal of their claims. *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) (affirming dismissal of pro se complaint without leave to amend). The Court should therefore affirm the denial of leave to amend as well.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's judgment dismissing Plaintiffs' Complaint.

Dated: November 18, 2024                    Respectfully submitted,


                                             */s/ Raymond A. Cardozo*
Martin J. Bishop                             Raymond A. Cardozo
REED SMITH LLP                               REED SMITH LLP
2850 N Harwood St.                           101 Second Street
Suite 1500                                   Suite 1800
Dallas, TX 75201                             San Francisco, CA 94150
(469) 680-4200                               (415) 543- 8700
                                             rcardozo@reedsmith.com
Jason T. Mayer
REED SMITH LLP
10 South Wacker Drive
Suite 4000
Chicago, IL 60606-7507
(312) 207-1000

Colin E. Wrabley
Michael J. McCune
REED SMITH LLP
225 Fifth Avenue
Suite 1200
Pittsburgh, PA 15222
(412) 288-3548

*Counsel for Defendant-Appellee Health Care Service Corporation*

## **CERTIFICATE OF COMPLIANCE**

On this 18th day of November, 2024, the undersigned certifies that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 12,822 words, as determined by the word-count function of Microsoft Word and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2; and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the body of the brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font. The brief's footnotes comply with Fifth Circuit Rule 32.1 because they have been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Garamond font.

_____ /s/ Raymond A. Cardozo_____

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d), the undersigned certifies that on this 18th day of November, 2024, he caused the Brief for Appellee Health Care Service Corporation to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system via electronic mail.

*/s/ Raymond A. Cardozo*