**No. 24-10561**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Guardian Flight, L.L.C.; Med-Trans Corporation,

Plaintiffs–Appellants,

v.

Health Care Service Corporation,

Defendant–Appellee.

*On Appeal from the United States District Court for the Northern District of Texas*
*District Court No. 3:23-CV-01861-B*

**BRIEF OF AMERICA'S HEALTH INSURANCE PLANS**
**AS *AMICUS CURIAE* IN SUPPORT OF APPELLEE**

Julie S. Miller
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
Tel.: 202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PARTIES

*Guardian Flight, L.L.C. v. Health Care Service Corp.*, No. 24-10561

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Guardian Flight, LLC<br>Med-Trans Corporation<br>Global Medical Response, Inc.<br>Air Medical Group Holdings Company<br>    LLC | Charlotte H. Taylor<br>Alexa R. Baltes<br>(Jones Day) |
| | Adam T. Schramek<br>Abraham Chang<br>Dewey Jude Gonsoulin, III<br>(Norton Rose Fulbright US LLP) |
| *Plaintiffs-Appellants and Affiliated Entities* | |
| | *Counsel for Plaintiffs-Appellants* |
| Health Care Service Corporation | Raymond A. Cardozo<br>Martin J. Bishop<br>Jason T. Mayer<br>Colin E. Wrabley<br>Michael J. McCune<br>(Reed Smith LLP) |
| *Defendant-Appellee* | |
| | *Counsel for Defendant-Appellee* |

| | |
|---|---|
| United States<br><br>*Federal Amicus Curiae* | Brian M. Boynton<br>Leigha Simonton<br>Joshua M. Salzman<br>Kevin B. Soter<br>Seema Nanda<br>Wayne R. Berry<br>Jeffrey M. Hahn<br>Isidro Mariscal<br>*Counsel for Federal Amicus Curiae* |
| American Hospital Association<br>American Medical Association<br>Federation of American Hospitals<br>Texas Medical Association<br><br>*Amici Curiae in Support of Plaintiffs-Appellants* | James E. Tysse<br>Kelly M. Cleary<br>Kristen E. Loveland<br>(Akin Gump Strauss Hauer<br>  & Feld LLP)<br><br>*Counsel for Amici Curiae in Support of Plaintiffs-Appellants* |
| America's Health Insurance Plans, Inc.<br><br>*Amicus Curiae on this Brief* | Hyland Hunt<br>Ruthanne M. Deutsch<br>(Deutsch Hunt PLLC)<br><br>Julie S. Miller<br>Thomas M. Palumbo<br>(America's Health Insurance Plans)<br><br>*Counsel for Amicus Curiae on this Brief* |

Under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), America's Health Insurance Plans, Inc. states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

s/Hyland Hunt
Hyland Hunt

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ...........................................i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ................................................................iv

STATEMENT OF INTEREST OF *AMICUS CURIAE*..............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................3

ARGUMENT ........................................................................................4

I.   Congress Intended Administrative Resolution of Any IDR Payment Issues. ...................................................................................................4

    A.   Communication Errors, Exacerbated by Providers' Submission of a High Volume of (Often Unqualified) Claims Have Caused IDR Processing Difficulties, Including for Payments.......................5

    B.   Incomplete Claims Submissions and Other Communication Issues Resulting in Payment Delays Can and Should Be Redressed Administratively. ......................................................................10

II.  Creating a Nonpayment Cause of Action Would Frustrate Congress's Goals for IDR and Drive Up Health Care Costs for All Americans.................14

CONCLUSION ...................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)............................................13

*Casas v. Am. Airlines, Inc.*, 304 F.3d 517 (5th Cir. 2002)......................13

*Health Care Plan, Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738 (2d Cir. 1992)...........13

*Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs.*,
  No. 23-40605, 2024 U.S. App. LEXIS 27568 (5th Cir. Oct. 30, 2024).... 4, 12, 15

**Statutes**

42 U.S.C. § 300gg-18(b)........................................................17

42 U.S.C. § 300gg-111(a) .......................................................5, 8

42 U.S.C. § 300gg-111(b) .......................................................5, 8

42 U.S.C. § 300gg-111(c) ...................................................... 12, 13

**Regulations**

86 Fed. Reg. 55980 (Oct. 7, 2021)............................................16

88 Fed. Reg. 75744 (Nov. 3, 2023)...................................... 6, 7, 8, 10, 16

**Other Authorities**

America's Health Insurance Plans, Inc. & Blue Cross Blue Shield Ass'n,
  *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month, While Provider Networks Grow* (Jan. 2024)..............................................6

Blue Cross Blue Shield Ass'n Comment Letter, Proposed Rule on Federal IDR
  Operations (Jan. 2, 2024)......................................... 7, 9, 10

Ctrs. for Medicare & Medicaid Servs., *Federal IDR Supplemental Tables for 2023 Q1 through Q4* (Feb. 15 and June 13, 2024)......................................8, 9

Ctrs. for Medicare & Medicaid Servs., *Federal Independent Dispute Resolution Process–Status Update* (Apr. 27, 2023).............................................11

Ctrs. for Medicare & Medicaid Servs., *Providers: submit a billing complaint* ......11

Ctrs. for Medicare & Medicaid Servs., *Supplemental Background on the Federal IDR PUF, July 1 – December 31, 2023* (June 13, 2024) ......................................6

CVS Health Comment Letter, Proposed Rule on Federal IDR Operations (Jan. 2, 2024) ............................................................................................................9

Matthew Fiedler & Loren Adler, *A first look at outcomes under the No Surprises Act arbitration process*, Brookings Inst. (Mar. 27, 2024)....................................7

Rodrigo Barradas & Jorge Vazquez, *Baseball Arbitration as a Suitable Alternative for Construction and Real Estate Disputes*, 40 J. Int'l Arbitration 211 (2023)...15

Tina Reed, *Doctors say insurers are ignoring orders to pay surprise billing disputes*, Axios (Aug. 3, 2023)...........................................................................7

U.S. Gov't Accountability Office, *Roll Out of Independent Dispute Resolution Process Has Been Challenging* (Dec. 2023) ...................................... 7, 11, 13, 16

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

America's Health Insurance Plans, Inc. (AHIP) is the national trade association representing the health insurance industry. AHIP is committed to market-based solutions and public-private partnerships that make high-quality coverage and care more affordable, accessible and equitable for everyone. AHIP's members provide health care coverage, services and solutions to more than 200 million Americans. That experience gives AHIP broad first-hand knowledge and a deep understanding of how the nation's health care and health insurance systems work.

AHIP's members strive to reach agreements with health care providers to offer consumers affordable networks that provide choices in the delivery of quality medical care. When unable to secure network agreements before treatment is rendered, health plans seek to negotiate reasonable out-of-network payments to prevent surprise medical bills and reduce costs for patients. But before the No Surprises Act, some providers—particularly air ambulance providers such as Appellants—often leveraged their refusal to participate in networks to send patients excessive surprise bills and extract payments well above typical market rates.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

1

Congress, after significant debate, ultimately arrived at a bipartisan solution in the No Surprises Act to protect consumers from out-of-network payment disputes and surprise bills. The Act does this by barring providers from billing patients for the balance of their out-of-network charges and encouraging health plans and out-of-network providers to resolve out-of-network payments through negotiations that take place ex post. If disputes persist, Congress established Independent Dispute Resolution (IDR) as a streamlined final offer dispute resolution process. Congress intended IDR to promptly and conclusively resolve payment disputes in what were expected to be rare instances where the parties do not agree on fair payment rates.

Providers have ample remedies, including an administrative complaint process, to ensure that they are paid when qualified IDR determinations are issued in their favor. To the extent payments are sometimes delayed, it is often due to simple miscommunication, exacerbated by a high volume of IDR claims, often for items not qualified by statute for IDR.

The Departments charged by Congress with implementing IDR—Health and Human Services (HHS), Labor, and Treasury—are actively working to address these problems facing the IDR system and any resulting effect on payments. Congress intended for the Departments—not the courts—to sort through when IDR determinations require payment, and when they don't, as part of their supervisory role for the IDR process, to ensure payment when appropriate. If instead providers

can sue for nonpayment whenever an IDR determination goes unpaid within 30 days, providers would have every incentive to overwhelm the IDR system, and then the courts, with disputes about bureaucratic errors that generated minor payment delays or claims that were never qualified for IDR in the first place. Far from serving the purposes of the No Surprises Act, the upshot would be to undermine the IDR system, waste scarce judicial resources, and ultimately drive up health care costs for all Americans.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As part of shielding Americans from surprise medical bills and spiraling out-of-network costs, Congress established IDR as a streamlined process for resolving out-of-network payments subject to administrative oversight. When Appellants and their *amici* insist that there is a widespread problem of nonpayment of IDR determinations, that is both inaccurate and omits the fact that the governing agencies are already working to fix the root causes: IDR communication and administrative errors resulting in payment delays. These issues have been only exacerbated by a flood of claims that should never have been submitted to IDR in the first instance.

While the Departments are developing comprehensive administrative solutions for these various process issues, they have already established an administrative remedy for sorting through whether an IDR determination requires payment and, if so, ensuring payment is made. Appellants' proposed judicial

remedy—purportedly available at day 31 if an IDR determination (qualifying or not) is not paid in 30 days—would bypass these straightforward administrative solutions. Opening the courthouse doors is thus unnecessary. It would also needlessly embroil the courts in tens, if not hundreds, of thousands of disputes regarding minor payment delays or IDR eligibility each year. Administrative costs would explode, burdening all Americans with unnecessary health care costs.

## ARGUMENT

### I.    Congress Intended Administrative Resolution of Any IDR Payment Issues.

The No Surprises Act, and the IDR process it establishes, were designed to protect patients from crushing surprise bills from out-of-network providers in situations where they cannot choose their provider and no state law protections apply. *Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 23-40605, 2024 U.S. App. LEXIS 27568, at *4-5 (5th Cir. Oct. 30, 2024).

Although it has worked well to protect patients from millions of surprise medical bills, the IDR process has been plagued with numerous processing delays and glitches from the start, made worse by an extraordinarily high volume of IDR disputes. A variety of issues are contributing to communication problems that can delay payment, including claims submitted with incomplete or incorrect information, claims directed to the wrong plan, duplicate claims (some with disparate determinations), and failures to communicate when an IDR determination

has been rendered.

In addition, IDR is not a catch-all forum for each and every plan-provider dispute. IDR is *not* available when state law mandates payment amounts or provides a dispute resolution process; when services are furnished by an in-network provider who had already agreed to negotiated rates before service was provided; when services fall outside the Act's coverage (e.g., where patients had the opportunity to consent in advance to an out-of-network provider), or when services are covered by other health coverage (such as Medicare or Medicaid). *See* 42 U.S.C. § 300gg-111(a)(1), (a)(3)(F)-(K), (b)(1). Yet providers have flooded the system with claims that do not belong in IDR, resulting in difficulties in processing IDR claims and determinations—including payments.

Fortunately, Congress contemplated administrative resolution of this multi-faceted problem. Appellants largely ignore that administrative efforts to address payment delays are already in place, and efforts to improve the IDR process are already underway.

**A. Communication Errors, Exacerbated by Providers' Submission of a High Volume of (Often Unqualified) Claims Have Caused IDR Processing Difficulties, Including for Payments.**

**1. The IDR system has been flooded by high IDR volume.**

The Act has been working to protect patients from surprise bills. Throughout 2023, the Act protected patients from receiving surprise medical bills that otherwise

could have resulted from about 13.5 million claims. AHIP & Blue Cross Blue Shield Ass'n (BCBSA), *No Surprises Act Continues to Prevent More than 1 Million Surprise Bills Per Month, While Provider Networks Grow* (Jan. 2024), http://tinyurl.com/4majdzam (finding more than 10 million claims were subject to the Act's protections between January 1 and September 30, 2023). For most providers it works, too. Per AHIP/BCBSA research, fewer than 7% of out-of-network claims subject to the Act even enter IDR. *Id.*

But 7% of claims entering IDR is still far more volume than Congress intended. In 2023, the first full calendar year that IDR was operational, nearly 680,000 IDR proceedings were initiated, nearly all (99.6%) by providers. Ctrs. for Medicare & Medicaid Servs., *Supplemental Background on the Federal IDR PUF*, *July 1 – December 31, 2023*, at 2 (June 13, 2024), https://tinyurl.com/36b2963j; Answer Br. 15. That is more than 30 times the number of disputes initially projected per calendar year by the Departments. 88 Fed. Reg. 75744, 75753 & n.68 (Nov. 3, 2023).

Closer examination of that volume reveals it is primarily driven by two phenomena. First, a handful of investment-backed provider firms have engaged in concentrated exploitation of the IDR system.[2] Second, the IDR system has been

---

[2] Just four "[l]arge investor-backed provider groups … have accounted for a large and disproportionate share of [non-air-ambulance] IDR cases." Matthew

overwhelmed by a huge number of disputes that do not qualify for IDR. *See* 88 Fed. Reg. at 75753; pp. 8-9, *infra*.

**2. High IDR volume has driven an extraordinary level of administrative and communication errors related to IDR claims.**

To the extent that IDR determinations go unpaid or are paid late, it is often due to incorrect information or miscommunication. *See* Tina Reed, *Doctors say insurers are ignoring orders to pay surprise billing disputes*, Axios (Aug. 3, 2023), https://tinyurl.com/3htmf7wu (Centers for Medicare & Medicaid Services (CMS) spokesperson reporting that payments are sometimes late due to "missing information in some payment determination letters"). If, for example, providers input incorrect health plan contact information, plans may lack notice of the IDR process or determination until "they receive a complaint from regulators that a payment has not been made within the required 30 days." BCBSA Comment Letter, Proposed Rule on Federal IDR Operations, at 16 (Jan. 2, 2024).

In addition, health plans are routinely encountering a high volume of duplicate disputes involving the same underlying IDR item or service. And because these

---

Fiedler & Loren Adler, *A first look at outcomes under the No Surprises Act arbitration process*, fig. 1, Brookings Inst. (Mar. 27, 2024), https://tinyurl.com/ub6hutwb. Air ambulance IDR volume was similarly driven by a few investment-backed companies. U.S. Gov't Accountability Office, *Roll Out of Independent Dispute Resolution Process Has Been Challenging*, at 45 (Dec. 2023), https://tinyurl.com/mrsvxbdr ("GAO Report").

duplicate disputes may not always be assigned to the same IDR entity, these otherwise identical claims can result in disparate determinations. Resolving these issues through appropriate administrative channels may lead to a delay in payment until the correct IDR determination is identified. Moreover, when IDR entities fail to provide notice of a determination to a plan at all, the plan may only first learn of the determination when a provider later seeks payment, and is then required to undertake its own efforts to confirm the provider's notification is accurate. Because of these various glitches—duplicate claims, misidentified plans, total lack of notice, etc.—payments may be delayed even though plans are undertaking extensive efforts to meet their payment obligations.

### 3. Much of the high IDR volume stems from unqualified claims.

Many communication errors stem from providers' scattershot approach to submitting IDR claims with little apparent due diligence to first ascertain correct plan information, whether the claim is a duplicate, or whether it even qualifies for IDR. Providers—whether unwittingly or knowingly gaming the system—are submitting hundreds of thousands of unqualified payment disputes—i.e., those Congress excluded from the IDR process[3]—to IDR each year. Over the course of about the first year that the IDR system was operational, nearly 40% of disputes were challenged as ineligible. 88 Fed. Reg. at 75753. A similar trend has continued

---

[3] *See* 42 U.S.C. § 300gg-111(a)(1), (a)(3)(F)-(K), (b)(1).

throughout 2023 (the latest year for which data is available). *See* CMS, *Federal IDR Supplemental Tables for 2023 Q1 through Q4* (Feb. 15 and June 13, 2024), tbl. 4, https://tinyurl.com/49x3j7p9 (between 30%-46% of disputes challenged as ineligible each quarter) ("2023 Tables").

Although IDR entities closed some disputes for ineligibility, *id.* at 75,753; 2023 Tables, *supra* (19%-28% of disputes closed as ineligible, depending on the quarter), there is not yet a comprehensive system for screening out all unqualified disputes. As a result, many unqualified disputes still make it through the process and become unqualified IDR determinations. *See, e.g.*, BCBSA Comment Letter, *supra*, at 21 (noting IDR entities "frequently allow disputes into the federal process that are out of scope (e.g., Medicare and Medicaid claims, disputes that fall under state surprise billing laws, etc.)"); CVS Health Comment Letter, Proposed Rule on Federal IDR Operations, at 5 (Jan. 2, 2024) ("A lack of eligibility verification and accountability for eligible claims submission has resulted in IDR decisions rendered against plans for NSA ineligible claims.").

Plans have often observed unqualified claims being submitted more than once, presumably in the hope that at least one (or more) will make it through to a favorable determination. As discussed above, the resulting competing determinations have to be sorted out at the payment stage, causing delays. And plans are also observing

providers simultaneously submitting claims in both federal IDR and state dispute resolution systems, again requiring time to sort through conflicting determinations.

**B. Incomplete Claims Submissions and Other Communication Issues Resulting in Payment Delays Can and Should Be Redressed Administratively.**

**1. The Departments are actively working on comprehensive fixes for the root causes of payment delays.**

Recognizing that miscommunication and information errors often lead to processing inefficiency and payment delays, the Departments have proposed changes to the types and format of information exchanged between plans and providers. *See* 88 Fed. Reg. at 75754. The Departments have also proposed several reforms to address the disruption and inefficiency caused by unqualified IDR claims. To address the issue of providers initiating IDR without "actively evaluating eligibility," the Departments have proposed an attestation requirement that requires providers to identify their basis for eligibility, as well as changing procedures for assessing administrative fees to reduce the incentive to file unqualified claims. *Id*. at 75797. Because IDR entities are often unable to effectively weed out unqualified claims, a proposed rule would have the agency take over the eligibility review process when "the volume of disputes outpaces the capacity of certified IDR entities to timely process eligibility determinations." *Id.* at 75778. Further administrative undertakings—through the complaint process described below or an administrative

appeal of eligibility determinations—may yet be considered. *See* BCBSA Comment Letter, *supra*, at 18. Collectively, these reforms show that the Departments are actively exercising their oversight authority, and the fixes would go a long way toward ameliorating any purported nonpayment or payment delay issues.

**2. A lawsuit remedy is wholly unnecessary because any payment issues can be resolved with an administrative complaint.**

Besides these systemwide reforms that are underway, the Departments already provide a remedy for any case-specific payment issues.

If a provider does not receive payment within 30 days, there is no need to run to court on day 31. Providers can file a complaint with CMS by either calling the No Surprises Help Desk or filling out a web form. *See* CMS, *Providers: submit a billing complaint*, https://tinyurl.com/46xehyda. Yet they have rarely done so. As of May 2023—after IDR had been operational for nearly a year—CMS had received about 3,400 complaints about payment of IDR determinations, of which about 3,200 were transferred to the Department of Labor (for health plans subject to ERISA). GAO Report, *supra*, at 35 n.59. By comparison, more than 42,000 determinations had been issued by then, meaning about an 8% payment complaint rate to CMS. *See* CMS, *Federal Independent Dispute Resolution Process–Status Update*, at 2 (Apr. 27, 2023), https://tinyurl.com/48xvhfmc (42,158 IDR determinations issued by March 31, 2023). So either the rate of payment problems is much lower than *amici*'s self-

reported sky-is-falling estimate, AHA Amicus Br. 20-21, or providers are simply ignoring their administrative complaint remedies.

Ignoring the administrative complaint process flouts the statute twice over. First, it impairs the supervisory role that Congress assigned to the Departments. Just as Congress intended for the Departments to supervise the accuracy of the Qualifying Payment Amount, *see Tex. Med. Ass'n*, 2024 U.S. App. LEXIS 27568, at *24, it intended for the Departments to supervise the IDR process. *See, e.g.*, 42 U.S.C. § 300gg-111(c)(2)(A), (4)(C)-(D) (establishment of IDR process and supervision of IDR entities). The administrative complaint process enables the Departments to exercise their supervisory authority by gathering information about issues plaguing the IDR system and developing comprehensive regulatory solutions. Case-by-case private suits for nonpayment would short-circuit such regulatory efforts.

Second, disregarding the complaint process supplants Congress's intended administrative remedy with a judicial one. The administrative process is well suited to sorting through case-by-case complexities, like whether an IDR determination is duplicative, and providing redress when payment is required. The complaint process can be initiated with a phone call—substantially less costly than filing a federal lawsuit.

Though Appellants would apparently prefer to avoid them, the availability of administrative remedies is strong evidence that Congress did not intend to create a judicial remedy. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). The government recognizes as much, acknowledging that a private right would "perhaps be unnecessary if there were an adequate alternative means" to redress payment issues. Gov. Br. 13. Yet in arguing that alternative remedies are insufficient, the government focuses entirely on civil enforcement penalties and other agency enforcement litigation, also ignoring the complaint process. Gov. Br. 13-14.

What's more, the remedies that the government does acknowledge, even if "indirect" (Gov. Br. 13) provide strong incentives to comply with required payments, and alone indicate that "Congress expressly relied upon an administrative scheme to induce compliance" in derogation of private remedies. *Health Care Plan, Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 741 (2d Cir. 1992) (civil penalties); *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 521-523 (5th Cir. 2002) (civil penalties and government enforcement suits). But they also don't stand alone. The Departments' complaint resolution program provides a *direct* means of remedying any nonpayment and has in fact yielded agency orders to plans to pay IDR determinations when appropriate. GAO Report, *supra*, at 35; *see* Answer Br. 13-14.

The Act may also provide plans a judicial remedy to vacate IDR determinations, including for unqualified claims. *See* 42 U.S.C. § 300gg-

111(c)(5)(E)(i)(II). But contrary to the government's argument (Br. 11-12), the express cause of action to vacate IDR determinations in some circumstances does not imply that Congress intended judicial enforcement "in all other circumstances." Congress provided a narrowly circumscribed pathway to judicial review as an option for plans or providers to provide a check on the IDR process in egregious circumstances, such as fraud—a pathway that should result in a tiny number of cases in extraordinary circumstances. What's more, the pathway is to a specific, circumscribed result: vacatur. What Appellants seek, by contrast, is a highway-sized roadway into the courts for enforcing IDR results—*i.e.*, making payment demands— in potentially hundreds of thousands of cases per year for ever-increasing numbers of IDR determinations, including determinations on claims that were never even qualified for IDR. Congress sensibly chose to direct that quagmire to administrative resolution rather than litigation.

## II.    Creating a Nonpayment Cause of Action Would Frustrate Congress's Goals for IDR and Drive Up Health Care Costs for All Americans.

Permitting providers to file a lawsuit whenever an IDR determination passes 30 days unpaid—in lieu of administrative remedies—would undermine the IDR system in several ways.

First, if providers can sue for nonpayment of any IDR determination within 30 days, that will only encourage the submission of even more duplicative, incorrect, or unqualified disputes, in hopes of receiving an IDR determination that can be taken

14

to court the second the clock passes day 30. The more claims that are submitted—identifying the wrong plan or not, qualified or not, duplicative or not—the more likely that the system is further overwhelmed, that administrative errors frustrate timely resolution and payment, and that unqualified or duplicative determinations sneak through. This would create additional burdens on health plans as they seek to issue timely payments following IDR determinations, as well as a vicious circle of perverse incentives that would abrogate Congress's careful constraints on the IDR system and bring the system crashing down.

Second, bypassing administrative remedies and instead allowing a manufactured judicial remedy would also embroil the courts in potentially hundreds of thousands of disputes which Congress never intended for judicial resolution, including about whether claims even qualified for IDR in the first place. This would vitiate Congress's choice to assign a precise set of out-of-network payment disputes to an efficient, relatively low-cost dispute resolution system—with only very narrow judicial review. Congress designed the IDR system with "baseball-style" features for a reason: those features tend to reduce costs and foster efficiency. *Tex. Med. Ass'n*, 2024 U.S. App. LEXIS 27568, at *8; Rodrigo Barradas & Jorge Vazquez, *Baseball Arbitration as a Suitable Alternative for Construction and Real Estate Disputes*, 40 J. Int'l Arbitration 211, 215 (2023). But Congress's approach only works if there is strict adherence to IDR's statutory guardrails. Gumming up the

system with hundreds of thousands of administrative errors and unqualified or duplicative disputes impairs IDR's efficiency. *See* GAO Report, *supra*, at 22 (identifying ineligible disputes as a primary reason for the IDR backlog).

Implying a litigation stage, whether under ERISA or the No Surprises Act, would only make things far, far worse. Although Appellants describe their nonpayment suit as if it would involve nothing more than a rubber stamp on an IDR determination, courts would in fact be drawn into "complex and time consuming" issues about whether a dispute is duplicative, identifies the right plan, qualifies for IDR, or a host of other issues plaguing the IDR system. *See* 88 Fed. Reg. at 75755. This would mean potentially hundreds of thousands of new court cases each year, with litigation costs dwarfing already-high IDR costs—in many cases to resolve disputes that never should have entered the IDR door.

All Americans—patients, people who purchase health insurance, and taxpayers—would pay the costs of providers filing lawsuits instead of using the administrative remedies Congress has already made available under the Act. This wasteful spending—not contemplated (much less authorized) by Congress—directly harms consumers who purchase insurance and indirectly harms taxpayers by increasing expenditures for premium tax credits. *See* 86 Fed. Reg. 55980, 56059 (Oct. 7, 2021). Such an outcome cannot be squared with either the Act's purpose to protect consumers from high out-of-network costs, or the broader legal, commercial,

and regulatory imperatives for health plans to limit the amount spent on administrative costs. *See, e.g.*, 42 U.S.C. § 300gg-18(b).

* * * * *

Permitting IDR payment disputes to proceed in court is contrary to Congress's design. Judicial remedies are not necessary to redress any issues with payment of IDR determinations, because providers have an administrative remedy. And regulatory improvements already underway will begin to help fix the root causes of any payment issues. By contrast, flooding the courts with payment disputes would only drive up administrative costs (including for potentially hundreds of thousands of new court cases per year). This outcome makes no sense for an Act designed to protect patients from out-of-control surprise medical bills, and it would upend, not reinforce, the system that Congress designed.

## CONCLUSION

The district court's judgment should be affirmed.

November 25, 2024

Respectfully submitted,

s/Hyland Hunt

Julie S. Miller
Thomas M. Palumbo
AMERICA'S HEALTH INSURANCE PLANS
601 Pennsylvania Ave. NW
South Building, Suite 500
Washington, DC 20004

Hyland Hunt
Ruthanne M. Deutsch
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
Tel.: 202-868-6915
Fax: 202-609-8410
Email: hhunt@deutschhunt.com

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Times New Roman proportional font and contains 3,752 words, and thus complies with the type-volume limitation set forth in Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure.


s/Hyland Hunt
Hyland Hunt

November 25, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2024, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.


s/Hyland Hunt
Hyland Hunt