No. 24-10561

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

GUARDIAN FLIGHT, L.L.C.; MED-TRANS CORPORATION,

*Plaintiffs-Appellants*

v.

HEALTH CARE SERVICE CORPORATION,

*Defendant-Appellee*

On Appeal from the United States District Court
for the Northern District of Texas, Hon. Jane J. Boyle
Case No. 3:23-cv-01861-B

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

Adam T. Schramek
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Boulevard
Suite 1100
Austin, TX 78701
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
adam.schramek@nortonrosefulbright.com

Charlotte H. Taylor
*Counsel of Record*
Alexa R. Baltes
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3872
ctaylor@jonesday.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10561, *Guardian Flight, LLC and Med-Trans Corporation v. Health Care Service Corporation*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellant: **Guardian Flight, LLC**, is a wholly-owned subsidiary of Global Medical Response, Inc. through a holding company, Air Medical Group Holdings Company LLC.

2. Plaintiff-Appellant: **Med-Trans Corporation**, is a wholly-owned subsidiary of Global Medical Response, Inc. through a holding company, Air Medical Group Holdings Company LLC.

3. Defendant-Appellee: **Health Care Service Corporation**

4. Amicus Curiae Movant: **American Hospital Association**

5. Amicus Curiae Movant: **American Medical Association**

6. Amicus Curiae Movant: **Federation of American Hospitals**

7. Amicus Curiae Movant: **Texas Medical Association**

8. Amicus Curiae Movant: **United States of America**

9. Amicus Curiae Movant: **America's Health Insurance Plans**

The following law firms and counsel have participated in this case, either in the district court or on appeal:

| Defendant-Appellee | Counsel |
|---|---|
| Health Care Service Corporation | Raymond A. Cardozo<br>REED SMITH, L.L.P.<br>101 2nd Street<br>Suite 2000<br>San Francisco, CA 94105<br><br>Martin J. Bishop<br>REED SMITH, L.L.P.<br>2850 N Harwood St.,<br>Suite 1500<br>Dallas, TX 75201<br><br>Jason Mayer<br>REED SMITH, L.L.P.<br>10 S. Wacker Drive<br>40th Floor<br>Chicago, IL 60606-7507<br><br>Colin E. Wrabley<br>Michael J. McCune<br>REED SMITH, L.L.P.<br>Reed smith Centre<br>225 Fifth Avenue, Suite 1200<br>Pittsburgh, PA 15222 |

| Plaintiffs-Appellants | Counsel |
|---|---|
| Guardian Flight, LLC & Med-Trans Corporation | Charlotte H. Taylor<br>Alexa R. Baltes<br>JONES DAY<br>51 Louisiana Ave. NW<br>Washington, DC 20001<br><br>Adam T. Schramek<br>NORTON ROSE FULBRIGHT US LLP<br>98 San Jacinto Boulevard<br>Suite 1100<br>Austin, TX 78701<br><br>Abraham Chang<br>Dewey Jude Gonsoulin, III<br>NORTON ROSE FULBRIGHT US LLP<br>1550 Lamar St.<br>Suite 2000<br>Houston, TX 77010-3095 |

| Amicus Curiae Movants | Counsel |
|---|---|
| American Hospital Association, American Medical Association, Federation of American Hospitals & Texas Medical Association | James E. Tysee<br>Kelly M. Cleary<br>Kristen E. Loveland<br>AKIN GUMP STRAUSS HAUER FELD LLP<br>2001 K. Street N.W.<br>Washington, DC 20006 |

| **Amicus Curiae Movant** | **Counsel** |
|---|---|
| United States of America | Brain M Boynton<br>Joshua M. Salzman<br>Kevin B. Soter<br>U.S. DEPARTMENT OF JUSTICE<br>Civil Division, Appellate<br>Section, Room 7222<br>950 Pennsylvania Ave NW<br>Washington, DC 20530<br><br>Seema Nanda<br>Wayne R. Berry<br>Jeffrey M. Hahn<br>Isidro Mariscal<br>U.S. DEPARTMENT OF LABOR<br>200 Constitution Ave NW,<br>N4511<br>Washington, DC 20210 |

| **Amicus Curiae Movant** | **Counsel** |
|---|---|
| America's Health Insurance Plans | Hyland Hunt<br>Ruthanne M. Deutsch<br>DEUTSCH HUNT PLLC<br>300 New Jersey Ave. NW,<br>Suite 300<br>Washington, DC 20001<br><br>Julie S. Miller<br>Thomas M. Palumbo<br>AMERICA'S HEALTH<br>INSURANCE PLANS<br>601 Pennsylvania Ave. NW<br>South Building, Suite 500<br>Washington, DC 20004 |

Certificate 4

Dated:  December 9, 2024

/s/ *Charlotte H. Taylor*
Charlotte H. Taylor

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................1

ARGUMENT ....................................................................3

I.   CONGRESS GRANTED PROVIDERS AN NSA PRIVATE RIGHT OF ACTION. ........3

     A.   The NSA Gives Providers a Right to Payment From Insurers. ...........3

     B.   The NSA Gives Providers a Judicial Remedy. ....................5

          1.   Text ................................................6

          2.   Structure ...........................................9

               a.   The NSA provides no alternative enforcement mechanism. ......................................9

               b.   The limited scope of "judicial review" reinforces rather than undermines Congress's intention for IDR-determined awards to be enforceable in court.......14

               c.   HCSC draws an illogical inference from Congress's choice not to incorporate the FAA's confirmation provision. .................................15

               d.   The NSA will collapse if providers cannot enforce their right to IDR-determined payment from insurers.......................................17

     C.   This Court May Consider the *Amici's* Arguments in Support of Finding a Private Right of Action. ....................................20

II.  THE PROVIDERS HAVE DERIVATIVE STANDING TO ASSERT AN ERISA CLAIM.......................................................................21

III. THE PROVIDERS STATED A CLAIM FOR EQUITABLE RELIEF ...........................25

IV.  THE PROVIDERS SHOULD HAVE BEEN GIVEN LEAVE TO AMEND .................26

CONCLUSION ...................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)......................................................................*passim*

*Azar v. Allina Health Servs.,*
    587 U.S. 566 (2019)....................................................................16

*Casas v. Am. Airlines, Inc.,*
    304 F.3d 517 (5th Cir. 2002) .....................................................12

*Cheminova A/S v. Griffin L.L.C.,*
    182 F. Supp. 2d 68 (D.D.C. 2002)........................................8, 9, 13, 15

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S. Ct. 2440 (2024)...............................................................4, 18

*Eldred v. Ashcroft,*
    255 F.3d 849 (D.C. Cir. 2001) ...................................................20

*Harrison v. Envision Mgmt. Holding, Inc.,*
    59 F.4th 1090 (10th Cir. 2023) ..................................................11

*Health Care Plan, Inc. v. Aetna Life Ins. Co.,*
    966 F.2d 738 (2d Cir 1992) .......................................................12

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) .....................................................14

*Key Tronic Corp. v. United States,*
    511 U.S. 809 (1994)......................................................................7

*Maine Cmty. Health Options v. United States,*
    590 U.S. 296 (2020)......................................................................6

*Mitchell v. Blue Cross Blue Shield of North Dakota,*
    953 F.3d 529 (8th Cir. 2020) .............................................................. 24

*Montefiore Med. Ctr. v. Teamsters Loc. 272,*
    642 F.3d 321 (2d Cir. 2011) ................................................................ 22

*Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.,*
    337 U.S. 582 (1949) .............................................................................. 6

*North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare,*
    781 F.3d 182 (5th Cir. 2015) .............................................................. 25

*Oxford Univ. Bank v. Lansuppe Feeder, LLC,*
    933 F.3d 99 (2d Cir. 2019) .................................................................. 13

*Resident Council of Allen Parkway Vill. v. HUD,*
    980 F.2d 1043 (5th Cir. 1993) ............................................................ 20

*Roberts v. Galen of Virginia, Inc.,*
    525 U.S. 249 (1999) ............................................................................ 23

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................... 23, 24

*Stokes v. Sw. Airlines,*
    887 F.3d 199 (5th Cir. 2018) ................................................................ 5

*Sverdrup Corp. v. WHC Constructors, Inc.,*
    989 F.2d 148 (4th Cir. 1993) ................................................................ 7

*Thole v. U.S. Bank N.A.,*
    590 U.S. 538 (2020) ............................................................................ 22

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,*
    444 U.S. 11 (1979) ................................................................................ 7

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................... 23, 24

*United States v. Bormes*,
568 U.S. 6 (2012)..............................................................................6

*United States v. Hankton*,
875 F.3d 786 (5th Cir. 2017) ..........................................................23

**STATUTES**

9 U.S.C. § 9 ..........................................................................15, 16, 17

9 U.S.C. § 10 ..............................................................................15, 16

9 U.S.C. § 11 ....................................................................................15

29 U.S.C. § 1132 ..............................................................................11

29 U.S.C. § 1185e ......................................................................22, 23

29 U.S.C. § 1185f.......................................................................22, 23

29 U.S.C. § 1191b ............................................................................23

33 U.S.C. § 2236 ..............................................................................14

42 U.S.C. § 300gg-22 ................................................................10, 11

42 U.S.C. § 300gg-111 ..............................................................*passim*

42 U.S.C. § 300gg-112 ...................................................4, 6, 7, 18

42 U.S.C. § 10139 ............................................................................15

**OTHER AUTHORITIES**

5th Cir. R. 29.2................................................................................21

*Black's Law Dictionary* (11th ed. 2019)........................................14

Gov't Accountability Off., GAO-24-106335, *Private Health
    Insurance: Roll Out of Independent Dispute Resolution Process for
    Out-of-Network Claims Has Been Challenging*
    (Dec. 2023) ........................................................................................................12

Restatement (Second) of Contracts (1981)............................................................24

# INTRODUCTION

As the Providers explained in their Opening Brief, the No Surprises Act employed a three-way bargain to address the problem of "surprise" medical bills for emergency services: patients receive healthcare coverage without risk of liability for unpaid balances, commercial insurers are promised that their payments for out-of-network care will be set at a reasonable rate (via neutral independent dispute resolution where needed), and out-of-network providers are guaranteed timely payment of a fair rate. But HCSC asks this Court to gut that last statutory guarantee. It insists that insurers can refuse to pay for lifesaving care as specified in the NSA, and there is nothing providers or covered patients can do about it. HCSC offers many pages of argument in support of that astonishing position but ignores key issues. Most conspicuously:

*First*, even though the private-right-of-action analysis must privilege statutory text, HCSC says *almost nothing* about the key statutory language: Congress's mandate that payment "shall be made" in the Timing of Payment Provision and its use of "binding" in the Effects of Determination Provision. That omission is glaring and dooms its analysis.

*Second*, HCSC skips over the fact that the United States Government—including the three Departments that administer the NSA—*agrees* that providers have a private right of action to enforce IDR awards. Instead of grappling with the

Government's central legal arguments, HCSC directly addresses only the Government's alternative equitable theory. And while asserting that the NSA provides an administrative alternative to private enforcement, HCSC never acknowledges the Government's position that there is "[*n*]*o adequate alternative means for enforcing an IDR award.*" U.S. Br. 7, 13 (emphasis added).

*Third*, HCSC sidesteps the obvious question of statutory structure (not to mention common sense) that its position raises: did Congress really go to the trouble of creating a detailed scheme for arbitration-like IDR but leave out any means of enforcing awards? Instead, HCSC (echoed by its *amicus*) falls back on badmouthing supposedly profit-hungry providers it accuses of abusing and overwhelming the system. But if HCSC wants to open a policy debate, then it should address evidence that (1) providers *win* the vast majority of the hundreds of thousands of IDR determinations initiated, which shows that insurers are systematically underpaying in the first place, and (2) insurers then fail to pay many of those congressionally mandated, IDR-determined awards *at all*—to say nothing of the large number they pay late or incorrectly. Providers of all kinds (not just air ambulance) are already suffering serious financial effects that will inevitably trickle down to patient care. But HCSC has nothing to say about this.

Even if HCSC were not ignoring so many elephants in this proverbial room, the arguments it does make are unpersuasive. The NSA's text and structure

unambiguously demonstrate Congress's intent that providers be able to enforce their right to IDR-determined payment in court.  Courts unanimously agree that patients are injured by insurers' failure to pay for covered care irrespective of financial consequences to the patients.  And if all else fails, courts maintain equitable power and discretion to ensure that positions like HCSC's, so flagrantly offensive to both Congress's commands and fundamental fairness, do not prevail.

## ARGUMENT

### I.    CONGRESS GRANTED PROVIDERS AN NSA PRIVATE RIGHT OF ACTION.

The parties agree that a private right of action requires affirmative indications that Congress intended to create a private right and a private remedy.  Opening Brief (Op. Br.) 24; HCSC Br. 26.  The NSA's text and structure provide ample evidence of intent to grant providers a right to IDR-determined payment from insurers and a remedy to enforce that right in court.  Op. Br. 28–44.  HCSC resists that conclusion but skips the private-right question, mangles the private-remedy question, and altogether fails to conform to Congress's statutory intent.

### A.    The NSA Gives Providers a Right to Payment From Insurers.

As the Providers explained (at 28–30), the Timing of Payment and Effects of Determination Provisions grant providers a right to IDR-determined payment from insurers.  HCSC never actually acknowledges the NSA's indisputably rights-creating language.  Instead, HCSC (at 34) brushes past the first half of the private-

right-of-action inquiry with nominal resistance grounded in legislative history. Because one purpose of the NSA is to protect consumers from surprise medical bills, HCSC concludes that providers are not a group for whose benefit the NSA was created. But that is not how courts do law, and HCSC's failure to grapple with the rights-creating language in the NSA undermines its analysis.

*First*, setting aside the obvious fact that a statute can benefit more than one group, HCSC ignores that "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2454 (2024) (citation omitted). That is especially true here, where the Supreme Court has emphasized that "[s]tatutory intent … is determinative." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Thus, "'rights-creating' *language*" is "critical." *Id.* at 288 (emphasis added) (citation omitted).

Here, the Timing of Payment Provision requires that payment of an IDR-determined amount "shall be made" by the insurer "directly to the nonparticipating provider … not later than 30 days after the date on which such determination is made." 42 U.S.C. §§ 300gg-111(c)(6); 300gg-112(b)(6). That is precisely the kind of language courts have found to be "rights-creating." *See* Op. Br. 29; U.S. Br. 10. And it is reinforced by the Effects of Determination Provision, which makes IDR awards "binding" on both parties involved. 42 U.S.C. §§ 300gg-111(c)(5)(E)(i)(I), 300gg-112(b)(5)(D); Op. Br. 30. HCSC cannot refute the text and does not try.

4

*Second*, because HCSC improperly ignores the existence of the rights-creating language, it also improperly ignores the "critical" *implications* of that language for the question at hand. *See Sandoval*, 532 U.S. at 288. Indeed, rights-creating language is itself an affirmative indication that the statute creates not only a right but also a remedy, which negates the presumption against finding a private right of action that would otherwise apply. *See* Op. Br. 23–28, 32.

HCSC nevertheless attempts (at 26) to invoke the presumption and accuses (at 33 n.7) the Providers of improperly "blend[ing]" the private-right and private-remedy analyses to "lessen their burden." But that is confused. *Cf.* Op. Br. 38–39. The presumption against finding a private right of action is merely an articulation of the principle that courts should disallow private suits "absent 'affirmative' evidence of [congressional] intent" to allow them. *See Stokes v. Sw. Airlines*, 887 F.3d 199, 202 (5th Cir. 2018) (quotation omitted). Rights-creating language provides some such evidence and therefore *informs* the distinct private-remedy question. HCSC would simply prefer to ignore half the required analysis.[1]

### B.    The NSA Gives Providers a Judicial Remedy.

The text of the Timing of Payment and Effects of Determination Provisions each demonstrate Congress's intent to give providers a judicial remedy. Op. Br. 31–

---

[1] Even if a presumption remained after the private-right analysis, the affirmative indications that Congress intended a private remedy are independently sufficient to overcome it. *Infra* I.B.

5

36.  That conclusion is reinforced by the NSA's structure.  Op. Br. 37–38, 40–41.

HCSC's contrary position is unavailing.

### 1.    Text

HCSC all but ignores the NSA text that directly indicates Congress's intent to

make providers' right to payment from insurers privately enforceable in court.  *First*,

the Timing of Payment Provision's shall-pay language, *see* 42 U.S.C. §§ 300gg-

111(c)(6), 300gg-112(b)(6), reflects Congress's "intent 'to create both a right and a

remedy,'" *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020)

(citation omitted); *see* Op. Br. 31–32; U.S. Br. 9–11.  After all, that is what the

Supreme Court said in a context it described as calling for "precisely" the same

analysis.  *Maine Cmty.*, 590 U.S. at 323 n.12.

HCSC's *only* response (at 37 & n.9) is that *Maine Community* addressed a

question under the Tucker Act, which provides the "missing ingredient" for recovery

of damages against the United States.  True, but irrelevant.  The Tucker Act is

"simply [a] jurisdictional provision[]" that "waive[s] sovereign immunity for claims

premised on other sources of law."  *United States v. Bormes*, 568 U.S. 6, 10 (2012)

(citation omitted); *see Nat'l Mut. Ins. Co. of D.C. v. Tidewater Transfer Co.*, 337

U.S. 582, 594 n.22 (1949) (plurality) ("[T]he Tucker Act simply opens those courts

to plaintiffs already possessed of a cause of action.").  And an immunity wavier is

not needed here, in a suit between private parties.  Moreover, the Court has endorsed

the same principle beyond the Tucker Act: "[T]o say that A shall be liable to B is the *express* creation of a right of action." *See Key Tronic Corp. v. United States*, 511 U.S. 809, 818 n.11 (1994) (quoting and agreeing with *id.* at 822 (Scalia, J., dissenting)). The Timing of Payment Provision provides such language making insurers liable for payment to providers, and HCSC's superficial sideswipe at a single supportive precedent fails to engage the plain meaning of that text.

*Second*, Congress's decision to make IDR awards "binding upon the parties," 42 U.S.C. §§ 300gg-111(c)(5)(E)(i)(I), 300gg-112(b)(5)(D), independently demonstrates its intent to provide a judicial remedy. As the Providers explained (at 32–36), the plain meaning of the term "binding," backed by over a century of precedent, indicates that the determination in question is enforceable in court by a party to the determination. Indeed, that understanding and practice *pre-dates* the FAA, Op. Br. 33, *post-dates* the enactment of the FAA for cases in which its streamlined procedure is not invoked, Op. Br. 33–34, 42–43, and *even withstands* the FAA's requirement (for awards invoking the FAA) that parties have "agreed" to entry of "judgment" confirming the award, Op. Br. 34–35. In short, when courts see "binding" awards, they "have always been willing" to enforce them. *Sverdrup Corp. v. WHC Constructors, Inc.*, 989 F.2d 148, 154–55 (4th Cir. 1993); *see* Op. Br. 34. This Court must assume that Congress intended those "customary legal incidents" of the term "binding." *See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,

444 U.S. 11, 19 (1979); *Cheminova A/S v. Griffin L.L.C.*, 182 F. Supp. 2d 68, 73–74 (D.D.C. 2002) (Congress's use of the "terms 'binding' and 'final and conclusive'" demonstrates its intent "that an award will be enforceable in court").

HCSC's response to that body of law is fleeting, and the limited arguments it offers are nonsensical. HCSC primarily attempts (at 36) to evade its force entirely by noting that parties to ordinary arbitration must agree that the arbitration is binding, while IDR awards are binding by statutory command. Perhaps that would matter if any question turned on what made an award binding. But none does. The relevant question is the *meaning* and *effect* of a binding award. And on that courts are clear: binding means enforceable in court. Of course, Congress could deviate from that default implication by using different or additional language. But given that use of the term "binding" "in an agreement between private parties is tantamount to consent to judicial enforcement," its use by Congress "should not convey a different meaning." *Cheminova*, 182 F. Supp. 2d at 74.

HCSC's only other response is to take issue with a single precedent that stands for the *precise* proposition here: In *Cheminova*, the court held that by providing for "binding arbitration proceedings," Congress intended that the resulting award would "be enforceable in court," consistent with the "import of the terms." *See Cheminova*, 182 F. Supp. 2d at 73–74 & n.3. HCSC first tries (at 36) to distinguish *Cheminova* because it "did not consider whether a statute created an implied right of action."

*Cheminova* held that a party similarly situated to the Providers could enforce an arbitration award in court.  But even if HCSC were right, so what?  *Cheminova* analyzed the same statutory language in an analogous context for the purpose of identifying congressional intent.  HCSC also notes (at 36–37) that the statute at issue in *Cheminova* pointed to particular arbitral rules, which, in turn, happened to provide for consent to judgment.  But the upshot of the court's analysis was that the rule was not "*ultra vires*" *precisely because* it was "entirely consistent with the FIFRA language" making awards "binding."  *Id.* at 77.  *Cheminova* firmly supports the Providers' position, and it is simply icing on the cake given the other ample supportive caselaw that HCSC ignores.

### 2.     Structure

With virtually nothing to say about the plain meaning of the relevant text, HCSC devotes nearly all of its briefing on the issue to arguing that those provisions cannot mean what they say in light of other provisions in the NSA, the Public Health Service Act, or the U.S. Code more broadly.  HCSC Br. 28–31, 34–35.  Each of HCSC's arguments fall short.  In fact, the structure of the NSA reinforces the conclusion that Congress intended to grant providers *an enforceable* right to payment.  Op. Br. 37–38, 39–41.

#### a.  *The NSA provides no alternative enforcement mechanism.*

As the Providers and the Government explained, "aside from allowing

providers to enforce their rights to payment in court, the NSA provides no other enforcement mechanism to *ensure* payors pay providers what they are due," which is further evidence of Congress's intent to provide a private right of action. Op. Br. at 37 (emphasis added); *see* U.S. Br. 13–14 ("no such alternative is apparent"). HCSC in turn takes the astonishing and incorrect position (at 31, 34) that the NSA delegates all enforcement authority to HHS without so much as acknowledging HHS's contrary position.[2]

As support, HCSC points—for the first time—to 42 U.S.C. § 300gg-22(b)(2). But that provision does not stand for the proposition HCSC claims. In its haste to capitalize on the Government's explanation of its very limited indirect authority— offered by the Government as evidence that the NSA *does not* provide an alternative to private enforcement—HCSC misses that HHS's limited power reaches only "insurers subject to its jurisdiction," which many are not. U.S. Br. 13. Section 300gg-22(b)(2) applies to "*individual* health insurance coverage" or "group health plans that are *non-Federal governmental plans*," *i.e.*, plans maintained by state and local governments. *See* 42 U.S.C. § 300gg-22(b)(1)&(2) (emphases added); *id.*

---

[2] HCSC misrepresents (at 2) the Government's *amicus* brief as the "DOL Amicus" and consistently refers (e.g. at 5) to the positions therein as those of the Department of Labor. But the Government's brief is from the *United States*, not the Department of Labor, and it represents the interests of the "Departments of Health and Human Services (HHS), Labor, and Treasury." *See* U.S. Br. 1.

§ 300gg-91(a)(1), (b)(4)&(5), (d)(8)(C) (defining terms).  It does not apply to group health plans that are *not* non-Federal governmental plans, like ERISA plans.  *Id.*  Thus, even aside from the fact that the provision's civil monetary penalties at best might indirectly coerce insurers into paying rather than directly effectuating the "binding" nature of any award, *see* U.S. Br. 13, there is no sense in which § 300gg-22(b)(2) operates as *any* kind of enforcement mechanism for a large swath of "binding" awards.  Yet that is the *only* statutory provision HCSC cites.

To be sure, the Government flags another provision that gives the Department of Labor some power to pursue equitable remedies to enforce ERISA, into which the NSA is also incorporated.  U.S. Br. 13; *see* 29 U.S.C. § 1132(a)(5).  But even if HCSC had raised that provision, it would not support its argument.  ERISA covers only a subset of what the NSA does.  Moreover, the Department's authority is discretionary.  *See* 29 U.S.C. § 1132(a)(5) ("A civil action may be brought…."). And as the Government explained (at 13–14), it is "unreasonable to assume that the DOL is capable of policing every employer-sponsored benefit plan in the country," (quoting *Harrison v. Envision Mgmt. Holding, Inc.*, 59 F.4th 1090, 1112 (10th Cir. 2023)), which means it cannot ensure awards are "binding" on the parties.

Practice bears out the point.  "A 2023 survey of more than 48,000 physicians across 45 states found that *52%* of IDR awards owed providers had not been paid at all."  AHA Br. 20 (citation omitted).  And of those that had been paid, *half* were late

11

and *a third* were incorrect.  AHA Br. 21.  In response, HCSC cites (at 14, 31) a GAO

Report stating that CMS allegedly compelled payment from insurers to providers in

30 cases, Gov't Accountability Off., GAO-24-106335, *Private Health Insurance:*

*Roll Out of Independent Dispute Resolution Process for Out-of-Network Claims Has*

*Been Challenging*, www.gao.gov/assets/870/864587.pdf, 37 (Dec. 2023) ("GAO

Report")—a drop in the bucket of the massive failure-to-pay problem, *infra* 19.  And

though AHIP blames providers (at 11–12) for not filing more complaints with the

Departments, the same report explains that CMS has "discouraged [providers] from

continuing to contact the help desk," and when providers do file complaints "they

receive little to no response."  GAO Report at 39.[3]

Scattershot, after-the-fact instances where CMS compelled insurer payment

cannot be considered a comprehensive mechanism for enforcing "binding" awards.

Perhaps certain indirect or intermittent coercive measures could qualify as

"enforcement" in other contexts, as AHIP suggests (at 13)—though its purported

examples are inapposite, as both found there was no statutory right to be enforced in

any event.  *See Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 522 & n.8 (5th Cir. 2002);

*Health Care Plan, Inc. v. Aetna Life Ins. Co.*, 966 F.2d 738, 741 (2d Cir 1992).  But

---

[3] AHIP suggests (at 12–13) that the help desk set up by CMS to receive complaints is the "administrative remedy" "Congress[] intended."  But the existence of a help desk cannot expand the agency's statutory enforcement authority—which is the relevant question here.

here the statutory text mandates specific payment within a specific time and makes "binding" on the parties *each and every* award. *See* Op. Br. 28–36; U.S. Br. 13; *cf. Cheminova*, 182 F. Supp. 2d at 76. No one would think that a court judgment retained its "binding" character if Congress passed a statute taking away judicial remedies and establishing a new agency that could impose civil penalties for non-payment—in the small subset of cases its resources permitted it to pursue. The great benefit of a binding award or judgment is that the creditor does not have to wait for the government to come to her aid to enforce payment; she gets to start the process herself, in court. *See* Op. Br. 32–36.

But even if the very limited authority available to the Departments constituted *some* meaningful enforcement, it would not preclude a private right of action given the "other aspects of the statute [that] suggest the contrary." *See Sandoval*, 532 U.S. at 290 ("suggestion" that "Congress intended to preclude" private enforcement by including an express alternative mechanism is only "[s]ometimes" strong enough to overcome other indications); *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 106 (2d Cir. 2019) ("suggestion" against implied right of action "can be overcome where … the meaning of the text is clear"). Given the strength of the indications in the NSA's text and structure that "suggest the contrary," the at-best meager mechanisms raised here could not "preclude[] a finding of congressional intent to create a private right of action." *See Sandoval*, 532 U.S. at 290.

**b.** *The limited scope of "judicial review" reinforces rather than undermines Congress's intention for IDR-determined awards to be enforceable in court.*

HCSC separately argues (at 28–29, 35) that because the NSA limits judicial *review* of IDR awards to the grounds for vacatur in the FAA, the NSA necessarily precludes judicial *enforcement* of IDR awards.  In HCSC's view, all judicial action constitutes "judicial review."  As support, HCSC cites (at 28) a few decisions that use "judicial review" as a catchall to describe the available judicial actions under the FAA.  But HCSC's sparse analysis does not withstand scrutiny.

To start, "judicial opinions are not statutes, and we don't dissect them word-by-word as if they were." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).  Naturally, courts sometimes use "judicial review" as a shorthand for possible judicial actions under the FAA.  But when interpreting a statute, courts must consider "judicial review" as a term-of-art.  It means a court's "power to review the actions of other branches or levels of government" or "review of … an administrative body's factual or legal findings." JUDICIAL REVIEW, *Black's Law Dictionary* (11th ed. 2019).  Judicial review requires analysis of another decisionmaker's decision to see if it should be *disturbed*.  *See* U.S. Br. 12.[4]

---

[4] HCSC asserts (at 28) that Congress also "routinely uses the term 'judicial review' to address private causes of action."  But HCSC offers no examples where Congress used "judicial review" to provide a cause of action to *enforce* a decision.  Rather, in its examples, "judicial review" provided a way to *challenge* a decision. *See* 33 U.S.C. § 2236(b)(2) (allowing persons aggrieved by "a proposed scheme or

14

Neither judicial confirmation under FAA § 9 nor judicial enforcement pursuant to the "binding" language in the NSA looks anything like "judicial review" properly defined. U.S. Br. 11–13; Op. Br. 41–42. Instead, courts "must" confirm arbitration awards under the FAA unless a party separately shows a basis for vacatur or modification. 9 U.S.C. §§ 9–11. Similarly, absent "a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity," all IDR awards are "binding" on the parties—and therefore must be enforced without independent analysis. 42 U.S.C. § 300gg-111(c)(5)(E)(i). The NSA sets forth the limited grounds for "judicial review" and vacatur separately. *Id.*

As the Government explained (at 12–13), this reading best serves Congress's choice to both make IDR awards "binding" and limit "judicial review" to narrow grounds. *See also Cheminova*, 182 F. Supp. 2d at 76–77. HCSC's reading would allow dissatisfied parties to nullify the "binding" results of mandatory IDR without bothering to demonstrate a ground justifying vacatur. "That is not a plausible understanding of Congress's intent." U.S. Br. 13; *see* U.S. Br. 15–16.

> **c.** *HCSC draws an illogical inference from Congress's choice not to incorporate the FAA's confirmation provision.*

HCSC next argues (at 29–31, 36) that because Subsection (II) of the Effects of Determination Provision references the FAA's *vacatur* provision, its failure to

---

schedule of port or harbor dues" to "seek judicial review"); 42 U.S.C. § 10139(a)–(c) (similar in relevant respects).

reference the FAA's *confirmation* provision indicates that Congress did not intend to grant a private judicial remedy. That argument fails at least twice over.

For starters, HCSC misreads Subsection (II), which does not fully incorporate FAA § 10—the vacatur provision. Instead, it cross-references "a case described" in four paragraphs of subsection 10(a), none of which use the word "vacate." *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). In other words, the NSA does not expressly adopt *either* the vacatur *or* confirmation mechanism from the FAA. In the example cited by HCSC (at 30), the Court drew an inference from wholesale incorporation of one exemption in the APA but not a neighboring exemption. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 576–77 (2019). But the NSA does no such thing, so Subsection (II) tells us little about whether Congress intended providers to be able to enforce their IDR awards via the FAA's confirmation provision. *See* Op. Br. 51–52.

Moreover, even assuming arguendo that the NSA incorporates FAA § 10, that still would not help HCSC. At most, a reference to the FAA's vacatur provision combined with silence as to its confirmation provision would suggest that Congress did not intend providers to be able to enforce their IDR awards via the FAA's streamlined procedure. HCSC fails to grapple with the fact that FAA § 9 is not an exclusive means for enforcing arbitration awards—even for awards subject to its reach. Op. Br. 42–43; *see* Op. Br. 33–36. That Congress could have explicitly

referenced FAA § 9 in the NSA and has done so in other statutes says nothing about whether Congress intended judicial enforcement outside the FAA's streamlined confirmation procedure.[5]

> **d.** *The NSA will collapse if providers cannot enforce their right to IDR-determined payment from insurers.*

Congress carefully designed the NSA to establish a workable system to resolve disputes between providers and insurers without risking surprise medical bills to patients. Op. Br. 1–3, 37–38, 40–41. If insurers fail to play their role—that is, fail to pay for out-of-network care according to the NSA, *see* Op. Br. 7–12 (detailing the statutory scheme)—the system will fall apart: providers cannot seek payment from patients or use other means to directly compel insurer payments; providers will therefore lack funds sufficient to sustain expensive, lifesaving care; and, ultimately, patients will suffer. This is not some farfetched parade of horribles; it is plain from the statutory design, and it is happening already as insurers systematically fail to comply with NSA IDR payment obligations. *See* AHA Br. 20–26 (explaining the scope of the non-payment problem).

HCSC's main defense (at 32, 38) of a position so offensive to the NSA scheme is to ignore the enacted NSA completely, and instead rely on broad statements about

---

[5] HCSC's related suggestion (at 29) that Congress could have more expressly set forth a remedy is likewise no answer to affirmative indications that Congress intended to provide a remedy here. The point of the *Sandoval* paradigm is determining when to *imply* a private right of action. Op. Br. 43–44.

what Congress "might have anticipated" or "may not have wanted" as support for inserting self-interested policy arguments. *See also* AHIP Br. 14–17. That approach is nonstarter after *Sandoval*. But regardless, the reality on the ground only further *proves* the centrality of a private right of action to sustaining the overall scheme.

The search for statutory intent gives no weight to "concerns" attributed to Congress, *e.g.*, HCSC Br. 32, but "unmoored from any statutory text," *see Corner Post*, 144 S. Ct. at 2454. Yet HCSC provides no statutory basis, for example, for assuming (at 32, 38) that Congress would have been more concerned about preventing a high number of enforcement lawsuits than about adherence to the statute's 30-day deadline for paying binding IDR awards. Of course, "mere[]" late payments, *see* HCSC Br. 17 n.5, are only a small part of the problem—an alarming number of awards are not paid at all, AHA Br. 20–21. But more to the point, it is not up to HCSC to decide that the 30-day deadline is nonessential, as it does both in briefing and practice. Indeed, Congress *emphasized* its importance by making the deadline one of the few the Departments cannot alter, 42 U.S.C. §§ 300gg-111(c)(6)&(9), 300gg-112(b)(6)&(9)—a point HCSC omits from its blanket assertion (at 13) that "HHS 'may modify any deadline or other timing requirement.'" (citation omitted).

Still, it is worth pausing on the statistics that undergird HCSC's (and AHIP's) policy arguments, because they actually support the Providers' position. Citing

"more than 675,000 [IDR] disputes" initiated by providers in 2023, HCSC worries (at 32) that if providers could file enforcement lawsuits, "federal courts would be deluged." *See also* AHIP Br. 15. But a large number of IDR disputes could translate to a large number of possible provider lawsuits only if: (1) providers *win* a large number of IDR disputes (indicating initial payments by insurers are inappropriately low); and (2) insurers fail to pay the awards as dictated by the NSA. In other words, any risk that federal courts will be deluged by provider enforcement suits could only exist because *insurers* systematically underpay and skirt their NSA obligations.

True, insurers have been doing exactly that. During the second half of 2023, for example, providers won 82% of IDR payment determinations, many of which insurers failed to, or failed to timely, pay. AHA Br. 20–22 (citations omitted). But even so, recognizing a private right of action does not mean courts will be overrun with enforcement suits. Instead, recognizing the means Congress intended for holding them accountable is far more likely to end (or meaningfully reduce) insurer recalcitrance, obviating the need for litigation. By contrast, if insurers were to learn that they can simply not pay with impunity, it would surely compound the already "serious consequences for health systems" and patients and push the sustainability of the NSA to a tipping point.[6] *See* AHA Br. 23.

---

[6] AHIP claims (at 7) that late payment is often a result of miscommunication and thus reiterates (at 11) HCSC's concern that providers will "run to court on day 31." But even though the NSA gives them the right, providers have little incentive

### C.    This Court May Consider the *Amici's* Arguments in Support of Finding a Private Right of Action.

The Providers' *Amici* raised several strong arguments supporting the Providers' ability to enforce their NSA right to payment.  U.S. Br. 7–16; AHA Br. 7–26.  HCSC plucks out (at 39–41) a couple for brief response—ignoring the rest, including the Government's arguments (at 9–16) that the NSA grants a private right of action and lacks an alternative enforcement mechanism, and the argument (AHA Br. 20–26) from the coalition of provider groups led by the American Hospital Association ("Provider Coalition") that insurers' failure to pay is tanking Congress's carefully designed system.  Instead, HCSC takes aim at the Government's equitable arguments, U.S. Br. 16, and the Provider Coalition's constitutional avoidance arguments, AHA Br. 14–20.

HCSC claims (at 39) those arguments are not "properly presented" because they were not raised by the Providers.  But HCSC fails to distinguish between issues and arguments.  While courts may decline to consider new *issues* raised only by *amici*, *see Resident Council of Allen Parkway Vill. v. HUD*, 980 F.2d 1043, 1049 (5th Cir. 1993), "the role of an *amicus* is to assist the court in addressing the issues already raised *with new arguments and perspectives*," *Eldred v. Ashcroft*, 255 F.3d

---

to file enforcement lawsuits under the NSA "on day 31" every time an insurer commits a foot fault.  Litigation is expensive and time-consuming; it is only worthwhile for providers when faced with an insurer's systematic failure to pay.  For this reason too, HCSC's warnings about a flood of litigation are overblown.

849, 852 (D.C. Cir. 2001) (Sentelle, J., dissenting from denial of rehearing en banc) (emphasis added).  Indeed, according to this Court's rules, *amicus* briefs "should avoid the repetition of facts or legal arguments contained in the principal brief and should focus on points either not made or not adequately discussed in those briefs." 5th Cir. R. 29.2.  The Provider Coalition's constitutional avoidance arguments and the Government's equitable arguments were both offered in support of the Providers' claim—raised at all levels, ROA.70–76; Op. Br. 22–44—that they can enforce their right to IDR-determined payment from insurers in court.  Both arguments offer strong supplemental support for the Providers' position and should be considered.

## II.  THE PROVIDERS HAVE DERIVATIVE STANDING TO ASSERT AN ERISA CLAIM.

The Providers have derivative standing to bring an ERISA improper-denial-of-benefits claim because HCSC plan participants and beneficiaries suffer concrete harm when HCSC denies plan benefits by failing to pay IDR awards.  Op Br. 44–49; U.S. Br. 17–28.  HCSC counters (at 41–47) that because plan participants "are responsible for their in-network cost-sharing only, regardless of any further dispute over payments," (1) payment covering the cost of healthcare is not a benefit to plan participants, and (2) plan participants are not injured by HCSC's failure to comply with the NSA's coverage mandate as needed for standing.  Because HCSC is wrong about its first argument, its second argument also fails.

*First*, payment for care is part of the healthcare-coverage plan benefit.  The NSA mandates that ERISA plans cover out-of-network care to the same extent as in-network care.  29 U.S.C. §§ 1185e(a)(1), 1185f(a).  HCSC cannot dispute the robust authority indicating that the NSA's coverage mandate is a contractual term in every ERISA plan.  *See* Op. Br. 45–46; U.S. Br. 18–22, 26–27.  Instead, HCSC argues (at 43–45) that the benefit to participants is limited to receiving services without risk of balance billing.

But the "right to 'health care at no cost' (or at less cost, where a co-payment or co-insurance fee is involved) is made possible only by arrangements to have one's health care provider reimbursed for the balance of the fee for services."  *Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 329 (2d Cir. 2011).  Because care and payment go hand-in-hand, it is inaccurate to conclude that a participant entitled to healthcare coverage "is entitled only to healthcare at no cost"; instead, the entitlement is to *paid-for* healthcare.  *Id.*[7]  That is no less true here.  Indeed, HCSC's position would essentially mean that Congress could conscript private providers to work for free.  That is both unamerican and unsupported by ERISA, which defines "health insurance coverage" to include medical-care benefits "provided directly,

---

[7] HCSC's reliance (at 43) on *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), is thus inapposite, as healthcare coverage and the intertwined elements of care and payment were not at issue.

*through insurance or reimbursement*, or otherwise and including items and services *paid for* as medical care." *See* 29 U.S.C. § 1191b(b)(1) (emphases added); *id.* §§ 1185e(a)(1), 1185f(a) (NSA Coverage Provisions).[8]

*Second*, because payment is a plan benefit, HCSC's failure to pay denies plan participants the benefit of their ERISA-plan bargain, which is an injury sufficient for standing.  Op. Br. 46–49; U.S. Br. 22–28.  Again, HCSC does not dispute that the NSA's Coverage Provision becomes part of the bargained-for terms of every ERISA plan, which are themselves essentially contracts.  Instead, it wrongly assumes (at 45–47) that an injury (or risk thereof) must be financial or physical to establish constitutional standing.  But the cases it relies on say no such thing.  In fact, *TransUnion* and *Spokeo* both recognize that intangible harms "with a close

---

[8] Nor is it an answer to say, as HCSC does (at 44–45), that Congress excluded patients from the IDR process, or that, where the IDR process is invoked, patients suffer no adverse benefit determination where a disputed payment amount is resolved by that process.  The IDR *process* does not involve the participants.  But the issue here is that HCSC failed to comply with the NSA coverage mandate, and thereby denied participants benefits due, by not paying the Providers the IDR *awards*.  *See* U.S. Br. 21.  HCSC's standing argument fails.  And for the same reason, so does its "alternative" failure-to-state-a-claim argument (at 45 & n.10).  Of course, the Court should "decline" to adopt the "alternative" ground regardless, as the Providers had no opportunity to develop a position in district court.  *See United States v. Hankton*, 875 F.3d 786, 793 (5th Cir. 2017); *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 253–54 (1999) (declining to address alternative grounds because they were not "sufficiently developed below").

relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" satisfy standing's concrete-injury requirement. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)); *see* Op. Br. 48.   Historically, courts have found that contract violations give rise to such a harm. *See* U.S. Br. 23–24 (collecting cases).   And it is blackletter law that where a promisor breaches a contractual duty to a third-party beneficiary (as insurers do to providers here), the promisee (here, the plan beneficiary) has a right to sue for performance where not financially damaged. Restatement (Second) of Contracts § 305 (1981).

It is thus unsurprising that courts have unanimously held that plan beneficiaries are injured by insurers' failure to cover care even when the beneficiaries do not suffer financial consequences. *See* Op. Br. 46–48; U.S. Br. 24–26.   HCSC claims (at 46) those cases are distinguishable because, technically, the beneficiaries there "face[d] potential liability to the providers."   But that is not completely true.   In *Mitchell v. Blue Cross Blue Shield of North Dakota*, for example, the provider and the participant entered into an agreement prior to litigation whereby the participant would face no liability even if litigation was unsuccessful.   953 F.3d 529, 534 (8th Cir. 2020).   Even though there was *no* risk of balance billing, the Eighth Circuit held that the participant was injured by the insurer's failure to cover

(pay for) care because the breach "deprives them of the benefit of their bargain." *Id.* at 536.

Moreover, even in cases where the provider maintained a legal right to payment from the participants, the courts' analyses did not turn on that fact. Take this Court's decision in *North Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, for example, which explained that the "contract law concept of benefit of the bargain is a friendly fit" to establish standing because "[i]n purchasing her [health] plan, [the participant] agreed to pay for coverage," and the insurer "is failing to uphold the bargain by paying for covered services." 781 F.3d 182, 193 (5th Cir. 2015). Indeed, that certain parts of a benefit might "accrue to others" "does not change that fact that [the participant] has negotiated for the benefit and has incurred obligations … to secure it." *Id.* at 193–94 (quotation omitted).

In short, the asserted injury is neither financial nor merely procedural. It is contractual and concrete, sufficient for standing.

## III.    THE PROVIDERS STATED A CLAIM FOR EQUITABLE RELIEF.

If the district court was bent on erroneously closing the statutory doors to court, it should have drawn on its broad equitable powers to allow the Providers to pursue a quantum-meruit or unjust-enrichment claim. Op. Br. 49–51. HCSC disagrees (at 47–49), arguing that claims related to IDR awards are limited to those authorized by the NSA. But the upshot of HCSC's argument is that there is *no means* by which

insurers can be made to pay providers their legal due. That cannot be. And courts have powers in equity to avoid that result, under a quantum-meruit/unjust-enrichment theory or otherwise. Op. Br. 49–51; *see* U.S. Br. 16.

## IV. THE PROVIDERS SHOULD HAVE BEEN GIVEN LEAVE TO AMEND.

The district court's premature prejudicial dismissal on the same day it granted HCSC's motion to dismiss inappropriately deprived the Providers of the customary chance to amend their complaint and reframe their claims. Op. Br. 51–53. HCSC disagrees and chastises (at 49–50) the Providers for not explaining what material facts they would have included in their amended complaint. But the facts are not at issue: HCSC is required to pay the Providers IDR-determined awards and to cover the relevant healthcare for its plan participants, but it refuses. The point is that before conclusively determining that there is no way to enforce IDR payment determinations, the district court should have given the Providers the opportunity to assert additional viable theories of relief that would make Congress's scheme work as intended. *E.g.*, Op. Br. 51–52.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's dismissal of the Providers' complaint.

December 9, 2024                          Respectfully submitted,

                                         */s/ Charlotte H. Taylor*

Adam T. Schramek                         Charlotte H. Taylor
NORTON ROSE FULBRIGHT US LLP             Alexa R. Baltes
98 San Jacinto Boulevard, Suite 1100     JONES DAY
Austin, TX 78701                         51 Louisiana Ave. NW
Telephone: (512) 474-5201                Washington, DC 20001
Facsimile: (512) 536-4598                Telephone: (202) 879-3939
adam.schramek@nortonrosefulbright.com    Facsimile: (202) 626-1700
                                         ctaylor@jonesday.com

                                         *Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I certify that on December 9, 2024, I served a copy of the foregoing on all counsel of record by CM/ECF.

Dated:  December 9, 2024

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) & (7)(B), and Fifth Circuit Rule 32.1 & 32.2.  The brief contains 6,492 words and was prepared using Microsoft Word and produced in Times New Roman 14-point font.

I further certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated:  December 9, 2024

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor

*Counsel for Plaintiffs-Appellants*