

**Driving progress**
*through partnership*

**Raymond A. Cardozo**
Direct Phone:  +1 415 659 5990
Email:  rcardozo@reedsmith.com

Reed Smith LLP
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
+1 415 543 8700
Fax +1 415 391 8269
reedsmith.com

May 16, 2025

**Rule 28j Supplemental Authority Letter**

Lyle W. Cayce, Office of the Clerk
United Stated Court of Appeals
for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA  70130-3408

**Re:**  ***Guardian Flight, L.L.C.; Med-Trans Corporation v. Health Care Service Corporation,***
**Fifth Circuit Case No. 24-10561**
**U.S. District Court for the Northern District Case No. 3:23-cv-01861-B**

Dear Mr. Cayce,

*Guardian Flight v. Aetna*, No. 3:24-cv-680-MPS (D. Conn. May 14, 2025) ("*Aetna*") (enclosed) is erroneous, and the district court ruling below is better reasoned and should be affirmed.

***First, Aetna* erred in holding the No Surprises Act (NSA) creates a private right of action.** *Aetna* ignored that (1) in the NSA, Congress omitted text authorizing parties to confirm and enforce IDR determinations, despite including such text in similar statutes, and (2) Congress authorized federal agencies to enforce the failure to timely pay a "binding" IDR award. HCSC Br. 29-31. Whether agency enforcement is sufficient "to police … compliance with each IDR determination" is a question for Congress, not the courts. *Compare Aetna* 16, n.6 *with Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).

*Aetna* also overlooked the NSA's prohibition on judicial review, HCSC Br. at 28-29, reasoning that "while IDR awards under the NSA are binding once they are issued—without further action by the parties or any court—the same is not true of arbitration awards under the FAA." *Aetna* 14. Not so. As Plaintiffs-Appellants argue, arbitration awards subject to the FAA *are* binding upon issuance. Op. Br. 33. Moreover, per the NSA, IDR determinations are only "binding upon the parties involved, in the absence of a fraudulent

ABU DHABI ♦ ASTANA ♦ ATHENS ♦ ATLANTA ♦ AUSTIN ♦ BEIJING ♦ BRUSSELS ♦ CENTURY CITY ♦ CHICAGO ♦ DALLAS ♦ DENVER ♦ DUBAI ♦ FRANKFURT
HONG KONG ♦ HOUSTON ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH ♦ NEW YORK ♦ ORANGE COUNTY ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH
PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

\

Lyle W. Cayce, Office of the Clerk
May 15, 2025
Page 2



claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I). Thus, any court must perform "judicial review" before finding the award is "binding." *See also* HCSC Br. 28-29, 35-36. And the NSA prohibits "judicial review, except in a case described in" the FAA's *vacatur* provisions. *See id.* As the court below correctly ruled, these specifications of limited judicial review, foreclose the *unspecified* judicial *confirmation* review.

**Second, *Aetna* erred in holding plaintiffs may pursue an ERISA claim.** *Aetna* ignored that (1) plaintiffs have no statutory standing for an ERISA claim, (2) per the NSA's text and Supreme Court precedent, plaintiffs' assignees have no concrete injury from an untimely IDR award payment, and (3) the IDR process exists outside of ERISA and does not implicate plan benefits or ERISA claim procedures. HCSC Br. 41-48.

Respectfully submitted,

*Raymond A. Cardozo*

Raymond A. Cardozo

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GUARDIAN FLIGHT LLC, REACH AIR MEDICAL SERVICES LLC, CALSTAR AIR MEDICAL SERVICES LLC, MED-TRANS CORPORATION, AIR EVAC EMS, INC., and AIRMED INTERNATIONAL LLC,<br><br>    *Plaintiffs*,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, AETNA HEALTH, INC., AETNA HEALTH AND LIFE INSURANCE COMPANY, and CIGNA HEALTH AND LIFE INSURANCE COMPANY,<br><br>    *Defendants.* | No. 3:24-cv-00680-MPS |

## RULING ON MOTIONS TO DISMISS

Plaintiffs Guardian Flight LLC ("Guardian Flight"), REACH Air Medical Services LLC ("REACH"), CALSTAR Air Medical Services LLC ("CALSTAR"), Med-Trans Corporation ("Med-Trans"), Air Evac EMS, Inc. ("Air Evac"), and AirMed International LLC ("AirMed") (collectively, "Plaintiffs"), all of which are "air ambulance" companies, bring this action to enforce Independent Dispute Resolution ("IDR") determinations under the No Surprises Act. Plaintiffs also allege violations of § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1332, *et seq.*, and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Ann. §§ 42-110a, *et seq.* Defendants Aetna Health, Inc., Aetna Life Insurance Company, and Aetna Health and Life Insurance Company (collectively, "Aetna") and Defendant Cigna Health and Life Insurance Company ("Cigna") move to dismiss Plaintiffs'

claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  As explained

below, Defendants' motions to dismiss are granted in part and denied in part.

## I.     BACKGROUND

### A.  <u>The No Suprises Act</u>

Congress enacted the No Surprises Act ("NSA"), Pub. L. 116-260, 134 Stat. 2758 (2021),

in 2020 "to protect patients from surprise medical bills in situations where they have no choice

over whether their provider is in-network." *Texas Med. Ass'n v. United States Dep't of Health &*

*Hum. Servs.*, 120 F.4th 494, 501 (5th Cir. 2024).  "Before the Act, when an out-of-network

healthcare provider furnished medical care to a patient, the patient's insurer could refuse to pay

or unilaterally determine what amount to pay." *Id.*  "This sometimes left patients responsible for

so-called 'balance bills,' the amounts of which could be staggering." *Id.*  The NSA thus "aims to

cap the patient's share of liability to out-of-network providers at an amount comparable to what

the patient would have owed had the patient received care from an in-network provider" in

circumstances where the patient has no choice over his or her provider—such as emergency

transportation by an air ambulance. *Id.*

To achieve this goal, the NSA "simultaneously modified portions of the Public Health

Service Act, the Internal Revenue Code, and the Employee Retirement Income Security Act."

*Med-Trans Corp. v. Cap. Health Plan, Inc.*, 700 F. Supp. 3d 1076, 1079 (M.D. Fla. 2023),

*appeal dismissed*, No. 24-10134, 2024 WL 3402119 (11th Cir. May 30, 2024).  The statute

requires health plans and insurers to provide out-of-network coverage for any air ambulance

services that would be covered in-network.  *See* 42 U.S.C. § 300gg-112(a) ("In the case of a

participant, beneficiary, or enrollee…who receives air ambulance services from a

Case 2:24-cv-10630-MPB   Document 87   Page: 5   Date Filed: 05/16/2025   37

nonparticipating provider…with respect to such plan or coverage, if such services would be covered if provided by a participating provider…the cost-sharing requirement…shall be the same requirement that would apply if such services were provided by such a participating provider, and any coinsurance or deductible shall be based on rates that would apply for such services if they were furnished by such a participating provider…"); 29 U.S.C. § 1185f(a) (a nearly identical provision within ERISA); 45 C.F.R. § 149.130(a) ("If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides or covers any benefits for air ambulance services, the plan or issuer must cover such services from a nonparticipating provider of air ambulance services….").

To ensure that no single party in the healthcare system was unfairly burdened,[1] the NSA also created "a standardized process for the presentation and payment of air ambulance transport claims":

> After receiving a bill from an air ambulance provider, the insurance company either makes or refuses to make an initial payment. [42 U.S.C. § 300gg-

---

[1] The NSA's legislative history shows that Congress thought carefully about how to balance providers' and insurance issuers' interests.  For example, during a House Ways and Means Committee mark-up session, Congressman Thomas Suozzi stated that the Committee had "three primary objectives" in crafting the bill:

> First, and most importantly, protect consumers and patients.  Second, ensure that health care providers, including hospitals and doctors, and payers, including insurance companies and self-funded plans, are incentivized to resolve their differences amongst themselves.  Third, ensure that no single party is treated unfairly or improperly burdened.

Ways and Means Committee, *Markup of Surprise Billing and Other Health Legislation*, YOUTUBE (Feb. 12, 2020), https://www.youtube.com/watch?v=KYQDC5TA98Y (remarks beginning at around 2:13:11). And Senator Lamar Alexander—then Chairman of the Senate Health, Education, Labor, and Pensions Committee—made remarks on the Senate floor regarding the various reimbursement procedures that the Committee was considering for out-of-network providers, including air ambulances.  165 Cong. Rec. S4622-01, S4623 (daily ed. June 27, 2019).

112(a)(3)].  If the air ambulance company disagrees with the insurance company's decision, it can initiate open negotiations. § 300gg-112(b)(1)(A).

If these negotiations fail, the dispute goes to [an "IDR entity," § 300gg-112(b)(2)(A)] for "baseball style" arbitration. § 300gg-112(b)(1)(B). IDR entities must be qualified by the governing executive agency. § 300gg-111(c)(4). If the parties cannot agree to a specific IDR entity, one is randomly assigned to the case. *Id*. The parties submit their best offers to the IDR entity, which analyzes several factors to pick a winner. § 300gg-112(b)(5). One of these factors is the "qualifying payment amount," or QPA. § 300gg-112(b)(5)(C)(i). This number, put very simply, is meant to represent the equivalent median in-network reimbursement rate or, if the insurer has no equivalent in-network data, the median in-network rate for the geographic area. *See* § 300gg-111(a)(3)(E)(i)–(iii). The IDR decision is binding "in the absence of a fraudulent claim or evidence of misrepresentation of facts" and "not ... subject to judicial review" except on the same grounds as are available to review awards under the Federal Arbitration Act. § 300gg-111(c)(5)(E)(i)(II) (citing 9 U.S.C. § 10(a)(1)–(4)).

*Med-Trans Corp.*, 700 F. Supp. 3d at 1079-80.  IDR awards must be paid within thirty days of the IDR entity's determination. 42 U.S.C. § 300gg-112(b)(6) ("The total plan or coverage payment…with respect to qualified IDR air ambulance services for which a determination is made under paragraph (5)(A)…shall be made directly to the nonparticipating provider not later than 30 days after the date on which such determination is made."); 29 U.S.C. § 1185f(b)(6) (a nearly identical provision in ERISA).

B.  **Factual Background**

The following facts are drawn from Plaintiffs' consolidated first amended consolidated class action complaint ("the complaint") and the attached exhibits.[2]  ECF No. 109.  These facts are accepted as true for the purpose of this motion.

Plaintiffs are national air ambulance providers.  *Id.* ¶¶ 22, 33.  Air ambulances transport patients requiring critical care to healthcare.  *Id.* ¶ 15.  Without air ambulances, more than 85 million Americans would be unable to access a Level 1 or 2 trauma center within an hour when emergency care is needed.  *Id.*  To deliver air ambulance services, providers must make substantial investments in specialized aircraft, air bases, technology, personnel, and regulatory compliance systems.  *Id.*

At issue in this case are a number of out-of-network air ambulance transports performed by Plaintiffs, each of which involved a health plan that was administered and/or insured by Aetna or Cigna.  *Id.* ¶¶ 19-20.  Though Defendants received the benefit of Plaintiffs' services, they made unreasonably low initial payments for these transports.  *Id.* ¶ 20.

Plaintiffs thus initiated the NSA's IDR process.  *Id.* ¶¶ 17, 19.  As part of this process, they submitted position statements and proposed offers of payment to a certified IDR entity.  *Id.* ¶¶ 18-19.  After considering their proposed offers, as well as those of the Defendants, the IDR entities rendered IDR awards that were more than what Defendants had initially paid Plaintiffs

___

[2] "In considering a motion to dismiss…a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."  *Newman Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996).

for the corresponding service.  *Id.*  On average, providers are owed nearly 150% more than what Defendants initially paid them.  *Id.* ¶ 21.

Defendants have failed to comply with these IDR determinations.  *Id.* ¶¶ 22-26.  In some cases, they made late payments and did not include interest to account for their payment delays. *Id.* ¶ 22.  In other instances, they have made only partial payments or have not made any payments whatsoever.  *Id.* ¶¶ 25-26.  At the time Plaintiffs' complaint was filed, several of these awards were more than 500 days past due and Defendants had late-paid or not paid over $20 million in IDR awards.  *Id.* ¶¶ 2, 22.

Defendants' "low pay, late pay or no pay" scheme has become a widespread business practice, as evidenced by 1) the numerous unpaid and/or late paid IDR awards at issue in this lawsuit, and 2) the number of plaintiffs in this lawsuit that have failed to receive timely payment of IDR awards.  *Id.* ¶¶ 2, 24, 26, 44; *see also id.* at 17-39 (listing hundreds of IDR awards owed to Plaintiffs that Defendants either paid late or have yet to pay).  In addition, many other providers of emergency services are also being subjected to the same unfair business practices. *Id.* ¶ 24.  Defendants make low initial payments to providers like Plaintiffs in the hopes that they will be too busy to initiate IDR proceedings under the NSA or will miss one of the NSA's strict deadlines.  *Id.* ¶ 21.  Providers are thus forced to jump through the many hoops in the NSA to receive an award of fair compensation, which is burdensome and costly.  *Id.* ¶¶ 1, 21.  Though Defendants know that they are statutorily required to pay IDR awards within thirty days of each IDR determination, they have not invested in the compliance systems and personnel needed to meet their obligations under federal law because they know that they, their shareholders, and the health plans they serve profit from their non-compliance with the NSA's Timing of Payment

6

provision.  *Id.* ¶ 23.  The longer they delay or deny payment, the more they earn from the interest and/or investment income generated from fully insured plans, and the more competitive they are with respect to administering self-funded plans.  *Id.*

### C.  <u>Procedural Background</u>

Plaintiffs brought this action against Aetna in the Southern District of Texas on March 3, 2023.  ECF No. 1.  It was assigned to Judge Alfred H. Bennett.  Aetna moved to dismiss the case for lack of jurisdiction, improper venue, and failure to state a claim, ECF No. 12, and sought to stay discovery pending resolution of this motion, ECF No. 27.  Meanwhile, Plaintiffs moved to consolidate the case with a related action against Cigna.  ECF No. 17.

Judge Bennett granted the motion to consolidate.  ECF No. 42.  He then granted Aetna's motion to dismiss—as well as a motion to dismiss filed by Cigna in the consolidated case—for improper venue on March 28, 2024.  ECF No. 64.  The case was then transferred to the District of Connecticut, and all pending motions were denied as moot.  *Id.*

On April 29, 2024, Plaintiffs moved for leave to amend their complaint.  ECF No. 78.  I granted this motion, ECF No. 100, and Plaintiffs filed an amended complaint, ECF No. 101. On June 10, 2024, Plaintiffs moved again for leave to amend their complaint, which I granted.  ECF No. 106; ECF No. 108.  Plaintiffs filed a second amended complaint, which is the operative complaint for the purposes of these motions.  ECF No. 109.  The complaint sets forth three counts: (1) enforcement of IDR awards under the NSA; (2) enforcement of IDR awards concerning self-funded health plans and payment of plan benefits under § 502 of ERISA; and (3) violations of CUTPA.  *Id.* at 8-14.

7

Defendants filed the present motions to dismiss on July 19, 2024.  ECF No. 121; ECF No. 123.  Plaintiffs filed an opposition brief, ECF No. 131, and Defendants submitted replies, ECF No. 144; ECF No. 145.  Because these replies addressed a Connecticut Supreme Court opinion that had not been published at the time Plaintiffs submitted their opposition brief, I allowed Plaintiffs to file a sur-reply addressing the impact of this decision on the case at hand. ECF No. 136.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(1)

 "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A court does not have subject matter jurisdiction over a case or claim if the plaintiff lacks standing to bring it.  *In re U.S. Catholic Conference,* 885 F.2d 1020, 1023 (2d Cir. 1989).  Plaintiffs "must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).  "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Id*. at 561.  Thus, in deciding a motion to dismiss for lack of standing under Rule 12(b)(1), I "must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in

favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014).[3]

## B. **Rule 12(b)(6)**

To bring a case, a plaintiff must have "a cause of action under the applicable statute." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016). The plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When evaluating motions to dismiss for failure to state a claim under Rule 12(b)(6), courts must accept as true all of the complaint's factual allegations, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). But "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

---

[3] As I have noted in previous rulings, the Second Circuit has not always been clear about whether inferences should be drawn in the pleader's favor on a Rule 12(b)(1) motion. *See, e.g., Parmlee v. Office of Attorney General*, 2022 WL 1462247, at *2 n.2 (D. Conn. May 9, 2022) (citing Court of Appeals decisions instructing that a court should draw inferences favorable to the pleader and Court of Appeals decisions instructing that it should not do so). In this ruling, I take as true the allegations in Plaintiffs' complaint and draw all reasonable inferences in their favor.

## III.    DISCUSSION

Plaintiffs bring claims under the NSA, § 502(a)(1)(B) and (a)(3) of ERISA, and CUTPA. They seek "enforcement of all IDR awards not paid within thirty days"; compensatory damages, including pre- and post-judgment interest; punitive damages; "[e]quitable relief requiring Defendants to…pay[] all future IDR awards within thirty…days"; and attorney's fees and legal costs. *Id.* at 14-15. Aetna and Cigna move to dismiss the NSA, ERISA, and CUTPA claims under Rule 12(b)(6) and also seek to dismiss the ERISA claim for lack of standing under Rule 12(b)(1). For the reasons set forth below, I deny Defendants' motions except with respect to Plaintiffs' claim for equitable relief under ERISA § 502(a)(3).

### 1.    NSA

Defendants first argue that Plaintiffs' claim under the NSA fails because the statute does not provide a private cause of action to enforce IDR awards.[4] As explained below, I disagree.

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "A federal statute may create a private right of action either expressly or, more rarely, by implication." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014). "In determining whether a statute implies a cause of action, [courts] consider whether 'the text and structure of' the statute evince 'congressional intent to create new rights.'" *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1112 (2d Cir. 2024) (quoting *Sandoval*, 532 U.S. at 288-89). They must first "consider whether the statute

---

[4] To the extent that Cigna seeks to dismiss Plaintiffs' prayer for interest on untimely paid IDR awards, *see* ECF No. 124 at 11, I decline to entertain this argument at this stage. *See Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *2 (D. Conn. Apr. 25, 2025).

uses rights-creating language, meaning language that focuses on the individuals protected rather than the person regulated," and then must examine "whether the statute's methods of enforcement manifest an intent to create a private remedy, as opposed to empowering agencies to enforce their regulations." *Id.* (internal quotation marks and alterations omitted). "Generally, 'the express provision of one method of enforcing a substantive rule,' such as through an agency proceeding, 'suggests that Congress intended to preclude others,' like a private cause of action." *Id.* (quoting *Sandoval*, 532 U.S. at 290).

Here, Plaintiffs seek enforcement of their IDR awards under 42 U.S.C. § 300gg-112. This provision of the NSA contains strong, mandatory language, which Plaintiffs argue creates a cause of action. Specifically, the statute provides:

> In the case of a participant, beneficiary, or enrollee who is in a group health plan or group or individual health insurance coverage offered by a health insurance issuer and who receives air ambulance services from a nonparticipating provider (as defined in section 300gg-111(a)(3)(G) of this title) with respect to such plan or coverage, if such services would be covered if provided by a participating provider (as defined in such section) with respect to such plan or coverage--
>
> …
>
> (3) the group health plan or health insurance issuer, respectively, *shall*--
>
> > …
> >
> > (B) *pay a total plan or coverage payment*, in accordance with, if applicable, subsection (b)(6), *directly to such provider* furnishing such services to such participant, beneficiary, or enrollee that is, with application of any initial payment under subparagraph (A), equal to the amount by which the out-of-network rate (as defined in section 300gg-111(a)(3)(K) [to include IDR determinations]) for such services and year involved exceeds the cost-sharing amount imposed under the plan or coverage, respectively, for such services (as determined in accordance with paragraphs (1) and (2)).

42 U.S.C. § 300gg-112(a)(3)(B) (emphasis added).  It further provides that IDR awards "*shall be made directly to the nonparticipating provider not later than 30 days* after the date on which such determination is made."  *Id.* § 300gg-112(b)(6) (emphasis added) (the "Timing of Payment" provision").

> The statute explains that IDR determinations should have the following effects:
>
> A determination of a certified IDR entity under subparagraph (A)--
>
> (I) *shall be binding upon the parties involved*, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim; and
>
> (II) shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a) of Title 9.

*Id.* § 300gg-111(c)(5)(E)(i) (emphasis added); *see id.* § 300gg-112(b)(5)(D) (explaining that "[t]he provisions of section 300gg-111(c)(5)(E) of this title shall apply" to IDR determinations involving air ambulance services).  The statute referenced in § 300g-11(c)(5)(E)(i)(II) is § 10 of the Federal Arbitration Act ("FAA"), which allows district courts to:

> [M]ake an order vacating [an arbitration] award upon the application of any party to the arbitration—
>
> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators…;
>
> (3) where the arbitrators were guilty of misconduct…; or
>
> (4) where the arbitrators exceeded their powers….

9 U.S.C. § 10(a).

There is little question that the NSA uses "rights-creating language," *Murphy Med. Assocs., LLC*, 120 F.4th at 1112 (internal quotation marks omitted), with respect to air

ambulance providers.  Defendants suggest that the statute is meant to protect consumers from air ambulance providers rather than create new rights for such providers, *see* ECF No. 124 at 9, but providers' obligations to patients are addressed in a different part of the NSA.  *See id.* §§ 300gg–131 to 139; *see, e.g.*, *id.* § 300gg-135 (air ambulance service providers may not hold plan participants liable for amounts that exceed "the cost-sharing amount," *i.e.*, the negotiated or IDR-determined amount); *id.* § 300gg-137 (providing for dispute resolution between patients and providers).  The NSA provisions quoted above are plainly aimed at compensating providers for their services.[5]  The NSA does not, however, expressly create a private right of action to enforce these payment requirements.  Instead, it creates the IDR process.

That leads me to the question presented by the Defendants' motions: Does the NSA create a private remedy for untimely IDR award payments?  Defendants argue the statute "limit[s] judicial review of IDR awards to the four well known grounds for vacatur under the [FAA]," and that, "[a]bsent one of those four grounds, the NSA does not offer a path of any kind into court, let alone an implied right of action for remedies relating to the payment of IDR awards."  ECF No. 122 at 13-14.  They incorporate the following reasoning from *Health Care Services Corporation*:

> [A]lthough Congress borrowed from § 10 of the FAA, it notably did not
> incorporate the FAA provision that enables parties to confirm arbitration awards,
> which further indicates that Congress did not intend to create a private cause of

---

[5] Even *Guardian Flight LLC v. Health Care Services Corporation*—a recent decision in the Northern District of Texas cited extensively in Defendants' briefs—conceded that there were "compelling arguments that the NSA created a right" for air ambulance providers.  735 F. Supp. 3d 742, 749 (N.D. Tex. 2024).

action under the NSA. The FAA expressly provides parties with a procedural
mechanism to vacate, modify, and confirm arbitration awards in a federal court. 9
U.S.C. §§ 9–11. If Congress intended to create such a procedural mechanism
under the NSA, it simply could have incorporated one more section from the
FAA, yet Congress did not do so.

735 F. Supp. 3d 742, 750 (N.D. Tex. 2024).

I decline to adopt this approach, as it overlooks key differences between arbitration
awards under the FAA and IDR awards under the NSA, which explain Congress's choice to
incorporate only § 10 of the FAA into the latter statute.  Most significantly, while IDR awards
under the NSA are binding once they are issued—without further action by the parties or any
court—the same is not true of arbitration awards under the FAA, *i.e.*, arbitration awards rendered
under an arbitration agreement.  *See Key Inv. Servs., LLC v. Oliver*, 691 F. Supp. 3d 496, 502 (D.
Conn. 2023) ("[A]rbitration awards are not self-enforcing." (internal quotation marks omitted)).
Arbitration awards "must be given force and effect by being converted to judicial orders by
courts."  *Id.* (internal quotation marks omitted).  The FAA thus "provides a streamlined process"
for obtaining "a judicial decree confirming" arbitration awards.  *Trustees of New York City Dist.
Council of Carpenters Pension Fund v. Earth Constr. Corp.*, No. 19-CV-5411 (ALC), 2020 WL
614740, at *2 (S.D.N.Y. Feb. 10, 2020) (internal quotation marks omitted).  District courts do
more than simply enforce arbitration awards during these confirmation proceedings; they also
engage in judicial review.  Though this review is "narrowly limited" and "extremely deferential,"
*Jules v. Andre Balazs Properties*, No. 20 CIV. 10500 (LGS), 2023 WL 5935626, at *2 (S.D.N.Y.
Sept. 12, 2023) (internal quotation marks omitted), courts need not enforce the award if there is
not a "a barely colorable justification for the outcome reached"—or if one of the limited

exceptions in § 10(a) of the FAA apply, *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 103-04 (2d Cir. 2013) (internal quotation marks omitted).

IDR awards, on the other hand, are rendered in the absence of any arbitration agreement and immediately trigger the payment obligations set forth in § 300gg-112(a)(3)(B) and (b)(6). No judicial "confirmation" is required for them to become "binding." There is thus no reason for the NSA to reference § 9 of the FAA.

This context clarifies the NSA's proscription against judicial review of IDR determinations in § 300g-111(c)(5)(E)(i). Barring the limited exceptions in § 10(a) of the FAA, IDR awards are final. Courts cannot vacate or entertain collateral attacks on these awards—even those that would fall within the FAA's narrow scope of review.

Section 300gg-111(c)(5)(E)(i) does not mean, however, that courts cannot *enforce* these awards. To the contrary, the NSA's text and structure evinces an intent to allow for judicial enforcement. As noted already, the NSA contains strong, mandatory language regarding health plans' and insurers' payment obligations and the "binding" effect of IDR awards. As the Supreme Court has held in another context, such mandatory text "often reflects congressional intent to create both a right *and a remedy*" for the individuals to whom payment is due. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (internal quotation marks and citations omitted) (emphasis added). By placing the "determination…shall be binding on the parties" language in a clause immediately preceding the clause barring judicial review—and by locating the two provisions in a paragraph entitled "Effects of determination," 42 U.S.C. § 300g-111(c)(5)(E)(i)—Congress indicated that the judiciary would play a role in ensuring IDR awards

15

were "binding," and sought only to clarify that courts should not undermine the substance or finality of these awards.

Any other interpretation would render IDR awards meaningless except, as described below, in the rare instance in which an award was challenged <u>un</u>successfully. And "courts have recognized that a private right of action may be implied if there are no enforcement mechanisms or express remedies available, such that without an implied private cause of action, plaintiffs would have no remedy to the legislatively recognized harm." *Martinez v. Capital One, N.A.*, 863 F. Supp. 2d 256, 263 (S.D.N.Y. 2012), *aff'd and remanded sub nom. Cruz v. TD Bank, N.A.*, 742 F.3d 520 (2d Cir. 2013).[6]

Providing a private right of action only in cases that fall under the exceptions in § 10(a) of the FAA would also create strange asymmetries: in cases involving fraud, corruption, partiality, and other misconduct, courts could review and vacate IDR awards, or decline to vacate them, in which case they would have the same force as civil judgments. *See* 42 U.S.C. § 300g-

---

[6] The parties did not address 42 U.S.C. § 300gg-22 in their briefs. This provision provides that "each State may require that health insurance issuers…meet the requirements of this part and part D"—which includes 42 U.S.C. § 300gg-112—"with respect to such issuers." *Id.* § 300gg-22(a)(1). If the HHS Secretary determines "that a State has failed to substantially enforce a provision (or provisions) in this part or part D with respect to health insurance issuers in the State, the Secretary shall enforce such provision (or provisions)," including by imposing civil monetary penalties. *Id.* § 300gg-22(a)(2), (b)(2). Because the parties do not address it, I decline to consider whether this provision provides a "method of enforcing [the] substantive rule" in the NSA's Timing of Payment provision, *Sandoval*, 532 U.S. at 290, or otherwise bears on the availability of a private right of action to enforce this provision. For the purposes of my analysis above, however, I note that it is unlikely that any such enforcement scheme could police insurers' and health plans' compliance with each IDR determination. *See Harrison v. Envision Mgmt. Holding, Inc. Bd. of Directors*, 59 F.4th 1090, 1112 (10th Cir.), *cert. denied sub nom. Argent Tr. Co. v. Harrison*, 144 S. Ct. 280, 217 L. Ed. 2d 128 (2023) (noting that "it is unreasonable to assume that the [U.S. Department of Labor] is capable of policing every employer-sponsored benefit plan in the country" under ERISA's administrative enforcement scheme).

111(c)(5)(E)(i); 9 U.S.C. § 10(a).  But in all other cases, IDR determinations would be effectively unenforceable.  In other words, the awards would be enforceable *only if* they were challenged on one of the narrow grounds in § 10(a) of the FAA, *and then only if* the Court found that the challenge lacked merit.  An interpretation of a statute that leads to absurd results is an erroneous interpretation.  *See United States v. Granderson*, 511 U.S. 39, 47 n.5 (1994) (avoiding "plain meaning" interpretation that would "lead[] to an absurd result" (internal quotation marks omitted)); *In re Int'l Admin. Servs.*, 408 F.3d 689, 707-08 (11th Cir. 2005) (eschewing "strict construction" of bankruptcy code to avoid "absurd" results).

Defendants contend that "[o]ther aspects of the NSA's framework demonstrate that Congress did not intend to create an implied cause of action to enforce IDR awards through the courts."  ECF No. 122 at 14.  Specifically, they argue that "Congress vested [the Department of Health and Human Services ('HHS')] with extensive regulatory oversight to ensure compliance with the NSA's provisions," and that this evinces its intent to empower agencies—not the judiciary—to enforce the statute.  *Id.*; *see also* ECF No. 124 at 10.  But the statutory provisions that Defendants cite do not empower agencies to enforce individual IDR awards or to hold health plans and insurers accountable for untimely payments.  The first directs the HHS Secretary to establish a methodology for determining the "qualifying payment amount," as well as a process for auditing insurers' and health plans' "compliance with the requirement of applying a qualifying payment amount" in accordance with that methodology.  42 U.S.C. § 300gg-111(a)(2).  Nothing in § 300gg-111 suggests that these audits would evaluate health plans' and insurers' compliance with the NSA's Timing of Payment provision—or would apply to air

17

ambulances at all.[7]  And these audits need only be conducted on a "sample…from not more than

25 group health plans and health insurance issuers."  *Id.* § 300gg-111(a)(2)(A)(ii).  Though the

Secretary "may" conduct additional audits "if the Secretary has received any complaint or other

information" about a particular plan or insurer, he is not required to do so and these supplemental

audits would not address complaints about untimely IDR award payments.  *See id.*

      The second provision requires the Secretary to "establish a process to certify (including

to recertify) [IDR] entities."  *Id.* § 300gg-111(c)(4).  Certifications can be "revoked…if the entity

has a pattern or practice of noncompliance" with various statutory requirements, and various

stakeholders can "petition for a denial of a certification or a revocation of a certification…for

failure of meeting a requirement of this subsection."  *Id.*  This provision does not empower the

Secretary to enforce IDR awards or adjudicate payment disputes.  Nor does it create any

mechanisms by which providers or individuals could report noncompliant plans and insurers.

      In sum, I conclude that the NSA creates a private cause of action to enforce IDR awards.

---

[7] Section 300gg-112—the portion of the NSA that addresses air ambulances—incorporates parts of § 300gg-111, including its definition of the term "qualifying payment amount."  *See, e.g.*, 42 U.S.C. § 300gg-112(c)(2).  It does not, however, incorporate the audit provisions in § 300gg-111.  *See generally id.* § 300gg-112.  Further, § 300gg-112 does not require insurers to use qualifying payment amounts ("QPAs") when reimbursing out-of-network air ambulance providers; rather, *IDR entities* must consider QPAs when determining the appropriate award.  *See id.* § 300gg-112(b)(5)(C)(i).  Insurers' compliance with § 300gg-112 thus falls outside the scope of the audits authorized by § 300gg-111, as these audits are expressly limited to "group health plans and health insurance issuers[']…compliance with the requirement of applying a qualifying payment amount."  *See id.* § 300gg-111(a)(2)(A).  In other words, Defendants' argument that the existence of a provision for HHS oversight of insurers means that Congress did not intend to create a private remedy is incorrect, at least insofar as it concerns air ambulances; that provision does not apply to air ambulances.

### 2.   ERISA § 502(a)(1)(B)

Section 502(a)(1)(B) of ERISA provides for a civil cause of action by a "participant or beneficiary" to recover benefits due to him or to clarify or enforce his rights under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  Plaintiffs concede that they are not participants in the health plans at issue in this case but argue that they "have been assigned all of their patients' claims under ERISA," and thus "step into the shoes of, and are now considered, ERISA beneficiaries."  ECF No. 109 ¶ 32.

Defendants, on the other hand, contend that Plaintiffs do not have standing to bring this claim.  They raise arguments related to both constitutional standing and what they call "statutory standing."  These are distinct concepts, which Defendants at times appear to conflate; so I will begin by explaining them.

"Constitutional standing refers to the requirement that parties suing in federal court establish that a 'Case' or 'Controversy' exists within the meaning of Article III of the United States Constitution."  *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016).  The party invoking federal jurisdiction bears the burden of establishing the three elements of Article III standing: (1) "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted).

19

"Statutory standing," on the other hand, "in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute." *Id.* at 359 (internal quotation marks omitted). "This inquiry does not belong to the family of standing inquiries, because the absence of a valid cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." *Id.* (internal quotation marks, citations, and alterations omitted). Accordingly, "the 'statutory standing' appellation is 'misleading' and 'a misnomer,'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d at 359 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 128 n.4 (2014)), and arguments that fall under this umbrella implicate Rule 12(b)(6), not Rule 12(b)(1), *see Jeannot v. New York State*, No. 24-CV-05896 (HG), 2025 WL 80689, at *9 (E.D.N.Y. Jan. 13, 2025).

Though Defendants' arguments regarding Article III standing and "statutory standing" are interrelated, I will evaluate them separately so as not to confuse the concepts and applicable legal standards. As explained below, I find that Plaintiffs have constitutional standing to pursue their claim under § 502(a)(1)(B) and also that they have stated a plausible claim under this provision.

### a. Article III Standing

Defendants first argue that Plaintiffs do not have constitutional standing because they have not alleged an injury-in-fact. They contend that, as assignees of this claim, Plaintiffs can assert only injuries suffered by the patient-assignors. And, because the NSA ensures that patients do not have to pay IDR awards, the patient-assignors "have not suffered an injury, nor is

20

there an imminent threat of injury," from Defendants' alleged failure to pay IDR awards to Plaintiffs.  ECF No. 145 at 7.

I find this argument overlooks the basic principles of standing under Article III of the Constitution. Although the parties do not analyze the standing issue this way, I note again that constitutional standing requires (1) an injury-in-fact, (2) causation, and (3) redressability.  Here, taking all uncontroverted facts in the complaint as true and drawing all reasonable inferences in Plaintiffs' favor, the complaint plainly satisfies each of these elements.  Plaintiffs allege that the Defendants have failed to pay them amounts Defendants owe them.  *See, e.g.*, ECF No. 109 ¶ 22 ("Defendants next either unreasonably delay payment, partially pay what is owed, or never pay at all…. And when Defendants do pay, they do not include interest to account for the time value of the money that has been illegally withheld.").  There can be no doubt that this is an actual injury.  Plaintiffs' allegation also satisfies causation: they allege that *Defendants* failed to pay these awards and thereby caused their financial injury.  *Id.*  Finally, there is redressability: if Plaintiffs prevail on their cause of action, the Court will redress their injury by ordering Defendants to compensate Plaintiffs for the untimely paid IDR awards.  Though the parties do not analyze constitutional standing this way, the Court has its own obligation to determine whether it has subject-matter jurisdiction and thus whether the Plaintiffs allegations show that they have Article III standing in this case.  As I have just discussed, they plainly do.

Nonetheless, I will address the parties' arguments regarding the assignment issue since the parties have briefed the constitutional standing question in these terms.  Plaintiffs assert that the "denial of plan benefits, i.e. not paying [out-of-network] providers the amounts owed for services provided the ERISA beneficiary, is a concrete injury for Article III standing even when

patients are not billed for the medical services and stand no prospect of financial loss." ECF No. 131 at 25. They cite various cases in support of this argument including *North Cypress Medical Center Operating Co., Ltd. v. Cigna*, 781 F.3d 182 (5th Cir. 2015) (hereinafter, *North Cypress*).

In *North Cypress*, the Fifth Circuit—relying in part, on caselaw from the Second Circuit—explained:

> [A] patient suffers a concrete injury if money that she is allegedly owed contractually is not paid, regardless of whether she has directed the money be paid to a third party for her convenience. The patient in this circumstance is being denied use of funds rightfully hers. The fact that she has directed the funds elsewhere does not change that reality. From a different angle, failure to pay also denies the patient the benefit of her bargain. In purchasing her Cigna plan she agreed to pay for coverage at out-of-network providers like North Cypress, and Cigna is failing to uphold the bargain by paying for covered services.

781 F.3d at 193.

Defendants contend that these cases are distinguishable because they "are failure-to-sue cases, not inability-to-sue cases." ECF No. 145 at 8. That is, "the assignor legally *could* have sued the defendant directly in the future," and thus "had an 'actual or imminent' redressable injury," whereas, in this case, "the plan members have no legal right to seek payment of the IDR awards." *Id.*

But the standing determination in *North Cypress* was not based on a risk of future injury. The court explicitly noted that the patients "were never at imminent risk of out-of-pocket expenses," as the provider "did not bill patients for the amounts Cigna did not pay and never intended to do so." *Id.* at 192. The court's decision was instead grounded on a concrete injury that was alleged to have already occurred:

> The patients contracted for coverage at out-of-network providers under their insurance plans. The patients allegedly incurred charges for medical care, and

22

directed that the payments be made to the provider, *but the contracted-for payments have not been made. The patients have thus allegedly been deprived of what they contracted for*, a concrete injury.

*Id.* at 194 (emphasis added).

This point is reinforced by *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284 (6th Cir. 2018), which incorporated *North Cypress*'s reasoning. *Springer* was not, in the words of Defendants, a "failure-to-sue" case: the plan beneficiary himself brought an action against his health plan for its refusal to reimburse an air ambulance provider. The health plan argued that the patient had not suffered a concrete injury, and thus did not have standing, because the provider had not billed him for its services. The Sixth Circuit disagreed, explaining:

Springer suffered an injury within the meaning of Article III because he was denied health benefits he was allegedly owed under the plan. Like any private contract claim, *his injury does not depend on allegation of financial loss. His injury is that he was denied the benefit of his bargain.* Springer purchased a health plan that said it would "pay 100% for transportation—including ... air ambulance," but Total Care only paid about ten percent of his air ambulance expense.

900 F.3d at 287 (citations omitted) (emphasis added). Whether the air ambulance provider could or would, in the future, collect payment from the plaintiff had no bearing on the court's decision.

Here, Plaintiffs' ERISA claim is based on Defendants' "improper[] deni[al of]…payment and benefits" for out-of-network air ambulance services. ECF No. 109 ¶ 37. Unlike in *North Cypress* and *Springer*, coverage for these services is mandated by the NSA. But patient-assignors are still owed these benefits under the plans for which they contracted, and their denial remains a concrete injury.

For the reasons set forth above, Defendants' motions to dismiss for lack of standing under Rule 12(b)(1) are denied.

### b.   *Failure to State a Claim*

Defendants also argue that Plaintiffs do not have a valid cause of action under ERISA. They contend that Plaintiffs' assignments from Defendants' beneficiaries are not enough to create a cause of action because (1) Plaintiffs could not directly bill or sue the assignor-participants for their services, and (2) the assignor-participants could not bring suit for payment of the IDR awards under ERISA.

I disagree on both counts.  Though health care providers cannot bring a claim under § 502(a) "simply because they provided medical services to participants and beneficiaries," *Murphy Med. Assocs., LLC v. EmblemHealth, Inc.*, No. 3:22-CV-59 (CSH), 2024 WL 4388305, at *10 (D. Conn. Oct. 3, 2024), the Second Circuit has carved out a "narrow exception" for "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care," *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 178 (2d Cir. 2001).  Defendants have not identified—and I have not independently found—any Second Circuit caselaw that suggests that this exception applies only where provider-assignees could have directly billed or sued the patient-assignors.

Defendants also contend that the assignors "could not sue…for payment of the IDR awards…because any claimed right to payment stems from the NSA, *not* the plan participants' rights under ERISA."  ECF No. 122 at 17.  As Plaintiffs explain, however, the NSA is not "some separate or standalone obligation," nor does it "create an independent payment obligation untethered to ERISA or ERISA regulated health plans."  ECF No. 131 at 26.  Rather, the NSA amended ERISA, along with two other statutes, *Med-Trans Corp.*, 700 F. Supp. 3d at 1079, and created coverage and reimbursement obligations that apply to ERISA health plans, *see* 29 U.S.C.

§ 1185f.  Plan participants and beneficiaries can bring an action under ERISA to enforce these

rights.  *See id.* § 1132(a)(1)(B).[8]  Accordingly, Plaintiffs have stated a plausible ERISA claim.

### 3.    ERISA § 502(a)(3)

Plaintiffs also bring a claim under § 502(a)(3) of ERISA, which provides for civil actions

"by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any

provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable

relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the

terms of the plan."  29 U.S.C. § 1132(a)(3).  Specifically, they seek to "enforc[e] prospectively

Defendants' obligation to pay awards within thirty days, and all other appropriate equitable relief

to redress such violations, such as the filing of quarterly reports with the court certifying

compliance for an appropriate period."  ECF No. 109 ¶ 39.

Plaintiffs have constitutional standing to pursue this claim.  Though "the alleged

underpayment of benefits is insufficient by itself to confer…constitutional standing to pursue

injunctive relief,…[a] 'continuing violation' or a past injury accompanied by any 'continuing,

present adverse effects'" is.  *Hamer v. JP Morgan Chase Bank, N.A. Long Term Disability

Benefit Plan*, No. 3:23-CV-00832 (JCH), 2024 WL 5457448, at *4 (D. Conn. Mar. 28, 2024)

(quoting *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34, 49 (2d Cir. 2023)).  And here,

Plaintiffs allege that "[s]everal awards at issue in this proceeding with outstanding balances are

---

[8] Though Defendants have not raised this point, I note that, although Plaintiffs have not explicitly alleged that their
assignments from the assignor-participants were "exchanged for healthcare benefits," *Am. Psychiatric Ass'n*, 821
F.3d at 361-62, this is a reasonable inference from their complaint.  S*ee* ECF No. 109 ¶ 32 ("Plaintiffs have been
assigned all of *their patients*' claims under ERISA." (emphasis added)); *id.* ¶ 33 ("Many of the transports at issue
herein were provided to patients in rural or super rural (also known as frontier) parts of the country.").

more than 500 days past due," and that Defendants have "continue[d] their unfair practice of low payments followed by late, partial or no payment of IDR awards" since this suit was filed,.  ECF No. 109 ¶¶ 22, 25.  Plaintiffs thus have Article III standing to pursue injunctive relief under § 502(a)(3) of ERISA.

As a general matter, however, "equitable relief will not be granted where an adequate remedy at law exists."  *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 363 (2d Cir. 1974).  And as the Supreme Court has explained, § 502(a)(3) is a "catchall provision" that "offer[s] appropriate equitable relief for injuries caused by [ERISA] violations *that § 502 does not elsewhere adequately remedy*."  *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (internal quotation marks omitted) (emphasis added).  Thus, "where Congress elsewhere provided adequate relief for a beneficiary's injury there will likely be no need for further equitable relief" under § 502(a)(3).  *Id.* at 515.  Plaintiffs cannot "expand the nature of their claim by couching it in equitable terms to allow relief under § 502(a)(3)"; if "the gravamen of [the] action remains a claim for monetary compensation," they cannot bring a claim under § 502(a)(3).  *Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006).

Here, Plaintiffs' requested relief is, in essence, a claim for monetary compensation.  *See* ECF No. 109 at 15 (Plaintiffs' prayer for relief, which includes "Equitable relief requiring Defendants to comply with ERISA and the NSA by paying all future IDR awards within thirty ("30") days; and…[a]ny and all additional legal or equitable relief to which Plaintiffs may be entitled and this Court deems just and proper").  Though this relief is forward-looking, it "falls comfortably within the scope of § 502(a)(1)(B)."  *Frommert*, 433 F.3d at 270.  Accordingly, Plaintiffs' claim for equitable relief under § 502(a)(3) is dismissed.

### 4.     CUTPA

CUTPA prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  A plaintiff bringing a CUTPA claim must show that "(1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce; and (2) [it] has suffered an ascertainable loss of money or property as a result of the defendant's acts or practices."  *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217 (2008) (citations omitted).

To determine whether a defendant has engaged in an "unfair or deceptive act or practice" under CUTPA, courts must consider the following criteria:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, competitors or other businesspersons.

*Am. Car Rental, Inc. v. Comm'r of Consumer Prot.*, 273 Conn. 296, 305-06 (2005) (alterations omitted).  This is commonly referred to as the "cigarette rule."  *Id.* at 305.  A practice may violate CUTPA without meeting all three criteria—i.e., a practice "may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three…."  *Id.* at 306.  Under the first criterion, "a breach of public policy…may result from a violation of another statute."  *Petrolito v. Arrow Financial Services, LLC*, 221 F.R.D. 303, 308 (D. Conn. 2004) (citation and internal quotation marks omitted).

Here, Plaintiffs contend that Defendants have engaged in unfair settlement practices in violation of the Connecticut Unfair Insurance Practices Act ("CUIPA"). ECF No. 109 ¶ 44.[9] Specifically, they allege that Defendants "ma[ke] low initial payments that force providers to file IDR proceedings to obtain a fair payment, [do] not pay[] IDR awards within thirty days as required by federal law, [do] not includ[e] interest on late payments when made, and [do] not invest[] in the compliance programs, systems and personnel needed to assure timely payment of IDR awards." *Id.* ¶ 42. Defendants argue that this claim is preempted by the NSA and ERISA and that Plaintiffs have failed to plausibly allege that Defendants violated CUIPA.

### *a. Preemption by the NSA*

Defendants contend that Plaintiffs' CUTPA claim is preempted because it conflicts with the NSA's purpose and terms. As explained below, I disagree.

"Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are without effect." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103-04 (2d Cir. 2010) (internal quotation marks omitted). "The key to the preemption inquiry is the intent of Congress. Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." *Id.* at 104 (citations omitted). "Conflict preemption,

---

[9] In their complaint, Plaintiffs grounded their CUTPA claim on Defendants' alleged violations of the NSA, including its amendments to ERISA, as well. ECF No. 109 ¶ 43. But Plaintiffs have since conceded that, in light of the Connecticut Supreme Court's decision in *NEMS, PLLC v. Harvard Pilgrim Health Care of Connecticut, Inc.*, 350 Conn. 525 (2024), "merely proving a violation of the NSA does not establish an independent violation of CUTPA." ECF No. 150 at 4. I will thus evaluate their CUTPA claim only insofar as it is based on CUIPA.

one form of implied preemption, refers to situations where compliance with both state and federal law is a physical impossibility, or…where the state law at issue 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (internal quotation marks omitted).

When addressing federal preemption questions, courts "presume[] that Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), and "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted). "In light of this assumption, the party asserting that federal law preempts state law bears the burden of establishing preemption." *Marentette*, 886 F.3d at 117 (internal quotation marks omitted).

Here, Defendants contend that Plaintiffs' CUTPA claim is impliedly preempted because it would impose additional obligations that conflict with the NSA's statutory scheme. For example, they argue, "Plaintiffs would have the Court impose penalties based on an insurer's initial payment determination." ECF No. 122 at 23. But this is not a fair reading of Plaintiffs' complaint. Though Plaintiffs make various allegations regarding Defendants' initial payments and other conduct during the open-negotiation period, the relief they seek is limited to

Defendants' failure to timely pay IDR awards.  *See* ECF No. 109 at 14-15 (Plaintiffs' prayer for relief).[10]

Defendants further argue that imposing CUTPA penalties on Defendants for their untimely payment of IDR awards "would frustrate the NSA's purpose by imposing punitive fines where Congress saw fit not to do so."  *Id.* at 24.  They contend that "[n]othing in the NSA's text or legislative history suggests that an insurer is subject to penalties—state law or otherwise—if payment is not made within 30 days of an award's issuance."  *Id.* at 24.

I disagree.  Imposing state law penalties for Defendants' failure to timely pay IDR awards would not create any obstacles to the NSA's purposes and objectives, as untimely payments are already proscribed by the NSA.  And state penalties could help to ensure that parties comply with the NSA's payment obligations and refrain from engaging in unfair practices to circumvent these provisions.  In sum, the NSA does not preempt Plaintiffs' CUTPA claim.

### b.  *Preemption by ERISA*

ERISA provides for two types of preemption: "complete preemption" under § 502, and "express preemption" under § 514.  *See* 29 U.S.C. §§ 1132, 1144(a); *Trundle & Co. Pension*

---

[10] I agree, however, that any claims based on Defendants' initial payments would be preempted.  Congress has created a standardized payment scheme for out-of-network air ambulance services, and this scheme expressly authorizes health plans and insurers to make "an initial payment or notice of denial of payment."  42 U.S.C. § 300gg–112(a)(3)(A).  It has also crafted a comprehensive process for addressing inadequate initial payments.  Imposing liability on health plans and insurers for their conduct during the open negotiation period could frustrate the NSA's statutory scheme by allowing courts to weigh in on what constitutes a fair payment.  This is plainly inconsistent with Congress's decision to have such issues decided by a third-party IDR entity, without judicial review.  Such claims could also impose heightened obligations on health plans and insurers that vary across states, thereby undermining the NSA's standardized reimbursement scheme.

*Plan v. Emanuel*, No. 18 CIV. 07290 (ER), 2019 WL 4735380, at *3 (S.D.N.Y. Sept. 27, 2019).

"Complete preemption under Section 502 is jurisdictional, essentially allowing for removal of

state law claims into federal court by converting the plaintiff's state law claim to one to enforce

the ERISA plan under federal law." *Id.* (internal quotation marks and alterations omitted). "This

civil enforcement scheme completely preempts any state-law cause of action that duplicates,

supplements, or supplants an ERISA remedy." *McCulloch Orthopedic Surgical Servs., PLLC v.

Aetna, Inc.*, 857 F.3d 141, 145 (2d Cir. 2017).

Express preemption, on the other hand, is one of the "familiar forms of ordinary

defensive preemption," as explained in the previous section. *Wurtz v. Rawlings Co., LLC*, 761

F.3d 232, 238 (2d Cir. 2014) (internal quotation marks omitted). Section 514 of ERISA

expressly preempts "any and all State laws insofar as they may now or hereafter relate to any

employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a).

Defendants argue that Plaintiffs' CUTPA claim "relates to" ERISA plans—and thus are

expressly preempted under § 514—because "Plaintiffs are trying to use CUTPA to enforce

alleged rights under ERISA-governed plans," and "the plans are an essential part of Plaintiffs'

claim, without which the alleged liability would not exist." ECF No. 122 at 25. I disagree for

the reasons set forth below.

"A state law relates to an ERISA plan if it has [(1)] a connection with or [(2)] reference to

such a plan." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (internal quotation

marks and alterations omitted). "To determine whether a state law has an impermissible

connection with an ERISA plan, this Court considers ERISA's objectives as a guide to the scope

of the state law that Congress understood would survive." *Id.* (internal quotation marks omitted).

31

"[W]here a state law tends to control or supersede 'central ERISA functions,' such as benefit eligibility determination or amounts of benefits, the state law has typically been held preempted." *NEMS PLLC v. Harvard Pilgrim Health Care of Connecticut Inc*., 615 F. Supp. 3d 125, 141 (D. Conn. 2022) (quoting *Stevenson v. Bank of N.Y. Co*., 609 F.3d 56, 59 (2d Cir. 2010)). But "[t]he Second Circuit [has been]…reluctant to find a statute preempted by ERISA where the state law does not involve 'relationships among the core ERISA entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries.'" *Id.* (quoting *Stevenson*, 609 F.3d at 59). With respect to the second "relates to" prong, "[a] law refers to ERISA if it acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Id.* (internal quotation marks omitted).

For example, in *Rutledge*, the Supreme Court held that an Arkansas law "requir[ing] [pharmacy benefit managers ('PBMs')] to reimburse pharmacies for prescription drugs at a rate equal to or higher than the pharmacy's acquisition cost" did not have an impermissible connection with an ERISA plan. *Id.* at 83, 88. The Supreme Court explained that, although "PBMs may well pass those increased costs on to plans, meaning that ERISA plans may pay more for prescription-drug benefits in Arkansas than in, say, Arizona," cost uniformity was not an "object" of ERISA preemption and the effect of this law was not "so acute that it will effectively dictate plan choices." *Id.* at 88. Nor did the law "refer to" ERISA, as it "applies to PBMs whether or not they manage an ERISA plan." *Id.*

Courts must apply these same principles when determining whether ERISA preempts CUTPA claims. *See DiPietro-Kay Corp. v. Interactive Benefits Corp.*, 825 F. Supp. 459, 462 (D. Conn. 1993) ("As with common law misrepresentation claims, a CUTPA or CUIPA claim is

preempted only if it is related to a benefits plan within ERISA."). CUTPA claims that "arise[]
from the denial of benefits under an ERISA plan" are foreclosed. *Murphy Med. Assocs., LLC v.
Yale Univ.*, No. 3:22-CV-33 (KAD), 2023 WL 2631798, at \*9 (D. Conn. Mar. 24, 2023), *aff'd*,
120 F.4th 1107 (2d Cir. 2024). But CUTPA claims are not "automatically preempted," as
Defendants suggest. *Id.*

> For example, this court in *NEMS PLLC* held that CUTPA claims based on violations of
Connecticut's Surprise Billing Law and CUIPA were not preempted by ERISA. 615 F. Supp. 3d
at 140-42. The Surprise Billing Law imposes reimbursement obligations on health carriers for
out-of-network emergency services. Specifically, they must "reimburse out-of-network
emergency medical providers for services rendered at the greater of the following rates: (i) the
in-network fee; (ii) the usual, customary and reasonable rate as set forth in a database called the
FAIR Health database or; (iii) the Medicare rate." *Id.* The plaintiff alleged that the defendant
had failed to comply with this requirement and that this constituted an unfair trade practice in
violation of CUTPA. *Id.* at 131, 136-37. The plaintiff also alleged that the defendant's conduct
violated various sections of CUIPA, which it sought to enforce via CUTPA. *Id.* at 137.

> The court rejected the defendant's argument that the plaintiff's CUTPA claims "related
to" ERISA-governed plans and thus were preempted by the statute. It explained that such claims
"do not derive from the particular rights and obligations established by any benefit plan, nor do
they interfere with the relationships among core ERISA entities or attempt to control or
supersede their functions." *Id.* at 142 (internal quotation marks and alteration omitted). The
court also noted that "the Surprise Billing Law applies equally to all insurance plans, not only
plans governed by ERISA." *Id.* Though the Surprise Billing Law could "slightly increase[]

costs for ERISA plans,…statutes that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage are not preempted." *Id.*

The same reasoning applies here.  Plaintiffs' claim does not derive from any rights or obligations established by an ERISA plan, but instead is grounded in Defendants' independent duty to reimburse out-of-network air ambulance providers.  And Plaintiffs' claim applies equally to all insurance plans, not just those governed by ERISA.[11]  Though imposing state penalties for these alleged violations may increase costs or alter incentives for ERISA plans, Defendants have not explained how this would impact relationships among the core ERISA entities or affect central ERISA functions.

---

[11] Plaintiffs allege that that Defendants have "violate[d] public policy embodied by ERISA and the NSA, which require payment of IDR awards 'directly to the nonparticipating provider not later than 30 days after the date on which' an IDR determination is made."  ECF No. 109 ¶ 43 (citing 29 U.S.C. § 1185f(b)(6)).  Though the statute they cite—29 U.S.C. § 1185f(b)(6)—is a provision of the NSA that amended ERISA, Plaintiffs have also incorporated by reference their prior allegations regarding other provisions of the NSA that apply to health plans and insurers not covered by ERISA. *See, e.g.*, ECF No. 109 ¶ 17 (citing 42 U.S.C. § 300gg-112).  29 U.S.C. § 1185f is substantively identical to 42 U.S.C. § 300gg-112 and contains the same Timing of Payment provision.  It is thus reasonable to infer that Plaintiffs' CUTPA claim applies to health plans that are not governed by ERISA.

Further, though Aetna argues that its "health plans at issue are largely, if not all, self-funded plans administered by Aetna in its role as a third-party administrator," ECF No. 122 at 26 n.22, it is reasonable to infer from Plaintiffs' complaint that at least some of the plans at issue here were fully-insured. *See* ECF No. 109 ¶ 19 ("Each transport concerned a health plan that was administered by a Defendant and either fully insured by the Defendant or self-insured."); *id.* ¶ 23 ("Defendants know that the longer they delay or deny payment, the more they earn from the interest and/or investment income generated for their fully insured business.").  As Aetna notes in its reply, fully-insured plans can be governed by ERISA as well.  ECF No. 145 at 12 (citing *Gannon v. Aetna Life Ins. Co.*, 2007 WL 2844869, at *1 (S.D.N.Y. Sept. 28, 2007)).  But at this stage, I must draw all reasonable inferences in Plaintiffs' favor.  And it is reasonable to infer that their claim addresses at least some health plans that do not fall under ERISA's ambit.

### c. *Failure to Allege a CUIPA Violation*

Defendants next argue that Plaintiffs have failed to plausibly allege that Defendants violated CUIPA and thus have failed to state a claim under CUTPA. I disagree.

"In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA." *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 625 (2006). Plaintiffs allege that Defendants engaged in "unfair settlement practices in violation of Conn. Gen. Stat. § 38a-816(6)(F)." ECF No. 109 ¶ 44. This provision provides that "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" is an "unfair method[] of competition and unfair and deceptive act[] or practice[] in the business of insurance" if it is "[c]omitt[ed] or perform[ed] with such frequency as to indicate a general business practice." Conn. Gen. Stat. § 38a-816(6)(F).

Here, Plaintiffs have plausibly alleged that Defendants have not attempted in good faith to settle claims once liability has become reasonably clear. As explained already, Plaintiffs contend that Defendants "[do] not pay[] IDR awards within thirty days as required by federal law, [do] not includ[e] interest on late payments when made, and [do] not invest[] in the compliance programs, systems and personnel needed to assure timely payment of IDR awards." ECF No. 109 ¶ 42. Defendants' liability would be "reasonably clear" by the time the IDR determinations were made, as these determinations are "binding" and not subject to judicial review. And though Defendants contend that their failure to timely pay IDR awards is due to "notice-related issues," ECF No. 122 at 30, I must accept as true Plaintiffs' allegation that Defendants have acted deliberately to avoid complying with this law so as to increase profits.

35

*See* ECF No. 109 ¶ 23 ("Defendants know they are statutorily required to pay IDR awards within thirty days. However, they do not invest in the compliance systems and personnel needed to meet their obligations under federal law because they know that they, their shareholders, and the health plans they serve profit from lack of compliance and violation of the mandatory payment obligations.").  It is reasonable to infer from these allegations that Defendants' failure to pay these awards has not been in good faith.

Plaintiffs have also plausibly alleged that Defendants' failure to timely pay IDR awards is a general business practice.  They have identified hundreds of IDR awards that Defendants allegedly have not paid or paid late.  *See* ECF No. 109 at 17-39.  Each of the six Plaintiffs in this case alleges to have been a victim of these practices, and Plaintiffs allege that other emergency providers have been subjected to the same conduct.  *See id.*; *id.* ¶ 24.  Defendants' alleged failure to timely pay these awards is sufficiently frequent to constitute a general business practice. Plaintiffs have thus plausibly alleged that Defendants engaged in "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance" in violation of CUIPA, and so have stated a plausible CUTPA claim.  *See* Conn. Gen. Stat. § 38a-816(6)(F).

IV.    **CONCLUSION**

In sum, I grant Defendants' motions to dismiss in part and deny them in part.  Plaintiffs' claim for equitable relief under ERISA § 502(a)(3) is dismissed with prejudice.

IT IS SO ORDERED.

_____
/s/
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        May 14, 2025

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d), the undersigned certified that on this 16th day of May, 2025, he caused the foregoing document to be filed electronically with the Clerk of the Court for the United Stated Cout of Appeals for the Fifth Circuit by using the CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system via electronic mail.

*Raymond A. Cardozo*
Raymond A. Cardozo